# IN THE COURT OF CRIMINAL APPEALS

**RECEIVED**
JUN 13 2018
Clerk of the Courts
Rec'd By _____

## AT NASHVILLE, TENN.
### *APPEALED FROM*

**Davidson County Criminal Court Divison**

THE HONORABLE, STEVE DOZIER, JUDGE, PRESIDING

1 TR
1 TE
1 EX

**FILED**
JUN 13 2018
Clerk of the Appellate Courts
Rec'd By _____

CRIMINAL COURT CLERK

DEFENDANT IS INDIGENT

DEFENDANT IS AT WCCF

**CERTIFIED
Transcript
OF
CAUSE**

*Execution No.*

# STATE OF TENNESSEE

*vs.*

FREDERICK E. BRAXTON, #00332561

M2018-00443-CCA-R3-ECN

*Execution No.*  2007-A-732

**APPEALED
TO
OF
Next Term,
20___**

### COURT OF CRIMINAL APPEALS

**JUDGMENT LOWER COURT**

PETITION FOR WRIT OF ERROR CORAM NOBIS WAS DENIED AFTER A HEARING

## ATTORNEYS

J. WESLEY KING, #24137, ASSISTANT DISTRICT ATTORNEY GENERAL, WASHINGTON SQ., SUITE 500, 222-2ND AVENUE NORTH

NASHVILLE, TN 37201-1649   615-862-5500

### FOR STATE

GREGORY D. SMITH, #013420, 331 FRANKLIN STREET, SUITE 1, CLARKSVILLE, TN  37040        931-647-1299

### FOR DEFENDANT

*Filed* _____ *day of* June _____ 20 18

*Clerk Supreme Court*

*By* HEATHER BARR

*Deputy Clerk*

# I N D E X

| | P A G E |
|---|---|
| Indictment | 1-3 |
| Judgment | 4 |
| CCA Mandate | 5-40 |
| Petition for Writ of Error Coram Nobis | 41-80 |
| Order Setting Hearing | 81-82 |
| Motion to Dismiss Petition | 83-86 |
| Petition Under Advisement | 87 |
| Order Denying Petition | 88-96 |
| Notice of Appeal | 97-98 |
| Certificate of Appellate Record | 99-100 |

TRANSCRIPT OF EVIDENCE AND EXHIBITS FILED UNDER SEPARATE
COVERS



_January_ **TERM, 20 07, CRIMINAL COURT**

STATE OF TENNESSEE

VS.                                                            NO. 2007-A-732

**LEONARD CARDELL HARRIS, Ct. 1**
**FREDERICK EDWARD BRAXTON, Cts. 1-2**
   **a.k.a. Frederick Frank Brown**

PROSECUTOR: **Terrance Bradley**          CHARGE:  **Ct. 1 Att. Murder – 1st Degree**
                                                                **Ct. 2 Simple Poss.**

Witness(es) before the Grand Jury:

_John Henry_

The above witness(es) appeared; was/were duly
sworn by me, the foreperson, and gave
testimony before the Grand Jury in the above-
styled cause this 13th day of _March_,
20 07.

**FILED**

MAR 1 5 2007

DAVID C. TORRENCE
CLERK

BY_____ D.C.

☒ **A TRUE BILL**      ☐ **A NO TRUE BILL**

_____
Foreperson
Davidson County Grand Jury

---

SUBPOENA THE FOLLOWING WITNESSES FOR THE STATE OF TENNESSEE:
COMPLAINT NO(S): 2006-090683; 2006-090583; 2006-149647

Terrance Bradley, MPD #00006910
James Williams, 703 North 9th Street, Nashville, TN 37206
Kenneth Miller, 549 Clearview Road, Cottontown, TN 37048
Robert Henry, 1070 West Main Street, Hendersonville, TN 37075
Michael Windsor, MPD #00004884
Woodrow Ledford, MPD #00004925
Jason Smith, MPD #00008813
Michael Wilson, MPD #00008947



# INDICTMENT

## State of Tennessee, Davidson County

### COUNT 1

THE GRAND JURORS of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that:

**FREDERICK EDWARD BRAXTON a.k.a. FREDERICK FRANK BROWN and LEONARD CARDELL HARRIS**

on the **15th** day of **February, 2006**, in Davidson County, Tennessee and before the finding of this indictment, did attempt to **intentionally and with premeditation kill James Williams**, in violation of Tennessee Code Annotated §39-13-202, and against the peace and dignity of the State of Tennessee.

## COUNT 2

THE GRAND JURORS of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that:

**FREDERICK EDWARD BRAXTON a.k.a. FREDERICK FRANK BROWN**

on the 17th day of **March, 2006**, in Davidson County, Tennessee and before the finding of this indictment, knowingly did possess or casually exchange **marijuana**, a Schedule **VI** controlled substance, and the controlled substance was not obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of his professional practice, and without any authorization under the law, in violation of Tennessee Code Annotated §39-17-418, and against the peace and dignity of the State of Tennessee.

VICTOR S. JOHNSON III
DISTRICT ATTORNEY GENERAL
TWENTIETH JUDICIAL DISTRICT

**IN THE CRIMINAL/CIRCUIT COURT OF** _DAVIDSON_ **COUNTY, TENNESSEE**

Case Number: _2007-A-732_   Count # _1_   Attorney for the State: _Wesley King_

Judicial District: _20B_   Judicial Division: _I_   Counsel for Defendant: _Lee Sprouse_

State of Tennessee
vs.

☐ Retained   ☒ Appointed   ☐ Public Defender
☐ Counsel Waived   ☐ Pro Se

Defendant: _Frederick Braxton_   Alias: _____

Date of Birth: _1/8/81_   Sex: _M_   Race: _B_   SSN: ~~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~~

Indictment Filing Date: _INFORMATION_   TDOC # _____ State Control # _____

State ID # _____ County Offender ID # _____

## JUDGMENT

☒ Original   ☐ Amended   ☐ Corrected

Comes the District Attorney General for the State and the defendant with counsel of record for entry of judgment.

On the _15th_ day of _October_ , _2008_ , the defendant:

| | |
|---|---|
| ☐ Pled Guilty   ☐ Dismissed/Nolle Prosequi | Indictment: Class (circle one) 1st (A) B C D E   ☒ Felony ☐ Misdemeanor |
| ☐ Nolo Contendere ☐ Retired/Unapprehended Defendant | Offense: _Attempted First Degree Murder_ |
| ☐ Guilty Plea – Pursuant to 40-35-313 | Amended Charge: _____ |
| | Offense Date: _2/15/06_   County: _DAVIDSON_ |
| Is found:   ☒ Guilty   ☐ Not Guilty | Conviction Offense: _Attempted Second Degree Murder_ |
| ☒ Jury Verdict ☐ Not Guilty by Reason of Insanity | Is this conviction offense methamphetamine related? ☐ Yes ☒ No |
| ☐ Bench Trial | TCA #: _39-12-101_   Sentence Imposed Date: _11/24/08_ |
| | Conviction: Class (circle one) 1st A (B) C D E   ☒ Felony ☐ Misdemeanor |

After considering the evidence, the entire record, & all factors in T.C.A. Title 40 Chapter 35, all of which are incorporated by reference herein, the Court's findings & rulings are:

| Sentence Reform Act of 1989 | | Concurrent with: | Pretrial Jail Credit Period(s): |
|---|---|---|---|
| Offender Status (Check One) | Release Eligibility (Check One) | | From _2.25.06_ to _2.25.06_ |
| ☐ Mitigated | ☐ Mitigated 20%   ☐ Multiple Rapist 100% | | From _10.15.08_ to _Date_ |
| ☐ Standard | ☐ Mitigated 30%   ☐ Child Rapist 100% | | From _____ to _____ |
| ☒ Multiple | ☐ Standard 30%   ☐ Repeat Violent 100% | Consecutive to: | From _____ to _____ |
| ☐ Persistent | ☒ Multiple 35%   ☐ Child Predator 100% | | |
| ☐ Career | ☐ Persistent 45% | | |
| ☐ Repeat Violent | ☐ Career 60%   ☐ 1st Degree Murder | | |
| | ☐ Violent 100%   ☐ Drug Free Zone | | |
| |   ☐ Gang Related | | |

Sentenced To: ☒ TDOC   ☐ County Jail   ☐ Workhouse

Sentence Length: _19_ Years _____ Months _____ Days _____ Hours _____ Weekends   ☐ Life   ☐ Life w/out Parole ☐ Death

Mandatory Minimum Sentence Length: _____ 39-17-417, 39-13-513, 39-13-514 in Drug Free Zone or _____ 55-10-401 DUI 4th Offense
or _____ 39-17-1324 Possession/Employment of Firearm

Period of incarceration to be served prior to release on probation: _____ Months _____ Days _____ Hours _____ Weekends

Minimum service prior to eligibility for work release, furlough, trusty status and rehabilitative programs: _____% (Misdemeanor Only)

Alternative Sentence: ☐ Probation ☐ Diversion ☐ Drug Court ☐ Community Based Alternative - Specify _____

_____ Years _____ Months _____ Days   Effective: _____

| Court Ordered Fees and Fines: | Restitution: Victim Name _____ |
|---|---|
| $ _____ Criminal Injuries Compensation Fund | Address _____ |
| $ _____ Sex Offender Tax | |
| $ _____ Court Costs   Cost to be Paid by | Total Amount $ _____   Per Month $ _____ |
| $ _____ Fine Assessed   ☐ Defendant ☐ State | |
| $ _____ Other: _____ | ☐ Unpaid Community Service: _____ Hours _____ Days _____ Weeks _____ Months |

☒ The Defendant having been found guilty is rendered infamous and ordered to provide a biological specimen for the purpose of DNA analysis.
☐ Pursuant to 39-13-521 the defendant is ordered to provide a biological specimen for the purpose of HIV testing.
☐ Pursuant to 39-13-524 the defendant is sentenced to community supervision for life following sentence expiration.

Special Conditions

| | | |
|---|---|---|
| _Hon. Steve R. Dozier_ | _Steve R. Do_____ | _11/24/08_ |
| Judge's Name | Judge's Signature | Date of Entry of Judgment |
| _____ | | |
| Attorney for State/Signature (optional) | Defendant's Attorney/Signature (optional) | |

CR-3419 (Rev. 1/08)   White – Criminal Court Clerk   Canary – TN Dept. of Correction/SMS   Pink – AOC   Goldenrod – Jail   RDA 1167

**MANDATE**

**STATE OF TENNESSEE**

---

*To the Honorable Judge of the Davidson County Criminal Court*

*Whereas, in our **Court of Criminal Appeals, Middle Division** at Nashville, it was adjudged and ordered in the cause of **State of Tennessee vs. Leonard C. Harris & Frederick Braxton** appealed to our said Court that the same be remanded thereto for further proceedings and final determination therein.*

*These are, therefore, to require you, the Davidson County Criminal Court as aforesaid, that you proceed with the execution of this Judgment of our said **Court of Criminal Appeals** by such further proceedings in your Court as shall effectuate the objects of this order to remand, and attain the ends of justice.*

*Witness, Michael W. Catalano, Clerk of said Court at office in Nashville.*

*Michael W. Catalano, Clerk*

*By* _Vicki L Smith_ *, Deputy Clerk*

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs June 22, 2010

## STATE OF TENNESSEE v. FREDERICK EDWARD BRAXTON AND LEONARD CARDELL HARRIS

### Direct Appeal from the Criminal Court for Davidson County
No. 2007-A-732     Steve R. Dozier, Judge

No. M2009-01735-CCA-R3-CD

| |
|---|
| F I L E D |
| AUG 2 5 2011 |
| Clerk of the Courts |

## JUDGMENT

Came the Appellants, Frederick Edward Braxton and Leonard Cardell Harris, by and through counsel, and also came the Attorney General on behalf of the State, and this case was heard on the record on appeal from the Criminal Court of Davidson County; and upon consideration thereof, this Court is of the opinion that there is no reversible error in the judgment of the trial court.

It is, therefore, ordered and adjudged by this Court that the judgment of the trial court is affirmed, and the case is remanded to the Criminal Court of Davidson County for execution of the judgment of that court and for collection of costs accrued below.

Because it appears to this Court that Appellants, Frederick Edward Braxton and Leonard Cardell Harris, are indigent, costs of this appeal will be paid by the State of Tennessee.

Thomas T. Woodall, Judge
Jerry L. Smith, Judge
J. C. McLin, Judge

I, Michael W. Catalano, Clerk, hereby certify that this is a true and exact copy of the original
Judgment
filed in the cause.
This 20th day of January 20 12
CLERK OF COURT
By

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 22, 2010

## STATE OF TENNESSEE v. FREDERICK EDWARD BRAXTON
## AND LEONARD CARDELL HARRIS

### Direct Appeal from the Criminal Court for Davidson County
### No. 2007-A-732     Steve R. Dozier, Judge

FILED

AUG 26 2011

Clerk of the Courts

### No. M2009-01735-CCA-R3-CD

The Defendants, Frederick Edward Braxton and Leonard Cardell Harris, were indicted for attempted premeditated first degree murder. Additionally, Defendant Braxton was charged with possession of marijuana, which was severed as unrelated. Following a jury trial, Defendants were convicted of attempted second degree murder. Defendant Braxton was sentenced to serve nineteen years in confinement as a Range II offender, and Defendant Harris was sentenced to serve eleven years in confinement as a Range I offender. On appeal, both Defendants argue that (1) the evidence was insufficient to support the convictions, and that the trial court erred in denying their motion for judgments of acquittal; (2) the trial court erred in precluding Defendants from questioning the victim about being previously shot in a home burglary and about the victim's prior arrest sixteen months before the shooting; (3) their sentences are excessive; and (4) trial counsel were ineffective for failing to request a jury instruction on the lesser-included offense of reckless endangerment. Defendant Braxton argues that the trial court erred in allowing the jail custodian of records to testify in rebuttal concerning Defendant Braxton's period of confinement in the Davidson County jail;(b) trial counsel was ineffective for (i) failing to object to the sentence or request a continuance when the State did not provide proper notice of intent to seek enhanced punishment or provide certified copies of the convictions; (ii) failing to amend the original notice of alibi, filed by previous counsel, to include an additional witness; (iii) failing to investigate possible defenses and alibi witnesses; (i.v.) failure to adequately meet with Defendant Braxton and prepare for trial. Defendant Harris argues that trial counsel was ineffective for asking the victim about a prior altercation with Defendant Harris which opened the door to the victim's testimony about an earlier attempt by Defendant Harris to harm or kill the victim. After careful review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and J.C. MCLIN, JJ., joined.

George J. Duzane and Dominic J. Leonardo, Nashville, Tennessee (on appeal), and Lee Sprouse and Ashley Preston, Nashville, Tennessee (at trial), for the appellant, Frederick Braxton.

William E. Griffith, Nashville, Tennessee (at trial and on appeal), and Karl Pulley, Nashville, Tennessee (at trial), for the appellant, Leonard C. Harris.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. (Torry) Johnson, III, District Attorney General; J. Wesley King, Assistant District Attorney General; and Pamela Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### State's Proof

On February 15, 2006, the victim, James Williams, was working at East Nashville Auto Sales located at 1413 Dickerson Pike. On that day, he noticed a car traveling down the street with "one of the defendants' brother in it." The victim did not think anything about it and continued "what [he] was doing at the time." He left work around 5:00 p.m. and drove toward downtown Nashville on Dickerson Pike, a four-lane road, to pick up his girlfriend. As he was driving in the left lane, the victim noticed "a green early nineties model - - uh - - Buick Century get behind [him] that [he] had seen before that [he] saw Mr. Harris in, maybe three weeks before the shooting." The victim testified that he closed his sunroof "thinking that if [he] shut the sun roof the car would be dark and they wouldn't know who was in it, that they wouldn't open no fire on the car." He then moved into the right lane of Dickerson Pike in an attempt to get to the interstate and lose the other vehicle. The victim testified that when he stopped in traffic, the green car pulled up beside him with "two men hanging out the car shooting." He recognized the two men as Defendant Braxton and Defendant Harris whom he had known since the early 1990's, and their relationship was one of "bad blood." Although there were four people in the vehicle, the victim could not identify the other two. He said that Defendant Harris was in the front and Defendant Braxton was in the back. Both men were on the passenger's side of the car.

Upon realizing that he had been shot, the victim played dead and after the Defendants left, he drove to the AM/PM Market on North First Street and asked a lady there to call 9-1-1. He testified that he had been carrying a .40 caliber handgun at the time of the shooting

-2-

that he tossed in a trash can before entering the market. The victim was then transported by ambulance to Vanderbilt Medical Center where he was immediately taken into surgery. The victim testified that one of the bullets struck him in the upper arm. He said:

It went through the back and came out there. They had to put a metal plate right here . . . straight through in and out right here. It went through my - - one bullet went through my hand and lodged in my wrist, one in my finger and one in my mouth. And, it knocked my teeth out.

The victim testified that he had surgery on his finger because it was "hanging off," and the bullet that entered his face is still lodged under his nose. He said that he lost six teeth, and there were sixteen bullet holes in his car as a result of the shooting.

The victim testified that he received a visit from Detective Bradley at the hospital shortly after coming out of surgery, and he told Detective Bradley that he did not want to talk about what happened. The victim said that he intended to handle the situation himself but changed his mind after speaking with his mother who told him to think of his family and the pain that he would cause them by taking matters into his own hands. The victim testified that he spoke with Detective Bradley a second time and told him that Defendants Braxton and Harris shot him. Detective Bradley later returned to the hospital with photographic line-ups, and the victim identified each Defendant. The victim admitted that he had previously been convicted of several criminal offenses. He further admitted that because he was a convicted felon, he broke the law by possessing the 40-caliber handgun at the time of the shooting.

The victim testified that after one particular court appearance on August 18, 2006, he saw Defendant Harris outside the courthouse. He made eye contact with Defendant Harris who said, "I'm gonna get you boy. So, be ready." He said that Defendant Harris then walked down the drive talking to his family and making gun-like gestures.

On an occasion prior to the shooting which is the subject of this case, the victim testified that in October of 2005, he arrived home around 1:30 or 2:00 a.m., and as he was walking through the breezeway to his residence, Defendant Harris and another individual opened fire on him. One of the bullets struck him in the foot. The victim testified that he shot at a third man who ran from the side of the building. He then hid under a neighbor's Jeep until Defendant Harris and the other men left. The victim testified that his sister called police, and when they arrived, he told them that everything was fine and that he would "handle it." He also told police that he did not know who shot at him. He said that he did not want police searching his house because he had two firearms on his person, and there

-3-

were additional assault rifles in his home. The victim testified that he had driven by Defendant Harris' beauty shop prior to the incident.

Kenneth Miller testified that he left work on February 15, 2006, and dropped a passenger off at Dunlap and Kyle Tire on Dickerson Road. As he was sitting at a traffic light, he heard gunshots nearby. Mr. Miller testified that he "located two cars in [his] side mirror going in the opposite direction. The one car pulled up next to the other car and - uh - they started firing again." He further testified:

> Uh - - when they fired again, I was watching in - - in my side mirror. Uh - - and, uh - - I saw - - uh - - either a black sleeve, or a black arm, holding a black semi-automatic. I personally own a Tarurus (phonetic) [sic] nine [millimeter]. And, it had the same style and size as that. And, I could - - I watched the hammer slide, ejecting the shells, and in the blink of an [eye], there was just pieces of that car were just exploding.

Mr. Miller stated that he saw the arm protruding out of the passenger's side of the car. He then drove a short distance and called police. He was assured that officers were on the scene, and he drove back and talked to an officer there. Mr. Miller testified that during the shooting it sounded "like emptying a clip and reloading a clip and emptying it again." He said that when the shooting "started, it started." Mr. Miller did not know the model of the car involved in the shooting. He said that it was a "sedan-type" vehicle.

Detective Michael Wilson of the Metropolitan-Nashville Police Department testified that he was working as a patrolman assigned to the East Precinct Crime Suppression Unit on February 15, 2006. He and Officer Jason Smith were standing on Joseph Avenue and Evanston late that afternoon and heard multiple gunshots. It sounded as though two different weapons were fired, and he could tell that the shots came from the Dickerson Road area. Detective Wilson and Officer Smith got into their cars and drove south on Dickerson Road to Cleveland Street. Detective Wilson testified that he pulled into the parking lot of the AM/PM Market and saw a small car parked in front of the gas pumps with blood inside it and twelve to fifteen bullet holes in the car on the driver's side. He walked inside the market and saw the victim, who was bleeding. One of the bullets had knocked out the victim's front teeth. Detective Wilson was unable to get much information from the victim before he was taken away by ambulance due to the trauma to his mouth.

Belba Wilson, the victim's mother, testified that she went to Vanderbilt Medical Center on February 15 or 16, 2006, to see the victim. She did not remember if the victim said who shot him, but he was talking about retaliation. Ms. Wilson told him to think of his kids and not take matters into his own hands.

-4-

Officer Woodrow Ledford testified that he responded to the shooting on Dickerson Road. He drove to the AM/PM Market and was then instructed to move further up Dickerson Road around Dunlap and Kyle Tire to look for evidence. The area had businesses along the entire street, and there were several parking lots. Because he was there around 5:00 p.m., the area was "fairly congested" with traffic. Officer Ledford testified that the area had two northbound and two southbound lanes, was two to three miles from downtown Nashville, and was heavily populated. He said that there was not an actual entrance ramp to the interstate from Dickerson Road, but it could be accessed from Spring Street.

Officer Ledford testified that when he pulled into the parking lot of Dunlap and Kyle Tire, a gentleman handed him "12 or so" spent shell casings that he had picked up. There was also a mirror from a vehicle. Officer Ledford also picked up five or six shell casings himself. He believed some of the casings were 40-caliber and some were smaller and appeared to be nine-millimeter. Officer Ledford gave the shell casings to another officer.

Officer Tommy Simpkins of the Metropolitan-Nashville Police Department, Identification Section, testified that he was dispatched to the AM/PM Market on February 15, 2006, and viewed a black, four-door Toyota Corolla. There were several bullet strikes in the vehicle, and he saw some projectile and projectile pieces. Officer Simpkins testified that there were no shell casings inside the Corolla. The windows were up and for the most part remained intact. There were holes on the front driver's door window and the rear driver's side window, and a bullet was found in the door frame of the driver's side. Officer Simpkins collected the victim's clothing, and a "slug" was retrieved from the trunk. He also found a tooth from the victim on the ground outside of the car. Officer Simpkins testified that he was given twelve spent shell casings by Officer Ledford. Seven of the casings were forty-caliber and five were nine-millimeter.

Detective Terrence Bradley testified that paramedics were treating the victim when he arrived at the AM/PM Market, and he followed the ambulance to the hospital. He spoke briefly with the victim who gave him a description of what happened. Detective Bradley testified that the victim gave him the names of Defendant Braxton and Defendant Harris. He said that the victim was in a lot of pain and did not want to talk any more. Detective Bradley then put together a photographic line-up and showed it to the victim at the hospital. The victim identified Defendant Braxton, but could not write because his hands were immobilized. At that time, Detective Bradley had not located anything on Defendant Harris. He later found Defendant Harris in the system and put together another line-up. The victim identified Defendant Harris. Detective Bradley then obtained warrants on Defendants Harris and Braxton.

-5-

On cross-examination, Detective Bradley testified that he did not recall asking the victim who shot him while he and the victim were at the market. He said that he stopped talking to the victim at the hospital because the victim became uncomfortable. He did not remember the victim saying that he wanted to take care of things himself, and he probably saw the victim three times at the hospital.

### Defendant Harris' Proof

Willie Sweat, Defendant Harris' step-son, testified that he was living with his mother and Defendant on February 15, 2006. He said that he arrived home from school around 3:30 p.m. and saw Defendant Harris in the restroom vomiting. Mr. Sweat then walked into his room and shut the door. He said that Defendant was at the house all night. Mr. Sweat testified that he could remember the date because it was the day after Valentine's Day, and they had all gone to Chili's to eat with a large group of people.

On cross-examination, Mr. Sweat testified that Defendant Harris was wearing a sleeveless t-shirt and underwear at the time. He said that his mother arrived home around 4:00 or 5:00 p.m. Mr. Sweat testified that he ate supper in his room, but saw Defendant Harris get some soup. He had no idea what time it was. Mr. Sweat admitted that he did not testify on Defendant Harris' behalf at the preliminary hearing. He further admitted that he had never told police or anyone at the district attorney's office that Defendant Harris was at home at the time of the shooting.

Pamela Sweat Harris testified that she was working on February 15, 2006, and arrived home by 4:30 p.m. She said that Defendant Harris walked out of the kitchen complaining that his stomach was hurting, and he told her that he had been vomiting. Ms. Harris testified that Defendant Harris took some medication and walked upstairs. She said that he was at home all night. Ms. Harris testified that she remembered the date because they had gone to Chili's on Valentine's Day with a large group of people.

On cross-examination, Ms. Harris testified that Defendant Harris was wearing a long t-shirt with short sleeves and jeans when she got home. She said that she did not know when Defendant Harris was arrested, and she did not know when the preliminary hearing was held. She also did not help him obtain legal counsel. Ms. Harris testified that she did not speak with Defendant Harris' attorney before the preliminary hearing; however, she thought that she told him at some point that Defendant Harris was at home with her at the time of the shooting.

### Defendant Braxton's Proof

-6-

Derrica Christman testified that she was living in the Parkway Terrace Apartments in February of 2006. She met Defendant Braxton in the summer of 2005, and he frequently hung around the apartment complex. Ms. Christman testified that she remembered February 15, 2006, because it was the day after Valentine's Day, and her daughter had attended a dance at Stratford High School. Her daughter only attended Stratford for one year. Ms. Christman testified that her daughter was going to ask Defendant Braxton for a ride to the dance, but Ms. Christman's brother took her instead. She said that the following day, February 15, Defendant Braxton asked how the dance went.

Ms. Christman testified that she saw Defendant Braxton and several others shooting dice near her back porch "no later than" 5:15 on February 15, 2006. She was certain of the time because her children usually arrived home from daycare between 5:15 and 6:00 p.m., and she had to go out and get them off the bus.

On cross-examination, Ms. Christman testified that four or five people usually played dice at her back porch, and Defendant Braxton was frequently there. She said that she and Defendant Braxton had a conversation about her daughter's dance on February 15, 2006, and she saw him on February 13 and 14, but not February 11 and 12. Ms. Christman testified that she also saw Defendant Braxton on February 5 and 6, 2006, and she remembered seeing him in the area around her home on February 5. Ms. Christman said that she did not learn of the shooting until April of 2006 when she was trying to find out why Defendant Braxton was in jail. At the time, she did not tell police or anyone at the district attorney general's office that they had the wrong person. She said that she came forward in October of 2006 after speaking with Defendant Braxton. Ms. Christman acknowledged that her apartment was located near the 700 to 800 block of Dickerson Road.

### State's Rebuttal Proof

On rebuttal, Derrica Christman was recalled as a witness. She testified that if February 6, 2006, was a weekday, she saw Defendant Braxton after 5:00 p.m. She also saw him on February 13, 2006, between 5:00 and 5:15 walking from the building next door to hers. He was wearing the same jacket that she saw him wearing on February 15, 2006. On cross-examination, Ms. Christman said that she last saw Defendant Braxton eight days before February 13, 2006, and she was not sure that she saw him on February 6, 2006. She was certain that she saw him on February 13, 2006.

Wayne Miller, Records Technician for the Davidson County Sheriff's Office, testified that Defendant Braxton was in the custody of Sheriff's Office during February of 2006. He entered the facility at 2:12 p.m. on February 6, 2006, and he left at 4:27 p.m. on February 13, 2006.

-7-

Alfred Gray, an investigator for the district attorney general's office, testified that he spoke with Ms. Christman concerning Defendant Braxton's case. Ms. Christman told him that she remembered Defendant Braxton being outside of her home on the night of the shooting. She remembered the incident because it happened the day after Valentine's Day, and Defendant Braxton had been released from jail the day before Valentine's Day. Ms. Christman did not mention anything about her daughter's dance. Investigator Gray indicated that Ms. Christman's residence at Parkway Terrace was located a little less than two miles from the intersection of Grace and Dickerson Road where the shooting took place.

## Analysis

### I. Sufficiency of the Evidence

Both Defendants challenge the sufficiency of the evidence to support their convictions for second degree murder because they assert that the convicting evidence does not show that they "knowingly" attempted to kill the victim. They also argue that the trial court erred by refusing to grant their motions for judgment of acquittal because the victim's testimony contained "inaccuracies."

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

As for the trial court's denial of Defendants' motions for judgment of acquittal, both Defendants chose to present evidence in their defense, and therefore have waived the right to specifically appeal the denial of their motions for judgement of acquittal. *Finch v. State*,

-8-

226 S.W.3d 307, 317 (Tenn. 2007); *State v. Mathis*, 590 S.W.2d 449, 453 (Tenn. 1979). In any event, this Court has noted that, "[i]n dealing with a motion for judgment of acquittal, unlike a motion for new trial, the trial judge is concerned only with the legal sufficiency of the evidence and not with the weight of the evidence." *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). The standard for reviewing the denial or grant of a motion for judgment of acquittal is analogous to the standard employed when reviewing the sufficiency of the convicting evidence after a conviction has been imposed. *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995). Thus, we will address Defendants' assertions that the evidence adduced at trial was insufficient to support the convictions.

Second degree murder is defined as "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1). It is also a "result-of-conduct offense," and "[t]he statute focuses purely on the result and punishes an actor who knowingly causes another's death." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). Thus, as pertinent here, a person acts "knowingly" with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id.* § 39-13-302(b). A person commits criminal attempt when that person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id.* § 39-12-101(a)(3). For conduct to be a "substantial step," a person's "entire course of action" must be "corroborative of the intent to commit the offense ." *Id.* § 39-12-101(b). "Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence. *State v. Inlow*, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000); *see also State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993).

Viewing the evidence in a light most favorable to the State, the proof shows that Defendants Harris and Braxton knowingly shot into the victim's car numerous times with the intent of killing him. The victim testified that he left work around 5:00 p.m. on February 15, 2006, and noticed "a green early nineties model - - uh - - Buick Century get behind [him] that [he] had seen before that [he] saw Mr. Harris in, maybe three weeks before the shooting." The victim moved into the right lane of Dickerson Pike in an attempt to get onto the interstate and avoid the other vehicle; however, when he stopped his car in traffic, the green car pulled up beside him with Defendant Braxton and Defendant Harris hanging out of the car shooting from the passenger's side. Bullets penetrated the victim's vehicle and struck him in the left upper arm, left lower arm, right hand, finger, and face. The bullet that struck the victim in the face knocked out six of his teeth and remains lodged under his nose. There were sixteen bullet holes in the victim's car as a result of the shooting. The victim spoke with Detective

-9-

Bradley and told him that Defendants Harris and Braxton shot him. He also identified them from a photographic line-up.

The victim's testimony was corroborated by Kenneth Miller who testified that he was sitting at a traffic light on Dickerson Road on February 15, 2006, and heard nearby gunshots. He looked into his side mirror and saw two cars pulled up next to each other. Mr. Miller testified that he saw a black sleeve or arm protruding out of the passenger's side of one of the cars holding a black semi-automatic handgun. He saw the weapon fired into the other vehicle. He said, "And I could - - I watched the hammer slide, ejecting the shells, and in the blink of an [eye], there was just pieces of that car were just exploding." Mr. Miller further testified that during the shooting it sounded "like emptying a clip and reloading a clip and emptying it again."

Based on our review, we find that a rational trier of fact could conclude beyond a reasonable doubt that Defendants Harris and Braxton knowingly attempted to kill the victim. Moreover, the jury resolved any inaccuracies or issues with credibility in favor of the State.

## II. The Victim's Prior Criminal History

Defendants both contend that the trial court erred in precluding them from questioning the victim on cross-examination about (1) an incident that occurred twelve years earlier when he was shot during a home burglary and (2) about his prior arrest for being in possession of two pistols and a thirty-round magazine while wearing a bullet proof vest.

Our supreme court has recognized that "[t]he Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense." *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000). A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. *State v. Wyrick*, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001). Denial of the defendant's right to effective cross-examination is "'constitutional error of the first magnitude'" and may violate the defendant's right to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the sound discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995); *Coffee v. State*, 188 Tenn. 1, 216 S.W.2d 702, 703 (1948). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994).

-10-

In *State v. Brown*, our supreme court set forth the necessary analysis when determining whether the constitutional right to present a defense has been violated by the exclusion of evidence. *Brown*, 29 S.W.3d at 433-434. Specifically, we must consider "whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *Id*. at 434.

"[W]hether excluded evidence is critical to a defense is a fact-specific inquiry." *State v. Flood*, 19 S.W.3d 307, 317 (Tenn. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 303, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973)). "Our supreme court has suggested that for evidence to be considered critical to the defense, the evidence must have some probative value and 'exclusion of the evidence would undermine an element of a particular defense.'" *State v. Cyntoia Denise Brown*, No. M2007-00427-CCA-R3-CD, 2009 WL 1038275, at (Tenn. Crim. App., at Nashville, Apr. 20, 2009), *perm. to appeal denied* (Tenn. Sept. 28, 2009)(quoting *Flood*, 219 S.W.3d at 317). Regarding the third *Brown* factor, the interests supporting exclusion of the evidence, a criminal defendant's right to confront and cross-examine witnesses against her or him is limited by Rule 402 of the Tennessee Rules of Evidence in that neither party "may cross-examine a witness on matters that are irrelevant." *State v. Williams*, 929 S.W.2d 385, 389 (Tenn. Crim. App. 1996). As our supreme court has observed, "the right to confront witnesses is satisfied if defense counsel receives wide latitude at trial to cross-examine, because the confrontation clause only guarantees 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish.'" *State v. Middlebrooks*, 840 S.W.2d 317, 332-33 (Tenn. 1992), *superceded by statute on other grounds as stated in State v. Stout*, 46 S.W.3d 689, 705 (Tenn. 2001).

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Under Tennessee Rule of Evidence 402, irrelevant evidence is not admissible. Relevant evidence is generally admissible but may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See id*. 402, 403. A trial court's evidentiary ruling based on relevance is reviewed on appeal for an abuse of discretion. *See State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997).

In this case, prior to trial, Defendant Harris filed a "Motion in Limine/Notice of the Defense Counsel's Intent to Introduce the Prior Criminal History of James Williams." The motion listed seven "prior Convictions or Prior Bad Acts" including two for unlawful possession of a weapon and "Weapon commission of Offense While Wearing a Body Vest." The motion also contained the following statement: "This Notice is given pursuant [to]

-11-

Tennessee Rules of evidence 609 and 405 for impeachment purposes and in order to adequately defend Mr. Harris."

At a pre-trial hearing on the motion, the State challenged the admissibility of several of the convictions and bad acts, and defense counsel agreed to remove the claims of domestic assault, reckless endangerment, and one claim of unlawful possession of a weapon because they were not criminal convictions. Defense counsel also agreed that the claim of "Weapon commission of Offense While Wearing a Body Vest" was not a conviction. Concerning the admissibility of that prior act however, the following exchange took place at the hearing:

THE COURT:           Is this somehow still admissible?

[DEFENSE COUNSEL]:   Yes, it is, Your Honor. It goes to the Defendant's reputation - -

THE COURT:           The Defendant's?

[DEFENSE COUNSEL]:   I'm sorry, the victim's reputation - - alleged victim's reputation. And, also, I think it's substantive proof in this matter that other people tried to kill him, simply because I think it's consistent with (indiscernible) that somebody roams around the - - the city of Nashville - -

THE COURT:           Okay. You've thrown about five things, potential rules, out; one, you're saying that he had potential - -

[DEFENSE COUNSEL]:   Well - -

THE COURT:           - - potential what? What are you - -

[DEFENSE COUNSEL]:   - - It just demonstrates to me, Your Honor, that other people that, maybe, are unknown to the State - -

THE COURT:           The fact that he's arrested for wearing a body vest?

-12-

| | |
|---|---|
| [DEFENSE COUNSEL]: | No, I think it's consistent with the fact that somebody's attempting to kill him. And I just - - it would just be estab - - |
| THE COURT: | Okay. Do you have proof of some third-party person that's after Mr. Williams? |
| [DEFENSE COUNSEL]: | I do not, Your Honor. And I'm - - of course, it's our contention that Mr. Harris is certainly not one of them. However, I mean, I just rest on the fact that - - |
| THE COURT: | Okay. Well, then explain to me how an arrest for wearing - - carrying a weapon - - I don't even know what offense this is - - but you've got weapon, commission of offense while wearing a body vest, has some relevancy to whether or not there was an attempted murder perpetrated against him by Mr. Harris or Mr. Braxton. |
| [DEFENSE COUNSEL]: | I just think that that is conduct by the victim that's consistent with the fact he's shooting - - he's being shot at by other people, that he feels like it's in his best interest to wear a bullet-proof - - or body armor. That's - - |
| THE COURT: | I've not any proof about people shooting at him. Do you have that? |
| [DEFENSE COUNSEL]: | No, I don't. |
| THE COURT: | Do you wanna (sic) proffer - - |
| [DEFENSE COUNSEL]: | No, I do not, Your Honor. |

Counsel for Defendant Braxton then argued that the victim's arrest in 2004 for being in possession of two weapons, one with a thirty-round clip and with the serial number removed, while wearing a "body vest" and him being previously shot in the back during a burglary demonstrated that the victim "is a guy with enemies, who knows he has enemies; and it

-13-

makes it more likely that it is someone else who shot him on February the fifteenth of two-thousand six."

Prior to the victim's testimony at trial, in a jury-out hearing, the victim testified concerning his conviction in November of 2004 of being a felon in possession of a weapon. He admitted that when he was arrested, he was in possession of two handguns, one of which was a Glock with a thirty-round clip. He was also wearing a bullet-proof vest. The victim testified that he was shot in the back twelve years earlier, which required surgery. He said that neither Defendant Braxton nor Defendant Harris were involved in the shooting. Counsel for Defendant Harris then stated to the trial court: "It's not character evidence that I'm going for. It's taken - - uh - - as a whole, all the events, shows that Mr. Williams leads a dangerous life style." Counsel further stated: "You don't go around wearing body armor unless you think somebody is going to shoot you." The following exchange then took place between the trial court and counsel for Defendant Harris:

| | |
|---|---|
| THE COURT: | But, you're not arguing credibility purposes. You're wanting to introduce other things other than 609 convictions. You just said it's for substantive evidence. |
| [DEFENSE COUNSEL]: | Well, Judge, I - - I don't think there is any question when it's a defendant the rules are different. It would fall under 404(b) and, if those convictions or different incidents were to go to show - - go to show not propensity, but, - - |
| THE COURT: | Okay. |
| [DEFENSE COUNSEL]: | - - motive or - - |
| THE COURT: | That might be true. But, isn't it all character? |
| [DEFENSE COUNSEL]: | Under 404(b), would it be? I - - |
| THE COURT: | No. I mean, you're wanting to disparage the character of Mr. Williams. |
| [DEFENSE COUNSEL]: | I don't think that's what I'm trying to do. I wouldn't put it that way. I'm trying to say that - - |

-14-

| | |
|---|---|
| THE COURT: | So, you're not wanting to get up in closing arguments in front of the jury and say look at all this man's convictions. You think - - there are fifty people after him, we could assume. And, he wants to suddenly point his finger at my client. You're not wanting to argue that. |
| [DEFENSE COUNSEL]: | I don't think that goes to character, Judge. I think it goes to who could have shot him. |
| THE COURT: | Okay. Who could have? |
| [DEFENSE COUNSEL]: | Someone else and that's all that's important. |
| THE COURT: | Based on his carrying weapons. |
| [DEFENSE COUNSEL]: | Well, I mean, if you put it that simply - - |
| THE COURT: | And, the convictions. |
| [DEFENSE COUNSEL]: | - - that wouldn't work. But, - - carrying weapons convictions, being shot, wearing body armor. |

The trial court then held that evidence of the victim being shot twelve years earlier and evidence of his possession of weapons while wearing body armor was not relevant:

In terms of the proffer involving Mr. Williams and the body armor and want to get outside the fact of a conviction and get into the facts surrounding those convictions, I think the convictions speak for themselves, first of all, in terms of multiple, three I think, felony possessions of a weapon . . . aggravated assaults, attempted - - attempt to commit aggravated robbery . . . give the jury what-ever view they might see of Mr. Williams through those convictions, speak for themselves, especially when the body armor issue that Mr. Sprouse is wanting to get into occurred sixteen months prior to this incident. It's not like it was six days or six months. It's sixteen months, which lessens the probative value what it is being offered for. I'm caught wearing body armor in 2004, therefore, somebody must be after me in 2006. I just don't see the relevancy of that, nor do I see the relevancy of asking Mr. Williams if he has ever been shot before, twelve years prior to this particular allegation being made.

-15-

Rule 404(a) of the Tennessee Rules of Evidence generally provides that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of providing action in conformity therewith." Nonetheless, evidence of a victim's character may be admissible under certain circumstances. For example, under Rule 404 (a), the defendant in a criminal case may offer "evidence of a pertinent trait of character" of the victim. "Evidence is called 'pertinent' when it is directed to the issues or matter in dispute, and legitimately tends to prove the allegations of the party offering it." *Black's Law Dictionary* 1145 (6th ed. 1990). In other words, to qualify as "pertinent," the character evidence must be relevant." *Id.*

In the present case, we conclude that the trial court did not err in excluding evidence of the victim being shot during a burglary twelve years prior to the shooting in this case nor did the court err in excluding evidence concerning the victim's wearing a bullet-proof vest sixteen months prior to the shooting. Although the trial court did not specifically state that the probative value of this evidence was outweighed by its prejudicial effect, such was implied in the court's ruling. Any connection between Defendants' claim that someone else shot the victim and the victim being shot twelve years earlier and his wearing of a bullet-proof vest sixteen months earlier is too tenuous for the evidence to be considered critical to the defense. Defendants are not entitled to relief on this issue.

## III.    Testimony Regarding Defendant Braxton's Prior Incarceration

Defendant Braxton argues that the trial court erred in allowing Wayne Miller of the Davidson County Sheriff's Office, Records Division, to testify in rebuttal that he was checked into the Davidson County Jail at 2:12 p.m. on February 6, 2006, and that he was released at 4:27 p.m. on February 13, 2006. He contends that the testimony "was unduly prejudicial and its probative value was outweighed by its prejudicial effect and violated Rule 403 of the *Tennessee Rules of Evidence*."

As previously discussed, Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." *State v. Biggs*, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997)). We also point out that rebuttal evidence " is that which

-16-

tends to explain or controvert evidence produced by an adverse party." *Cozzolino v. State*, 584 S.W.2d 765, 768 (Tenn. 1979). It is also within the trial court's sound discretion to allow or reject rebuttal evidence. *State v. Green*, 613 S.W.2d 229, 234 (Tenn. Crim. App. 1980).

During the trial Derrica Christman, an alibi witness for Defendant Braxton, testified during direct examination that she saw Defendant Braxton shooting dice on her back porch no later than 5:15 p.m. on February 15, 2006, the day that the victim was shot. During cross-examination by the State, the following testimony was elicited from Ms. Christman:

Q. When was the last time you had seen [Defendant Braxton] prior to February 15th, 2006?

A. February 14th.

Q. Okay. And, prior to February 14th?

A. February 13th.

Q. You had seen him on the thirteenth. Had you seen him on the twelfth?

A. No.

This was the extent of Ms. Christman's testimony during Defendant Braxton's proof which dealt with when she had observed Defendant Braxton on February 5, 6, or 13.

After both Defendants had submitted their proof, the State called Ms. Christman as a rebuttal witness to further testify as to when she had last seen Defendant Braxton prior to February 15, 2006. Her entire testimony in rebuttal is as follows:

[DIRECT EXAMINATION BY STATE]

Q. Ms. Christman, uh - - the last time you testified was a little while ago, you mentioned that you saw Mr. Braxton on February 6th - - uh - - of 2006, is that correct?

A. Uh - huh.

Q. Do you remember if that was in the morning, the afternoon or the night time?

-17-

A.  Had to be like in the evening, afternoon, evening.

Q.  Okay. When you say the evening, what time would you put that to be the best of your memory?

A.  Uh - - five or so, after five.

Q.  And, it would be - - you base that time on the same thing, about when your children get home from school. So, on February 6th, you would have seen him that evening after your children had been off the bus?

A.  If - -

Q.  Is that a yes?

A.  If that was a week day, then, yes.

Q.  Okay. Well, do you remember what February 6th was?

A.  No.

Q.  But, to the best of your recollection it was around five o'clock, correct?

A.  Yes.

Q.  Okay. And, did you also say that you saw him on the thirteenth of February, - -

A.  Yes.

Q.  - - of 2006?

A.  Uh-huh.

Q.  And, about what time did you see him?

A.  Uh - - it was . . . between five and five fifteen.

Q.  And, what was he doing when you saw him on the thirteenth?

-18-

A.   He was coming from the next building beside my building.

Q.   Okay. And, what was he wearing at the time?

A.   He was - - uh - - either brown or green jacket with patches on it.

Q.   Now, we're talking not on the fifteenth. We're talking on the thirteenth.

A.   Yeah.

Q.   Okay. And, he was wearing that same outfit?

A.   Uh-huh.

Q.   Okay. And, - -

A.   Same jacket at least.

Q.    - - that would have been around five fifteen on - -

A.   Yes.

Q.    - - thirteenth of February, 2006?

A.   Uh-huh.

Q.   And, to your knowledge does he have any - - he doesn't live where you are, does he?

A.   No.

[CROSS EXAMINATION BY DEFENDANT BRAXTON'S COUNSEL]

Q.   On cross-examination, your last cross-examination, uh - - you were asked when the last time you saw Mr. Braxton was previously to the thirteenth?

A.   Yes.

-19-

Q. Do you know when that was?

A. It was . . . it was more than a week. It was maybe . . .

Q. Do you know when it was?

A. Maybe eight days before the thirteenth.

Q. Okay. Let me . . . do you remember specifically? Is there anything special about that day that would make you remember it?

A. Other than that was the last time I had seen him until I saw him a week or so later.

Q. Okay. So, you wouldn't swear by the fact that it was the sixth?

A. No. I'm not sure.

Q. Okay; thank you.

In response to Ms. Christman's testimony, the State called Wayne Miller of the Davidson County Sheriff's Office, Records Division. Counsel for Defendant Braxton objected on the ground that while possibly relevant, Mr. Miller's testimony that Defendant Braxton was taken into the custody of the Davidson County Jail at 2:12 p.m. on February 6, 2006, and he was released on February 13, 2006, at 4:27 p.m. should not have been admitted because it was more prejudicial than probative. Specifically, the following colloquy occurred between Defendant Braxton's counsel and the trial court:

THE COURT: · The second time?

[DEFENSE COUNSEL]: Yes, Your Honor, the second time. Uh - - but, keep in mind - -

THE COURT: What did she say during her testimony when you called her?

[DEFENSE COUNSEL]: What did she say during the tes - - when I called her the first time?

THE COURT: Uh - - huh.

-20-

| | |
|---|---|
| [DEFENSE COUNSEL]: | During my direct? |
| THE COURT: | No, her full testimony. |
| [DEFENSE COUNSEL]: | During her cross-examination she said she had seen him on February 6th, but, her testimony was not clear . . . it was not precise. From - - -uh - - my recollection of it, she - - uh - - was not - - - it was February 4th or February 5th or February 6th, she was not sure. And, that is not - - |
| THE COURT: | Is that what she said? |
| [DEFENSE COUNSEL]: | I don't know - - uh - - that is what I remember it is. I'm not one hundred percent sure of that. |
| THE COURT: | Okay. I've got it that she saw Mr. Braxton on two five and two six in the area around her house. When she was called back by the State, she said it was February - - on February 6th, had to be in the evening after five p.m. |
| | Then, you got back up on recross and said, are you really wanting to swear that you saw - - that you saw him on two six? And, she said, well, I don't know, I'm not sure. |

The transcript reflects that Ms. Christman testified during Defendant Braxton's case-in-chief that she saw Defendant Braxton "maybe February 5th <u>or</u> the 6th." (emphasis added). This was the testimony the State was entitled to rebut in its rebuttal proof; the State was not entitled to rebut the more "definitive" testimony of seeing Defendant Braxton on February 6th during her testimony as a <u>rebuttal witness</u> for the State. This Court has explained:

> The phrase "rebuttal evidence" may be defined as evidence "which tends to explain or controvert evidence produced by an adverse party." *Cozzolino v. State*, 584 S.W.2d 765, 768 (Tenn. 1979). This phrase encompasses "[a]ny competent evidence which explains or is a direct reply to, or a contradiction of, material evidence introduced" by an adverse party. *Nease v. State*, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979). Rebuttal evidence is properly admitted for the purpose of impeaching a witness through the use of a prior

-21-

inconsistent statement. *Monts v. State,* 218 Tenn. 31, 57-58, 400 S.W.2d 722, 733-734 (1966); *Gray v. State,* 194 Tenn. 234, 247-248, 250 S.W.2d 86, 92 (Tenn. 1952); *Beasley v. State,* 539 S.W.2d 820, 824 (Tenn. Crim. App. 1976). *See* Tenn. R. Evid. 613(b).

*State v. Braden,* 867 S.W.2d 750, 760 (Tenn. Crim. App. 1993).

We conclude that the trial court erred by overruling Defendant Braxton's objection to Mr. Miller's testimony. In a close case this error, which allowed an employee of the sheriff's office to testify as to the incarceration of a defendant on obviously unrelated charges prior to the commission of the offense for which the defendant is being tried, could result in the necessity for granting a new trial. However, we are confident in concluding in this case that the error was harmless. Defendant Braxton is not entitled to relief on this issue.

## IV. Sentence Length

In this case, Defendants argue that their sentences are excessive as to their attempted second-degree murder convictions because the trial court erred in finding that they used a deadly weapon during the commission of the offense.

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." *Carter,* 254 S.W.3d, 335, 346 (Tenn. 2008). Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections-102 and-103 of the Sentencing Act." *Id.*

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the Defendant wishes to make in the Defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); *see also Carter,* 254 S.W.3d at 343; *State v. Imfeld,* 70 S.W.3d 698, 704 (Tenn. 2002).

-22-

In *Carter*, the Tennessee Supreme Court clarified the 2005 changes in Tennessee sentencing law and stated:

> [A] trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence.

*Carter*, 254 S.W.3d at 345-46.

Thus, a trial court's "fail[ure] to appropriately adjust" a sentence in light of applicable, but merely advisory, mitigating or enhancement factors, is no longer an appropriate issue for appellate review. *Id.*, 254 S.W.3d at 345 (citing *State v. Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App., at Jackson, July 6, 2007) (noting that "[t]he 2005 amendment [to the Sentencing Act] deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts").

The record reflects that the trial court considered the evidence presented at the trial and the sentencing hearing. The court further considered the presentence report, the principles of sentencing and the arguments as to sentencing alternatives, the nature and characteristics of the offenses, the evidence offered by the parties on enhancement and mitigating factors, and the potential for rehabilitation or treatment.

As a range I offender convicted of a Class B felony, the applicable range of punishment for Defendant Harris was no less than eight nor more than twelve years. T.C.A. § 40-35-112(a)(2). As a Range II offender convicted of a Class B felony, the range of punishment for Defendant Braxton was no less than twelve nor more than twenty years. T.C.A. § 40-35-112(b)(2).

The trial court applied enhancement factor (1) that both Defendants had a previous history of criminal convictions or criminal behavior, in addition to those necessary to

-23-

establish the appropriate range. T.C.A. § 40-35-114(1). The trial court found that Defendant Harris had "three prior felonies, a felony cocaine case, a felony theft case and a felony evading arrest case, and ten misdemeanor convictions, including a prior carrying a weapon conviction." In addition to the convictions necessary to establish Defendant Braxton as a Range II offender, he has "the prior 'E' felony . . . , and in addition six misdemeanor convictions, non-driving misdemeanor convictions." The trial court also applied enhancement factor (6) that extensive personal injury was inflicted upon the victim. T.C.A. § 40-35-114(6). At trial, the victim testified that after the shooting, he was transported by ambulance to Vanderbilt Medical Center where he was immediately taken into surgery. He said that one of the bullets struck him in the upper arm, which required a metal plate. A bullet also went through his hand and lodged in his wrist, and one struck his finger and his face. The victim testified that he had surgery on his finger because it was "hanging off," and the bullet that entered his face is still lodged under his nose, and he lost six teeth.

The trial court applied enhancement factor (8) that both defendants had a previous history of unwillingness to comply with release into the community. Defendant Harris had two prior probation violations, and Defendant Braxton had three. T.C.A. § 40-35-114(8). The trial court applied enhancement factor (9) that Defendants possessed and employed firearms in the commission of the offense. T.C.A. § 40-35-114(9). Concerning this factor, the court noted: "There is the enhancing factor as to both that a weapon was used, a firearm, multiple times, two different weapons according to the circumstantial proof . . . fired thirteen or so plus times into Mr. William's car." The trial court applied enhancement factor (11) that the offense involved the threat of death or serious bodily injury to other persons, in Defendant Braxton's case, as he had been previously convicted of a felony that resulted in death. T.C.A. § 40-35-114(11). The trial court pointed out that "there was a high risk of injury to others there in the community when this shootout occurred, one sided shootout occurred there in broad daylight with high traffic, including the witness, Mr. Miller, who testified at the trial." The court further noted that Defendant Braxton had a prior manslaughter conviction. Finally, the trial court applied enhancement factor (13) to Defendant Braxton's sentence noting that he was on probation at the time of the offense. T.C.A. § 40-35-114(13). The trial court did not find any applicable mitigating factors as to either Defendant.

Both Defendants argue that the trial court erred in finding that they employed firearms during the commission of the offenses because they contend that it is an element of the offense of attempted second degree murder. However, use of a deadly weapon is not an essential element of that offense. *See* T.C.A. §§ 40-35-114, 39-13-210, and 39-12-101; *State v. Matthew Joseph Carter*, No. E2009-00217-CCA-R3-CD, 2010 WL 4324386 (Tenn. Crim. App. Nov. 2, 2010) *no perm. app. filed.*

-24-

The record clearly shows that the trial court followed the statutory sentencing procedure, made findings of facts that are adequately supported in the record, and gave due consideration to the principles that are relevant to sentencing. Based on our review, we conclude that the enhancement factors considered by the trial court adequately support the trial court's discretionary decision to impose a sentence of eleven years for Defendant Harris and nineteen years for Defendant Braxton. Defendants are not entitled to relief on this issue.

Defendant Harris also seems to argue that he should not have been ordered to serve his sentence in confinement. However, he does not support his argument with appropriate references to the record or reasons why he should be granted relief. Therefore this issue is waived. Tenn. R. App. P. 27(a)(7)(A).

## VI. Ineffective Assistance of Counsel

Both Defendants argue that they received ineffective assistance of trial counsel in this case. More specifically, both Defendants argue that their respective trial counsel was ineffective for failing to request a jury instruction on the lesser-included offense of reckless endangerment. Defendant Braxton also argues that trial counsel was ineffective for (a) failing to object to the sentence or request a continuance when the State did not provide proper notice of intent to seek enhanced punishment or provide certified copies of his convictions; (b) failing to amend the original notice of alibi; (c) failing to investigate possible defenses or alibi witnesses; and (e) failing to adequately meet and prepare for trial. Defendant Harris contends that trial counsel was ineffective for asking the victim about a prior altercation with Defendant Harris that "opened the door" to the victim's testimony about an earlier attempt by Defendant Harris to harm or kill the victim.

Claims of ineffective assistance of counsel are generally more appropriately raised in a petition for post-conviction relief rather than on direct appeal. *See State v. Carruthers,* 35 S.W.3d 516, 551 (Tenn. 2000). This Court has consistently "warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant amount of development and fact finding such an issue entails." *Kendricks v. State,* 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999). Raising the issue of ineffective assistance of counsel on direct appeal is "a practice fraught with peril." *State v. Thompson,* 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997). This peril is two-fold. First, ineffective assistance can rarely be established without an evidentiary hearing. *See Strickland v. Washington,* 466 U.S. 668, 689-90, 694, 104 S.Ct. 2052, 2065, 2067, 80 L.Ed.2d 674 (1984). Post-conviction procedures afford an evidentiary hearing to a Defendant with colorable claims. *See* T.C.A. §§ 40-30-109(a),-110 (2006). Second, raising the issue in the direct appeal could result not only in losing on appeal, but also in barring the claimant from raising the issue later in the post-conviction arena. T.C.A. §§ 40-30-106(f) & (h)

-25-

(2006). A post-conviction claim for ineffective assistance of counsel will be dismissed where that claim has previously been determined by another court. T.C.A. § 40-30-106(f). "A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." T.C.A. § 40-30-106(h). However, because there is nothing barring a defendant from bringing an ineffectiveness claim in a direct appeal, we will proceed with our analysis of each Defendant's claims.

Under Tennessee Code Annotated section 40-30-110(f) (2003), a defendant seeking post-conviction relief on the basis of ineffective assistance of counsel is required to prove his or her allegations "by clear and convincing evidence." This same standard applies even when the claim of ineffective assistance of counsel is raised on direct appeal. *State v. Burns*, 6 S.W.3d 453, 461 n. 5 (Tenn. 1999) (citing *State v. Anderson*, 835 S.W.2d 600, 607 (Tenn. Crim. App. 1992)). The factual findings entered by the trial court are conclusive unless the defendant establishes that the evidence preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn.2001). For a defendant to successfully overturn a conviction based on ineffective assistance of counsel, the defendant must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Second, the defendant must show that the deficiencies "actually had an adverse effect on the defense." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). The defendant is not entitled to the benefit of hindsight; the defendant may not second-guess a reasonably based trial strategy; and the defendant may not criticize a sound, but unsuccessful, tactical decision made after adequate preparation for the case. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

*A. Failure to Request a Jury Instruction on the Lesser-Included Offense of Reckless Endangerment.*

Defendant Braxton and Defendant Harris both contend that their respective trial counsel was ineffective for failing to request a jury instruction on the misdemeanor offense of reckless endangerment as a lesser-included offense of attempted premeditated first degree murder.

Initially, we note that each Defendant has the burden of proving that he or she was prejudiced by an alleged deficiency on the part of trial or appellate counsel. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. In order to establish prejudice, each Defendant

-26-

must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, 466 U.S. at 694. A defendant is required to request in writing that the trial court instruct the jury on any specifically identified lesser included offense. T.C.A. § 40-18-110(a). In the absence of such a request, the trial court may charge the identified lesser included offense, but the defendant is not entitled to the charge. *Id.* § 40-18-110(b). Reckless endangerment is a lesser included offense of attempted first degree murder. *See State v. Rush*, 50 S.W.3d 424, 431-32 (Tenn. 2001). If it had been included in the jury charge, it would have been listed *after* aggravated assault.

In this case, Defendants were indicted for the offense of attempted first degree murder. The trial court instructed the jury on the indicted offense and the lesser included offenses of facilitation of attempted first degree murder, attempted second degree murder, facilitation of attempted second degree murder, attempted voluntary manslaughter, facilitation of attempted voluntary manslaughter, aggravated assault with a deadly weapon, and aggravated assault with serious bodily injury. The jury convicted Defendants of attempted second degree murder to the exclusion of the immediate lesser included offenses. Harmless error may be shown where the jury convicts on the higher offense to the exclusion of the immediately lesser offense, necessarily rejecting other lesser offenses. *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998). Therefore, we conclude that Defendants were not prejudiced by trial counsels' failure to request jury instruction on the lesser included offense of reckless endangerment.

*B. Failure to Object to the Sentence or request a Continuance When the State Did Not Provide Proper Notice of Intent to Seek Enhanced Punishment or Provide Certified Copies of Defendant Braxton's Convictions.*

In his motion for new trial, Defendant Braxton raised the following issue concerning his sentence:

> Defendant was denied effective assistance of counsel when counsel failed to object to the State's failure to file a Notice of enhanced punishment and allowing certain convictions to be used against the Defendant at sentencing, by not requiring certified copies of those convictions to be used, and by failing to make a motion for a continuance.

The trial court, in its order denying Defendant Braxton's motion for new trial held: "The Court accredits the testimony of trial counsel that he investigated all of the defendant's prior

-27-

convictions and believed they were valid. The Court finds the State had filed timely a notice of enhanced punishment."

The record supports the trial court's finding. At the hearing on the motion for new trial, counsel for Defendant Braxton testified that the State had filed a notice of enhanced punishment but did not provide certified copies of his convictions at the sentencing hearing. Trial counsel admitted that he did not object to the hearing. He said:

> I checked them out myself. I - - I suppose I - - I could have objected, there weren't any certified copies. And it is my understanding that , if that had been objected to, the - - it just would've been continued for ten days, because, while we are entitled to notice, I don't necessarily know if it's like a gotcha (sic) thing, sort of, "You didn't give us notice, so I'm sorry."

Defendant Braxton has failed to show that he was prejudiced by trial counsel's failure to object to his enhanced sentence or by failing to request a continuance. He is not entitled to relief on this issue.

## C. Failure to Amend the Original Notice of Alibi

Defendant Braxton next contends that trial counsel was ineffective for failing to amend the notice of alibi filed by his previous counsel to include an additional witness, Lateisha Martin. The trial court held that trial counsel made a tactical decision not to call Ms. Martin and did not render ineffective assistance of counsel.

Again, the evidence presented at the hearing on Defendant's Braxton's motion for new trial supports the trial court's decision. At the hearing, trial counsel testified that it was his understanding that all of the alibi witnesses that Defendant Braxton intended to call at trial were listed on the notice filed by previous counsel. However, trial counsel admitted that he was mistaken, and Ms. Martin was not listed on the notice. The following exchange then took place:

Q.   Did you have a bench conference regarding that particular witness?

A.   I don't remember if we had a bench conference or not. I know the issue was discussed. The State stood up and said, "If this witness is going to be called for alibi witnesses, they are not listed, we've had no notice."

-28-

I don't believe Judge Dozier made a ruling on whether or not she would be allowed to testify. I think the issue was just kinda (sic) tabled. And I called Derrica Christman at that point; she was listed - -

Q.   Who was listed - -

A.   - - on the notice. After her testimony the issue was re-raised and - - as to whether or not she would be allowed to testify.

And at that point I made the decision, based upon how Mr. Harris' alibi witnesses had testified, that, quite frankly, even I decided to press the issue and the Judge were to allow me to call her as an alibi, I was worried.

And I thought Ms. Christman had done a good enough job that I just simply chose not to push the issue.

Q.   Did you discuss that decision, not to call that particular witness, with Mr. Braxton?

A.   I'm sure that we whispered at the table about it, that, you know, "This is why I'm not pushing the issue, and it's my fault that she wasn't listed on the notice. But, quite frankly, at this point I don't know if I'd call her anyway."

But, no, there was no - - there was no recess, we didn't have an opportunity to, like, really get into it. We just whispered about it at the table.

Q.   What was your understanding of Mr. Braxton's position on that?

A.   I don't - - I don't remember him voicing strong objection to my position on it. I - - I - - I don't remember that happening. I'm not saying it didn't, but I don't remember it happening.

Q.   So, you don't recall if - - whether or not he - - that - - that - - in other words this was a tactical decision that you made, didn't - - didn't necessarily have to wait on the Court to rule on that, it was - -

-29-

A.     Lemme (sic) be clear. It was not a tactical decision to leave her off the notice; and, if I had that to do over again, she would've been on the notice, without question.

But at the time, when it came to - - to re-raise the issue, where I could've asked the Court, "Well, despite the fact that she's not on the notice, I wanna call her anyway," that's when I - - yes, I decided at that point that, quite frankly, even it I would, I did not want to - -

Q.     Okay.

A.     - - recall her.

Q.     But - - and, so, it was a tactical decision to not push the issue.

On cross-examination, trial counsel further testified:

Q.     With regard to the second alibi witness, who was not called, you've indicated that you had decided during the trial, during watching Mr. Harris' alibi witnesses testify, that you did not want to call this second alibi witness anyway.

A.     Yes, that's - - I mean, it was a toss-up; but, counting the fact that I'd left her off the notice and the fact that I was worried about conflicting testimony from the two of them, I decided that I was not going to push the issue with the Court.

I don't know if I'm muddling the issue or not.

| THE COURT: | (To the Witness) Worried about conflicting testimony between anyone that may or may not could've been called versus - |
|---|---|
| THE WITNESS: | Derrica Christman. |
| THE COURT: | - - the one that was called. |
| THE WITNESS: | That's correct. |

-30-

| | |
|---|---|
| THE COURT: | Okay. Well, I mean, did you have some information, as or after Ms. Christman was testifying, that - if I can find it here again (consulted file notes) - that Ms. Martin may have some inconsistent information? |
| THE WITNESS: | Not on any material facts. I spoke with them both beforehand, and I was not about [to] put them on the stand, if I thought they were going to perjure themselves, no. |
| THE COURT: | Right. |
| THE WITNESS: | I mean, the material facts - I could not discern any inconsistencies between the two of them. |
| | What I was speaking to more specifically is, when Mr. Harris' alibi witnesses testified, there were several questions about that they were wearing and that they had to eat and what time and what happened afterwards, quite frankly, things that were immaterial to the case, but nevertheless asked about, which they were dramatically different on. |
| | And - and I did not – I thought Ms. Christman had done such an excellent job testifying, that I didn't wanna run the risk of messing up her testimony. |

Trial counsel clearly made a tactical decision not to call Ms. Martin at trial, and Defendant Braxton has not presented any evidence to the contrary. Even if trial counsel had rendered deficient performance in failing to add Ms. Martin to the notice as an alibi witness, Defendant Braxton has not demonstrated any prejudice since he did not call Ms. Martin to testify at the hearing on his motion for new trial. *See Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008); *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1190).

D.    *Failure to Investigate Possible Defenses or Alibi Witnesses.*

Defendant Braxton argues that trial court was ineffective for failing to investigate any possible defenses that he had to the offense or to investigate the alibi witnesses provided to him. As pointed out by the State, this issue was not raised in Defendant Braxton's motion for new trial or in his amended motion, and he may not raise the issue for the first time in this

-31-

court. On direct appeal, our review is limited to the issues specifically raised in a motion for new trial. *See* Tenn. R. App. P. 3(e). "When an issue is raised for the first time on appeal, it is typically waived." *State v. Maddin,* 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005); Tenn. R. App. P. 36(a) ("relief may not be granted in contravention of the province of the trier of fact."). Therefore, this issue is waived.

## E. Failure to Adequately Meet and Prepare for Trial.

Finally, Defendant Braxton argues that trial counsel was ineffective for failing to adequately meet with him and prepare for trial. Again, as pointed out by the State, Defendant Braxton failed to raise this issue in his motion for new trial or in his amended motion. Therefore, the issue is waived. *See* Tenn. R. App. P. 3(e); 36(a); and *State v. Maddin,* 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005).

## F. Opening the Door to the Victim's Testimony About an Earlier Attempt by Defendant Harris to Harm or Kill the Victim.

Defendant Harris argues that his trial counsel rendered deficient performance by asking the victim about a prior altercation with Defendant Harris that "opened the door" to the victim's testimony about an earlier attempt by Defendant Harris to harm or kill the victim. At trial, the victim testified concerning the events surrounding the shooting on February 15, 2006. On cross-examination, trial counsel asked the victim about the shooting and questioned him about his prior testimony at the preliminary hearing where the victim indicated that he had no other altercations with Defendant Harris. After being cautioned by the court, trial counsel ultimately asked the victim, "Have you had any other altercations with Mr. Harris" to which the victim replied, "That's correct." Trial counsel then impeached the victim by pointing to the record of the preliminary hearing in which the victim indicated that had not had other altercations with Defendant Harris.

The State then sought to question the victim about a previous altercation during which Defendant Harris allegedly shot the victim in the foot. After a lengthy discussion out of the jury's presence, the trial court determined that the State would be allowed to question the victim about the prior altercation. On redirect examination, the victim testified that one night in October of 2005, someone had been following him. He said:

> I was - - uh - - headed down Gallatin road going to McDonald's to get me something to eat. And, I rolled (phonetic) Mr. Harris, beauty shop, barber shop, whatever it was at the time, and - - uh - - I just noticed a car get behind me. I turned, the car turned. And, I not gonna say it was a chase, but, the car stayed pretty much behind me where I had to speed up to lose the car. And,

-32-

I finally side [sic] on a side street. And, I jumped out of the car and jumped in the bushes.

The victim testified that two cars "kept circling the block," and he called a couple of friends to pick him up. He stayed at their house for a few hours and then drove home around 12:45 a.m. The victim testified that he parked his car like he did every night. He then "checked the bushes", and as he walked up the breezeway, Defendant Harris and another individual opened fire on him. The victim said that although he had two handguns on him, he did not have a chance to return fire. He then realized that he had been shot in the foot. The victim testified that there was a third person "who ran on the side of the building and me and him exchanged gun-fire." He then hid under a neighbor's jeep until the three men left.

The victim testified that one of the neighbors called police, and when they arrived, he did not tell them that he saw Defendant Harris or the other two individuals. He explained that he did not want to talk to police because he had two firearms on him, as well as several assault rifles in his home, and he did not want them to search his home.

Concerning this issue, the trial court held:

As to the defendant's allegations that trial counsel was ineffective in opening the door to a prior unproven altercation, the Court notes that trial counsel did ask this question. Before the witness could answer the question, "Have you had any other altercations with Mr. Harris," the Court asked counsel if he wanted to ask that question. Trial counsel said that he did wish to ask the question and the Court permitted him. Although the question opened the ability to question about other incidents in order to fill the conceptual void as to the bad blood between the defendant and the victim, much of this information was admissible if brought out by the State. This information also allowed information about the complaining witness and possible unfavorable demeanor seen by the jury. Even though potentially prejudicial, this was a tactical decision by trial counsel that may have had a valid defense motivation but certainly does not rise to the necessary level of effecting the outcome of the trial.

The record supports the trial court's findings. Trial counsel was able to successfully impeach the victim's testimony at the preliminary hearing where he testified that he had no prior alterations with Defendant Harris. Furthermore, as pointed out by the State, the victim's testimony had no corroboration from any other witness, and the victim admitted that he was in possession of two guns during the shooting, and there were additional assault rifles in the house. When police arrived on the scene, the victim did not tell them who shot at him

-33-

because he did not want his own criminal activities discovered. Defendant Harris has not shown that he was prejudiced by trial counsel's performance in this area. The proof presented at trial was sufficient to support Defendant Harris's conviction for attempted second degree murder. This issue is without merit.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_Thomas T. Woodall_

THOMAS T. WOODALL, JUDGE

:, Michael W. Catalano, Clerk, hereby certify that this is a true and exact copy of the original

This ___ day of _January_, 20_/2_
filed in the cause.

CLERK OF COURT
By:_____

# IN THE CRIMINAL COURT
## FOR DAVIDSON COUNTY, TENNESSEE
### AT NASHVILLE
### DIVISON I

| | | |
|---|---|---|
| **FREDERICK E. BRAXTON** | ) | **Case No.: 2007-A-732** |
| **Petitioner** | ) | **Judge Dozier** |
| | ) | |
| **vs** | ) | |
| | ) | |
| **STATE OF TENNESSEE** | ) | |
| **Respondent** | ) | |

## PETITION FOR WRIT OF *CORAM NOBIS*

Comes now the Petitioner, Frederick E. Braxton, pursuant to Tenn. Code Ann. §

40-26-105, and petitions this Honorable Court for a writ of *coram nobis* to address newly

obtained and discovered evidence/information, that could not have been litigated at the

time of Petitioner's original trial, that proves the actual innocence of Petitioner in this

matter. Petitioner would show unto the Court the following:

## I. RELEVANT FACTS

**1.1)** Petitioner, Frederick E. Braxton, was charged with Attempted First Degree
Murder for a drive-by, car-to-car, shooting of James Haywood Williams, Jr.
[*See*, attached Affidavit of James Haywood, Jr., attached "Ex. A" at A-1 and
Ex. A at Attachment 1, page 1-1]. A jury convicted Petitioner in a case heard
by this Honorable Court. [*Id*].

**1.2)** In mid-October, 2017, James Haywood Williams, Jr. came forward to admit he
deliberately committed Aggravated Perjury in this identification of Petitioner as
his assailant in Case No. 2007-A-732. [*See*, attached "Ex. A"]. James
Haywood Williams, Jr. was the sole eyewitness identifying Petitioner as a
shooter in Case No.2007-A-732. [Ex. A at Attachment 1, pages 1-1 and 1-2].

## II. ISSUES

**2.1)** The statute of limitations is tolled because the alleged victim's revelation of a
false identification arose in October, 2017.

**2.2)** Newly arising evidence, that could not be litigated prior to this petition, proves
actual innocence in this case in regards to Petitioner.

1

## III. LEGAL BACKGROUND FOR *CORAM NOBIS*

**3.1)** The whitehorse case on *coram nobis* within the past ten (10) years is State v. Vasques, 221 S.W.3d 514 (Tenn. 2007). Vasques sets a primer on how *coram nobis* applies to Tennessee cases. [Vasques, 221 S.W.3d at 525-528]. Counsel for Petitioner has a working knowledge of Vasques, as counsel was one of the lead counsels for defendants at the Supreme Court level of Vasques. [Vasques, 221 S.W.3d at 516]. Details on how *coram nobis* applies in this case will be discussed in "Part V: Merits of *Coram Nobis* Request" of this petition.

**3.2)** The standard of review and granting a writ of *coram nobis* is that the jury "may have" reached a different result, not that the new evidence "would have" resulted in a different result. [Lowery v. State, 2013 WL 4767188 (Tenn. Crim. App. 09/04/2013), attached "Ex. B" at B-2 to B-3].[1]

## IV. STATUTE OF LIMITATIONS

**4.1)** Later arising issues, which justify a tolling of the Tenn. Code Ann. §§ 40-26-105 and/or 27-7-103 statute of limitations, asks if Due Process requires a tolling of the statute of limitations. [Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010)]. This determination is a three-part test, which asks the following:

  **A)** When the limitations period would normally begin to run;

  **B)** Did the newly discovered evidence actually arise after the statute of limitations period expired; and

  **C)** If the ground is "later-arising," determine if, under the circumstances of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

[State v. Harris, 301 S.W.3d 141, 145 (Tenn. 2010)].

**4.2)** In the case at hand, the sole eye witness that identified Petitioner has not only recanted his previous trial testify, that sole eyewitness has admitted, under oath, that he deliberately and knowingly gave false testimony that was the lynch-pin testimony leading to Petitioner's original conviction. [*See*, attached "Ex. A"]. These facts did not come to light until October, 2017. Fundamental Fairness and Due Process dictate that the procedural bar, such as the statute of limitations, should keep Petitioner from addressing this matter in open court. [*See*, Holliman v' State, 2012 WL 3793143 (Tenn. Crim. App. 08/31/2012),

---

[1] No T.R.A.P. 11.

Case 3:20-cv-00251   Document 9-14   Filed 06/08/20   Page 44 of 102 PageID #: 912

42 of 100

attached "Ex. C" at page C-2[2] and <u>Eblen v. State</u>, 2013 WL 4677619 (Tenn. Crim. App. 08/28/2013), attached "Ex. D" at page D-2 to D-3].[3]

## V. MERITS OF CORAM NOBIS REQUEST

**5.1)** The purpose of the writ of *coram nobis* is to bring to the attention of the court some fact unknown to the court which, if known, would have resulted a difference judgment. [State *ex rel.* Carlson v State, 407 S.W.2d 165, 167 (Tenn. 1966). *Accord*, Payne v. State, 493 S.W.3d 478, 484-485 (Tenn. 2016)].

**5.2)** The standard of review on *coram nobis* cases require a "Reasonable Probability" that the new evidence "may have resulted in a different judgment." [State v. Workman, 111 S.W.3d 221 S.W.3d 10, 17-18 (Tenn. Crim. App. 2002) and Vasques, 221 S.W.3d at 524-526].

**5.3)** A petition for writ of coram *nobis* in a criminal case, which seeks relief on a ground of subsequently newly discovered evidence, should recite the following points:

    **A)** The grounds and nature of the newly discovered evidence;

    **B)** How/why the new evidence would result in a different judgment;

    **C)** Petitioner was "without fault in failing to present" the newly discovered evidence at an earlier or the appropriate time; and

    **D)** The relief sought by Petitioner.

[Payne, 493 S.W.3d at 484-485]. Each of these points will be discussed in the next section.

**5.4)** The following <u>Teague</u> points are hereby respectfully asserted:

    **A) Grounds/Nature of Newly Discovered Evidence:** Sole eyewitness/victim recants trial testimony that Petitioner shot at victim. [*See*, Ex. A];

    **B) How/Why New Evidence Would Change Verdict:** The sole eyewitness/victim came forward in October, 2017 and admitted that he knowingly lied under oath in his identification of Petitioner as being in the car that shot at said victim. [Ex. A];

---

[2] No T.R.A.P. 11.
[3] TR.A.P. 11 denied 01/14/2014.

**C) Reason New Evidence Was Not Previously Presented:** Victim did not recant his testimony until October, 2017; and

**D) Relief Sought:** Case and conviction overturned and case dismissed with prejudice.

## VI. CONCLUSION

**WHEREFORE, PREMISES CONSIDERED;** Petitioner respectfully prays for the Court to grant a writ of *coram nobis* and Case No. 2007-A-732 be dismissed with prejudice.

This is the 9th day of November, 2017.

Respectfully Submitted:

Gregory D. Smith
Attorney for Petitioner
BPR #013420
331 Franklin Street, Ste. 1
Clarksville, TN 37040
(931) 647-1299

STATE OF TENNESSEE      )
COUNTY OF HARDEMAN      )

I, Frederick E. Braxton, duly sworn, make oath that the facts stated in the foregoing are true to the best of my knowledge and belief, and is not made out of levity, or by collusion with the Respondent, but in sincerity and truth, for the causes mentioned therein knowing the penalty for Aggravated Perjury, (Tenn. Code Ann. § 39-16-703, D felony), and asserting the information in this petition is true to the best of my own personal knowledge and belief.

Frederick E. Braxton

SWORN TO AND SUBSCRIBED before me, the undersigned Notary Public, on this the 7th day of November, 2017.



Notary Public
My Commission Exp: *August 25, 2020*

## CERTIFICATE OF SERVICE

I, Gregory D. Smith, do hereby certify that a copy of the foregoing has been mailed, postage prepaid in the U.S. Mail to the following on this the 9th day of November, 2017.

Honorable Glenn R. Funk, Davidson County District Attorney
222 Second Avenue, North
Suite 500
Nashville, TN 37201-1649

Gregory D. Smith

## IN THE CRIMINAL COURT
## FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE
## DIVISON I

| | | |
|---|---|---|
| **FREDERICK E. BRAXTON** | ) | **Case No.: 2007-A-732** |
| **Petitioner** | ) | **Judge Dozier** |
| | ) | |
| **vs** | ) | |
| | ) | |
| **STATE OF TENNESSEE** | ) | |
| **Respondent** | ) | |

| | |
|---|---|
| State of Tennessee | ) |
| | ) |
| County of Davidson | ) |

## AFFIDAVIT

James Haywood Williams, Jr., an adult citizen of the United States, and resident of

Davidson County, Tennessee, after being duly sworn according to law, and explained the penalty

for Tenn. Code Ann. § 39-16-703, Aggravated Perjury, does hereby swear and state the following

under oath:

1) Affiant is an adult citizen of the United States and resident of Davidson County, Tennessee and Affiant was the alleged victim in the case of State of Tennessee v. Frederick Edward Braxton, Davison Criminal No. 2007-A-732. A copy of the appeal opinion for said case, CCA No. M2009-01735-CCA-R3-CD, is attached as "Attachment 1" to this affidavit.

2) Affiant was the sole identifying witness in Frederick Edward Braxton's Attempted First Degree Murder conviction in Case No. 2007-A-732. [See, Attachment 1 at 1-1 to 1-2]. This alleged crime occurred on February 15, 2006. [Attachment 1 at 1-1]. Frederick Edward Braxton was convicted on Affiant's sole identification, corroborated by a second witness testifying he heard gunshots and saw an arm sticking out of a car shooting a gun, but the witness did not see the shooters' faces. [Attachment 1 at 1-5 to 1-6]. Frederick Edward Braxton was sentenced to nineteen (19) years to serve for this crime. [Attachment 1 at 1-1].

3) Affiant, after years of "bad karma," contacted the family of Frederick Edward Braxton to beg forgiveness. The basis of this request for forgiveness is that Affiant had knowingly and intentionally lied about identifying Frederick Edward Braxton as the person who shot at Affiant on February 15, 2006. Affiant saw the shooters clearly, and neither person shooting at Affiant was Frederick Edward Braxton. Affiant knew this fact prior to the trial of Case No. 2007-A-732, but affiant testified falsely at trial anyway. Further, Affiant did not even see Frederick Edward Braxton in the car from

which shots were fired at Affiant on February 15, 2006. The reasons Affiant told police that Frederick Edward Braxton shot at Affiant was because Affiant and Frederick Edward Braxton had "bad blood" between the two men. Affiant is sorry he lied under oath.

4) Affiant, at Affiant's request, met with Gregory D. Smith, counsel for Frederick Edward Braxton, on October 10, 2017 at 4:00 p.m. at the U.S. Courthouse Library, 8th Floor, Nashville, Tennessee. Affiant knew the interview was being recorded and would eventually become the basis for this affidavit. The only condition for this interview was the counsel bring Affiant a copy of Tenn. Code Ann. § 39-16-703 (Aggravated Perjury) and Tenn. Code Ann. § 40-2-101 (Statute of Limitations for Felonies), for Affiant's review. These two (2) statutes are "Attachment 2" and "Attachment 3" to this affidavit. Affiant reviewed both statutes prior to acknowledging that Affiant committed Aggravated Perjury at Frederick Edward Braxton's trial in Case No. 2007-A-732.

5) Affiant has not received, nor relied upon, legal advice from Gregory D. Smith in making this affidavit. Affiant is fully aware that Gregory D. smith solely represents Frederick Edward Braxton and has no affiliation, loyalty or duty to Affiant and did not advise Affiant in any matter other than to say Affiant could seek his own attorney or separate legal advice before signing this affidavit.

6) Affiant has received no promise, gift, money or any other inducement to sign this affidavit from Frederick Edward Braxton, nor any agent, representative, family member, associate or friend of Frederick Edward Braxton. Affiant has received nothing from any third party to sign this affidavit.

7) Affiant, knowing the penalty for Aggravated Perjury, hereby swears that Affiant lied under oath in Court in Case No. 20074-A-732 regarding Frederick Edward Braxton shooting at Affiant on February 15, 2006. The reason Affiant is now coming forward to admit Affiant's own wrongdoing is that Frederick Edward Braxton, an innocent name, has spent over a decade in prison for a crime Frederick Edward Braxton did not commit. Affiant knew Frederick Edward Braxton was innocent of the crime charged of Attempted First Degree Murder in Case No. 2007-A-732 when Affiant testified against Frederick Edward Braxton in Davison County Criminal Case No. 2007-A-732. Affiant now apologizes to both the Court, Frederick Edward Braxton, and the family of Frederick Edward Braxton for this wrong. Affiant wants to now "make it right." That is the only reason Affiant came forward and requested that this affidavit be prepared. Affiant will testify at a *coram nobis* hearing on this matter consistent with this affidavit.

8) The information in this affidavit is true and accurate to the best of Affiant's own personal knowledge and belief and made with Affiant reviewed the penalty for perjury set out in Tenn. Code Ann. § 39-16-703.

This is the 26th day of _October_, 2017.

_James Haywood Williams, Jr._
Affiant

I, James Haywood Williams, Jr., duly sworn, make oath that the facts stated in the foregoing affidavit is true to the best of my knowledge and belief, and is not made out of levity, or by collusion with any other party, but in sincerity and truth, for the causes mentioned therein knowing the penalty for Aggravated Perjury, (Tenn. Code Ann. § 39-16-703, D felony), and asserting the information contained herein is true to the best of my own personal knowledge and belief.

_James Haywood Williams, Jr._

SWORN TO AND SUBSCRIBED before me, the undersigned Notary Public, on this the 26th day of _October_, 2017.

Notary Public
My Commission Exp: _08-20-2019_

# STATE of Tennessee v. Frederick Edward BRAXTON

## CCA. No. 2011 WL 3809773 (Tenn. Crim. App. 8/26/2011)

### M2009–01735–CCA–R3–CD.

T.R.A.P. 11 denied 1/10/2012

*Direct Appeal from the Criminal Court for Davidson County, No.2007–A–732; Steve R. Dozier, Judge.*

**OPINION**

**THOMAS T. WOODALL, J.**

**\*1 The Defendants, Frederick Edward Braxton and Leonard Cardell Harris, were indicted for attempted premeditated first degree murder. Additionally, Defendant Braxton was charged with possession of marijuana, which was severed as unrelated. Following a jury trial, Defendants were convicted of attempted second degree murder. Defendant Braxton was sentenced to serve nineteen years in confinement as a Range II offender, and Defendant Harris was sentenced to serve eleven years in confinement as a Range I offender. On appeal, both Defendants argue that (1) the evidence was insufficient to support the convictions, and that the trial court erred in denying their motion for judgments of acquittal; (2) the trial court erred in precluding Defendants from questioning the victim about being previously shot in a home burglary and about the victim's prior arrest sixteen months before the shooting; (3) their sentences are excessive; and (4) trial counsel were ineffective for failing to request a jury instruction on the lesser-included offense of reckless endangerment. Defendant Braxton argues that the trial court erred in allowing the jail custodian of records to testify in rebuttal concerning Defendant Braxton's period of confinement in the Davidson County jail;(b) trial counsel was ineffective for (i) failing to object to the sentence or request a continuance when the State did not provide proper notice of intent to seek enhanced punishment or provide certified copies of the convictions; (ii) failing to amend the original notice of alibi, filed by previous counsel, to include an additional witness; (iii) failing to investigate possible defenses and alibi witnesses; (i.v.) failure to adequately meet with Defendant Braxton and prepare for trial. Defendant Harris argues that trial counsel was ineffective for asking the victim about a prior altercation with Defendant Harris which opened the door to the victim's testimony about an earlier attempt by Defendant Harris to harm or kill the victim. After careful review, we affirm the judgments of the trial court.**

**State's Proof**

On February 15, 2006, the victim, James Williams, was working at East Nashville Auto Sales located at 1413 Dickerson Pike. On that day, he noticed a car traveling down the street with "one of the defendants' brother in it." The victim did not think anything about it and continued "what [he] was doing at the time." He left work around 5:00 p.m. and drove toward downtown Nashville on Dickerson Pike, a four-lane road, to pick up his girlfriend. As he was driving in the left lane, the victim noticed "a green early nineties model—uh—Buick Century get behind [him] that [he] had seen before that [he] saw Mr. Harris in, maybe three weeks before the shooting." The victim testified that he closed his sunroof "thinking that if [he] shut the sun roof the car would be dark and they wouldn't know who was in it, that they wouldn't open no fire on the car." He then moved into the right lane of Dickerson Pike in an attempt to get to the interstate and lose the other vehicle. The victim testified that when he stopped in traffic, the green car pulled up beside him with "two men hanging out the car shooting." He recognized the two men as Defendant Braxton and Defendant Harris whom he had known since the early 1990's, and their relationship was one of "bad blood." Although there were four people in the vehicle, the victim could not identify the other two. He said that Defendant Harris was in the front and Defendant Braxton was in the back. Both men were on the passenger's side of the car.

**\*2 Upon realizing that he had been shot, the victim played dead and after the Defendants left, he drove to the AM / PM Market on North First Street and asked a lady there to call 9–1–1. He testified that he had been carrying a .40 caliber handgun at the time of the shooting that he tossed in a trash can before entering the market. The victim was then transported by ambulance to Vanderbilt Medical Center where he was immediately taken into surgery. The victim testified that one of the bullets struck him in the upper arm. He said:**

It went through the back and came out there. They had to put a metal plate right here ... straight through in and out right here. It went through my—one bullet went through my hand and lodged in my wrist, one in my finger and one in my mouth. And, it knocked my teeth out.

The victim testified that he had surgery on his finger because it was "hanging off," and the bullet that entered his face is still lodged under his nose. He said that he lost six teeth, and there were sixteen bullet holes in his car as a result of the shooting.

The victim testified that he received a visit from Detective Bradley at the hospital shortly after coming out of surgery, and he told Detective Bradley that he did not want to talk about what happened. The victim said that he intended to handle the situation himself but changed his mind after speaking with his mother who told him to think of his family and the pain that he would cause them by taking matters into his own hands. The victim testified that he spoke with Detective Bradley a second time and told him that Defendants Braxton and Harris shot him. Detective Bradley later returned to the hospital with photographic lineups, and the victim identified each Defendant. The victim admitted that he had previously been convicted of several criminal offenses. He further admitted that because he was a convicted felon, he broke the law by possessing the 40-caliber handgun at the time of the shooting.

The victim testified that after one particular court appearance on August 18, 2006, he saw Defendant Harris outside the courthouse. He made eye contact with Defendant Harris who said, "I'm gonna get you boy. So, be ready." He said that Defendant Harris then walked down the drive talking to his family and making gun-like gestures.

On an occasion prior to the shooting which is the subject of this case, the victim testified that in October of 2005, he arrived home around 1:30 or 2:00 a.m., and as he was walking through the breezeway to his residence, Defendant Harris and another individual opened fire on him. One of the bullets struck him in the foot. The victim testified that he shot at a third man who ran from the side of the building. He then hid under a neighbor's Jeep until Defendant Harris and the other men left. The victim testified that his sister called police, and when they arrived, he told them that everything was fine and that he would "handle it." He also told police that he did not know who shot at him. He said that he did not want police searching his house because he had two firearms on his person, and there were additional assault rifles in his home. The victim testified that he had driven by Defendant Harris' beauty shop prior to the incident.

*3 Kenneth Miller testified that he left work on February 15, 2006, and dropped a passenger off at Dunlap and Kyle Tire on Dickerson Road. As he was sitting at a traffic light, he heard gunshots nearby. Mr. Miller testified that he "located two cars in [his] side mirror going in the opposite direction. The one car pulled up next to the other car and-uh -they started firing again." He further testified:

Uh—when they fired again, I was watching in—in my side mirror. Uh—and, uh—I saw—uh—either a black sleeve, or a black arm, holding a black semi-automatic. I personally own a Tarurus (phonetic) [sic] nine [millimeter]. And, it had the same style and size as that. And, I could—I watched the hammer slide, ejecting the shells, and in the blink of an [eye], there was just pieces of that car were just exploding.

Mr. Miller stated that he saw the arm protruding out of the passenger's side of the car. He then drove a short distance and called police. He was assured that officers were on the scene, and he drove back and talked to an officer there. Mr. Miller testified that during the shooting it sounded "like emptying a clip and reloading a clip and emptying it again." He said that when the shooting "started, it started." Mr. Miller did not know the model of the car involved in the shooting. He said that it was a "sedan-type" vehicle.

Detective Michael Wilson of the Metropolitan–Nashville Police Department testified that he was working as a patrolman assigned to the East Precinct Crime Suppression Unit on February 15, 2006. He and Officer Jason Smith were standing on Joseph Avenue and Evanston late that afternoon and heard multiple gunshots. It sounded as though two different weapons were fired, and he could tell that the shots came from the Dickerson Road area. Detective Wilson and Officer Smith got into their cars and drove south on Dickerson Road to Cleveland Street. Detective Wilson testified that he pulled into the parking lot of the AM/PM Market and saw a small car parked in front of the gas pumps with blood inside it and twelve to fifteen bullet holes in the car on the driver's side. He walked inside the market and saw the victim, who was bleeding. One of the bullets had knocked out the victim's front teeth. Detective Wilson was unable to get much information from the victim before he was taken away by ambulance due to the trauma to his mouth.

Belba Wilson, the victim's mother, testified that she went to Vanderbilt Medical Center on February 15 or 16, 2006, to see the victim. She did not remember if the victim said who shot him, but he was talking about retaliation. Ms. Wilson told him to think of his kids and not take matters into his own hands.

Officer Woodrow Ledford testified that he responded to the shooting on Dickerson Road. He drove to the AM/PM Market and was then instructed to move further up Dickerson Road around Dunlap and Kyle Tire to look for evidence. The area had businesses along the entire street, and there were several parking lots. Because he was there around 5:00 p.m., the area was "fairly congested" with traffic. Officer Ledford testified that the area had two northbound and two southbound lanes, was two to three miles from downtown Nashville, and was heavily populated. He said that there was not an actual entrance ramp to the interstate from Dickerson Road, but it could be accessed from Spring Street.

*4 Officer Ledford testified that when he pulled into the parking lot of Dunlap and Kyle Tire, a gentleman handed him "12 or so" spent shell casings that he had picked up. There was also a mirror from a vehicle. Officer Ledford also picked up five or six shell casings himself. He believed some of the casings were 40-caliber and some were smaller and appeared to be nine-millimeter. Officer Ledford gave the shell casings to another officer.

Officer Tommy Simpkins of the Metropolitan–Nashville Police Department, Identification Section, testified that he was dispatched to the AM/PM Market on February 15, 2006, and viewed a black, four-door Toyota Corolla. There were several bullet strikes in the vehicle, and he saw some projectile and projectile pieces. Officer Simpkins testified that there were no shell casings inside the Corolla. The windows were up and for the most part remained intact. There were holes on the front driver's door window and the rear driver's side window, and a bullet was found in the door frame of the driver's side. Officer Simpkins collected the victim's clothing, and a "slug" was retrieved from the trunk. He also found a tooth from the victim on the ground outside of the car. Officer Simpkins testified that he was given twelve spent shell casings by Officer Ledford. Seven of the casings were forty-caliber and five were nine-millimeter.

Detective Terrence Bradley testified that paramedics were treating the victim when he arrived at the AM/PM Market, and he followed the ambulance to the hospital. He spoke briefly with the victim who gave him a description of what happened. Detective Bradley testified that the victim gave him the names of Defendant Braxton and Defendant Harris. He said that the victim was in a lot of pain and did not want to talk any more. Detective Bradley then put together a photographic line-up and showed it to the victim at the hospital. The victim identified Defendant Braxton, but could not write because his hands were immobilized. At that time, Detective Bradley had not located anything on Defendant Harris. He later found Defendant Harris in the system and put together another line-up. The victim identified Defendant Harris. Detective Bradley then obtained warrants on Defendants Harris and Braxton.

On cross-examination, Detective Bradley testified that he did not recall asking the victim who shot him while he and the victim were at the market. He said that he stopped talking to the victim at the hospital because the victim became uncomfortable. He did not remember the victim saying that he wanted to take care of things himself, and he probably saw the victim three times at the hospital.

Defendant Harris' Proof

Willie Sweat, Defendant Harris' step-son, testified that he was living with his mother and Defendant on February 15, 2006. He said that he arrived home from school around 3:30 p.m. and saw Defendant Harris in the restroom vomiting. Mr. Sweat then walked into his room and shut the door. He said that Defendant was at the house all night. Mr. Sweat testified that he could remember the date because it was the day after Valentine's Day, and they had all gone to Chili's to eat with a large group of people.

*5 On cross-examination, Mr. Sweat testified that Defendant Harris was wearing a sleeveless t-shirt and underwear at the time. He said that his mother arrived home around 4:00 or 5:00 p.m. Mr. Sweat testified that he ate supper in his room, but saw Defendant Harris get some soup. He had no idea what time it was. Mr. Sweat admitted that he did not testify on Defendant Harris' behalf at the preliminary hearing. He further admitted that he had never told police or anyone at the district attorney's office that Defendant Harris was at home at the time of the shooting.

Pamela Sweat Harris testified that she was working on February 15, 2006, and arrived home by 4:30 p.m. She said that Defendant Harris walked out of the kitchen complaining that his stomach was hurting, and he told her that he had been vomiting. Ms. Harris testified that Defendant Harris took some medication and walked upstairs. She said that he was at home all night. Ms. Harris testified that she remembered the date because they had gone to Chili's on Valentine's Day with a large group of people.

On cross-examination, Ms. Harris testified that Defendant Harris was wearing a long t-shirt with short sleeves and jeans when she got home. She said that she did not know when Defendant Harris was arrested, and she did not know when the preliminary hearing was held. She also did not help him obtain legal counsel. Ms. Harris testified that she did not speak with Defendant Harris' attorney before the preliminary hearing; however, she thought that she told him at some point that Defendant Harris was at home with her at the time of the shooting.

**Defendant Braxton's Proof**

Derrica Christman testified that she was living in the Parkway Terrace Apartments in February of 2006. She met Defendant Braxton in the summer of 2005, and he frequently hung around the apartment complex. Ms. Christman testified that she remembered February 15, 2006, because it was the day after Valentine's Day, and her daughter had attended a dance at Stratford High School. Her daughter only attended Stratford for one year. Ms. Christman testified that her daughter was going to ask Defendant Braxton for a ride to the dance, but Ms. Christman's brother took her instead. She said that the following day, February 15, Defendant Braxton asked how the dance went.

Ms. Christman testified that she saw Defendant Braxton and several others shooting dice near her back porch "no later than" 5:15 on February 15, 2006. She was certain of the time because her children usually arrived home from daycare between 5:15 and 6:00 p.m ., and she had to go out and get them off the bus.

On cross-examination, Ms. Christman testified that four or five people usually played dice at her back porch, and Defendant Braxton was frequently there. She said that she and Defendant Braxton had a conversation about her daughter's dance on February 15, 2006, and she saw him on February 13 and 14, but not February 11 and 12. Ms. Christman testified that she also saw Defendant Braxton on February 5 and 6, 2006, and she remembered seeing him in the area around her home on February 5. Ms. Christman said that she did not learn of the shooting until April of 2006 when she was trying to find out why Defendant Braxton was in jail. At the time, she did not tell police or anyone at the district attorney general's office that they had the wrong person. She said that she came forward in October of 2006 after speaking with Defendant Braxton. Ms. Christman acknowledged that her apartment was located near the 700 to 800 block of Dickerson Road.

**State's Rebuttal Proof**

*6 On rebuttal, Derrica Christman was recalled as a witness. She testified that if February 6, 2006, was a weekday, she saw Defendant Braxton after 5:00 p.m. She also saw him on February 13, 2006, between 5:00 and 5:15 walking from the building next door to hers. He was wearing the same jacket that she saw him wearing on February 15, 2006. On cross-examination, Ms. Christman said that she last saw Defendant Braxton eight days before February 13, 2006, and she was not sure that she saw him on February 6, 2006. She was certain that she saw him on February 13, 2006.

Wayne Miller, Records Technician for the Davidson County Sheriff's Office, testified that Defendant Braxton was in the custody of Sheriff's Office during February of 2006. He entered the facility at 2:12 p.m. on February 6, 2006, and he left at 4:27 p.m. on February 13, 2006.

Alfred Gray, an investigator for the district attorney general's office, testified that he spoke with Ms. Christman concerning Defendant Braxton's case. Ms. Christman told him that she remembered Defendant Braxton being outside of her home on the night of the shooting. She remembered the incident because it happened the day after Valentine's Day, and Defendant Braxton had been released from jail the day before Valentine's Day. Ms. Christman did not mention anything about her daughter's dance. Investigator Gray indicated that Ms. Christman's residence at Parkway Terrace was located a little less than two miles from the intersection of Grace and Dickerson Road where the shooting took place.

**Analysis**

**I. Sufficiency of the Evidence**

Both Defendants challenge the sufficiency of the evidence to support their convictions for second degree murder because they assert that the convicting evidence does not show that they "knowingly" attempted to kill the victim. They also argue that the trial court erred by refusing to grant their motions for judgment of acquittal because the victim's testimony contained "inaccuracies."

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. State v. Black, 815 S.W.2d 166, 175 (Tenn.1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn.1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn.1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. State v. Bland, 958 S.W.2d 651, 659 (Tenn.1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn.Crim.App.1990).

*7 As for the trial court's denial of Defendants' motions for judgment of acquittal, both Defendants chose to present evidence in their defense, and therefore have waived the right to specifically appeal the denial of their motions for judgement of acquittal. Finch v. State, 226 S.W.3d 307, 317 (Tenn.2007); State v. Mathis, 590 S.W.2d 449, 453 (Tenn.1979). In any event, this Court has noted that, "[i]n dealing with a motion for judgment of acquittal, unlike a motion for new trial, the trial judge is concerned only with the legal sufficiency of the evidence and not with the weight of the evidence." State v. Hall, 656 S.W.2d 60, 61 (Tenn.Crim.App.1983). The standard for reviewing the denial or grant of a motion for judgment of acquittal is analogous to the standard employed when reviewing the sufficiency of the convicting evidence after a conviction has been imposed. State v. Ball, 973 S.W.2d 288, 292 (Tenn.Crim.App.1998); State v. Adams, 916 S.W.2d 471, 473 (Tenn.Crim.App.1995). Thus, we will address Defendants' assertions that the evidence adduced at trial was insufficient to support the convictions.

Second degree murder is defined as "[a] knowing killing of another." T.C.A. § 39–13–210(a)(1). It is also a "result-of-conduct offense," and "[t]he statute focuses purely on the result and punishes an actor who knowingly causes another's death." State v. Ducker, 27 S.W.3d 889, 896 (Tenn.2000). Thus, as pertinent here, a person acts "knowingly" with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Id. § 39–13–302(b). A person commits criminal attempt when that person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Id. § 39–12–101(a)(3). For conduct to be a "substantial step," a person's "entire course of action" must be "corroborative of the intent to commit the offense." Id. § 39–12–101(b). "Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence. State v. Inlow, 52 S.W.3d 101, 105 (Tenn.Crim.App.2000); see also State v. Holland, 860 S.W.2d 53, 59 (Tenn.Crim.App.1993).

Viewing the evidence in a light most favorable to the State, the proof shows that Defendants Harris and Braxton knowingly shot into the victim's car numerous times with the intent of killing him. The victim testified that he left work around 5:00 p.m. on February 15, 2006, and noticed "a green early nineties model—uh—Buick Century get behind [him] that [he] had seen before that [he] saw Mr. Harris in, maybe three weeks before the shooting." The victim moved into the right lane of Dickerson Pike in an attempt to get onto the interstate and avoid the other vehicle; however, when he stopped his car in traffic, the green car pulled up beside him with Defendant Braxton and Defendant Harris hanging out of the car shooting from the passenger's side. Bullets penetrated the victim's vehicle and struck him in the left upper arm, left lower arm, right hand, finger, and face. The bullet that struck the victim in the face knocked out six of his teeth and remains lodged under his nose. There were sixteen bullet holes in the victim's car as a result of the shooting. The victim spoke with Detective Bradley and told him that Defendants Harris and Braxton shot him. He also identified them from a photographic line-up.

*8 The victim's testimony was corroborated by Kenneth Miller who testified that he was sitting at a traffic light on Dickerson Road on February 15, 2006, and heard nearby gunshots. He looked into his side mirror and saw two cars pulled up next to each other. Mr. Miller testified that he saw a black sleeve or arm protruding out of the passenger's side of one of the cars holding a black semi-automatic handgun. He saw the weapon fired into the other vehicle. He said, "And I could—I watched the hammer slide, ejecting the shells, and in the blink of an [eye], there was just pieces

of that car were just exploding." Mr. Miller further testified that during the shooting it sounded "like emptying a clip and reloading a clip and emptying it again."

Based on our review, we find that a rational trier of fact could conclude beyond a reasonable doubt that Defendants Harris and Braxton knowingly attempted to kill the victim. Moreover, the jury resolved any inaccuracies or issues with credibility in favor of the State.

## II. The Victim's Prior Criminal History

Defendants both contend that the trial court erred in precluding them from questioning the victim on cross-examination about (1) an incident that occurred twelve years earlier when he was shot during a home burglary and (2) about his prior arrest for being in possession of two pistols and a thirty-round magazine while wearing a bullet proof vest.

Our supreme court has recognized that "[t]he Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense." State v. Brown, 29 S.W.3d 427, 432 (Tenn.2000). A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. State v. Wyrick, 62 S.W.3d 751, 770 (Tenn.Crim.App.2001). Denial of the defendant's right to effective cross-examination is " 'constitutional error of the first magnitude' " and may violate the defendant's right to a fair trial. State v. Hill, 598 S.W.2d 815, 819 (Tenn.Crim.App.1980) (quoting Davis v. Alaska, 415 U.S. 308, 318, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the sound discretion of the trial court." State v. Dishman, 915 S.W.2d 458, 463 (Tenn.Crim.App.1995); Coffee v. State, 188 Tenn. 1, 216 S.W.2d 702, 703 (1948). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." State v. Reid, 882 S.W.2d 423, 430 (Tenn.Crim.App.1994).

In State v. Brown, our supreme court set forth the necessary analysis when determining whether the constitutional right to present a defense has been violated by the exclusion of evidence. Brown, 29 S.W.3d at 433–434. Specifically, we must consider "whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." Id. at 434.

*9 "[W]hether excluded evidence is critical to a defense is a fact-specific inquiry." State v. Flood, 19 S.W.3d 307, 317 (Tenn.2007) (citing Chambers v. Mississippi, 410 U.S. 284, 303, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973)). "Our supreme court has suggested that for evidence to be considered critical to the defense, the evidence must have some probative value and 'exclusion of the evidence would undermine an element of a particular defense.' " State v. Cyntoia Denise Brown, No. M2007–00427–CCA–R3–CD, 2009 WL 1038275, at (Tenn.Crim.App., at Nashville, Apr. 20, 2009), perm. to appeal denied (Tenn. Sept. 28, 2009) (quoting Flood, 219 S.W.3d at 317). Regarding the third Brown factor, the interests supporting exclusion of the evidence, a criminal defendant's right to confront and cross-examine witnesses against her or him is limited by Rule 402 of the Tennessee Rules of Evidence in that neither party "may cross-examine a witness on matters that are irrelevant." State v. Williams, 929 S.W.2d 385, 389 (Tenn.Crim.App.1996). As our supreme court has observed, "the right to confront witnesses is satisfied if defense counsel receives wide latitude at trial to cross-examine, because the confrontation clause only guarantees 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish.' " State v. Middlebrooks, 840 S.W.2d 317, 332–33 (Tenn.1992), superceded by statute on other grounds as stated in State v. Stout, 46 S.W.3d 689, 705 (Tenn.2001).

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Under Tennessee Rule of Evidence 402, irrelevant evidence is not admissible. Relevant evidence is generally admissible but may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. See id. 402, 403. A trial court's evidentiary ruling based on relevance is reviewed on appeal for an abuse of discretion. See State v. Dubose, 953 S.W.2d 649, 652 (Tenn.1997).

In this case, prior to trial, Defendant Harris filed a "Motion in Limine/Notice of the Defense Counsel's Intent to Introduce the Prior Criminal History of James Williams." The motion listed seven "prior Convictions or Prior Bad Acts" including two for unlawful possession of a weapon and "Weapon commission of Offense While Wearing a Body

Vest." The motion also contained the following statement: "This Notice is given pursuant [to] Tennessee Rules of evidence 609 and 405 for impeachment purposes and in order to adequately defend Mr. Harris."

At a pre-trial hearing on the motion, the State challenged the admissibility of several of the convictions and bad acts, and defense counsel agreed to remove the claims of domestic assault, reckless endangerment, and one claim of unlawful possession of a weapon because they were not criminal convictions. Defense counsel also agreed that the claim of "Weapon commission of Offense While Wearing a Body Vest" was not a conviction. Concerning the admissibility of that prior act however, the following exchange took place at the hearing:

*10 THE COURT: Is this somehow still admissible?

[DEFENSE COUNSEL]: Yes, it is, Your Honor. It goes to the Defendant's reputation—

THE COURT: The Defendant's?

[DEFENSE COUNSEL]: I'm sorry, the victim's reputation—alleged victim's reputation. And, also, I think it's substantive proof in this matter that other people tried to kill him, simply because I think it's consistent with (indiscernible) that somebody roams around the—the city of Nashville—

THE COURT: Okay. You've thrown about five things, potential rules, out; one, you're saying that he had potential

[DEFENSE COUNSEL]: Well

THE COURT: potential what? What are you

[DEFENSE COUNSEL]:—It just demonstrates to me, Your Honor, that other people that, maybe, are unknown to the State—

THE COURT: The fact that he's arrested for wearing a body vest?

[DEFENSE COUNSEL]: No, I think it's consistent with the fact that somebody's attempting to kill him. And I just—it would just be estab—

THE COURT: Okay. Do you have proof of some third-party person that's after Mr. Williams?

[DEFENSE COUNSEL]: I do not, Your Honor. And I'm—of course, it's our contention that Mr. Harris is certainly not one of them. However, I mean, I just rest on the fact that—

THE COURT: Okay. Well, then explain to me how an arrest for wearing—carrying a weapon—I don't even know what offense this is—but you've got weapon, commission of offense while wearing a body vest, has some relevancy to whether or not there was an attempted murder perpetrated against him by Mr. Harris or Mr. Braxton.

[DEFENSE COUNSEL]: I just think that that is conduct by the victim that's consistent with the fact he's shooting—he's being shot at by other people, that he feels like it's in his best interest to wear a bullet-proof—or body armor. That's—

THE COURT: I've not any proof about people shooting at him. Do you have that?

[DEFENSE COUNSEL]: No, I don't.

THE COURT: Do you wanna (sic) proffer—

[DEFENSE COUNSEL]: No, I do not, Your Honor.

Counsel for Defendant Braxton then argued that the victim's arrest in 2004 for being in possession of two weapons, one with a thirty-round clip and with the serial number removed, while wearing a "body vest" and him being previously shot in the back during a burglary demonstrated that the victim "is a guy with enemies, who knows he has enemies; and it makes it more likely that it is someone else who shot him on February the fifteenth of two-thousand six."

Prior to the victim's testimony at trial, in a jury-out hearing, the victim testified concerning his conviction in November of 2004 of being a felon in possession of a weapon. He admitted that when he was arrested, he was in possession of two handguns, one of which was a Glock with a thirty-round clip. He was also wearing a bullet-proof

vest. The victim testified that he was shot in the back twelve years earlier, which required surgery. He said that neither Defendant Braxton nor Defendant Harris were involved in the shooting. Counsel for Defendant Harris then stated to the trial court: "It's not character evidence that I'm going for. It's taken—uh—as a whole, all the events, shows that Mr. Williams leads a dangerous life style." Counsel further stated: "You don't go around wearing body armor unless you think somebody is going to shoot you." The following exchange then took place between the trial court and counsel for Defendant Harris:

*11 THE COURT: But, you're not arguing credibility purposes. You're wanting to introduce other things other than 609 convictions. You just said it's for substantive evidence.

[DEFENSE COUNSEL]: Well, Judge, I—I don't think there is any question when it's a defendant the rules are different. It would fall under 404(b) and, if those convictions or different incidents were to go to show—go to show not propensity, but,—

THE COURT: Okay.

[DEFENSE COUNSEL]:—motive or—

THE COURT: That might be true. But, isn't it all character?

[DEFENSE COUNSEL]: Under 404(b), would it be? I—

THE COURT: No. I mean, you're wanting to disparage the character of Mr. Williams.

[DEFENSE COUNSEL]: I don't think that's what I'm trying to do. I wouldn't put it that way. I'm trying to say that—

THE COURT: So, you're not wanting to get up in closing arguments in front of the jury and say look at all this man's convictions. You think—there are fifty people after him, we could assume. And, he wants to suddenly point his finger at my client. You're not wanting to argue that.

[DEFENSE COUNSEL]: I don't think that goes to character, Judge. I think it goes to who could have shot him.

THE COURT: Okay. Who could have?

[DEFENSE COUNSEL]: Someone else and that's all that's important.

THE COURT: Based on his carrying weapons.

[DEFENSE COUNSEL]: Well, I mean, if you put it that simply—

THE COURT: And, the convictions.

[DEFENSE COUNSEL]:—that wouldn't work. But,—carrying weapons convictions, being shot, wearing body armor.

The trial court then held that evidence of the victim being shot twelve years earlier and evidence of his possession of weapons while wearing body armor was not relevant:

In terms of the proffer involving Mr. Williams and the body armor and want to get outside the fact of a conviction and get into the facts surrounding those convictions, I think the convictions speak for themselves, first of all, in terms of multiple, three I think, felony possessions of a weapon ... aggravated assaults, attempted—attempt to commit aggravated robbery ... give the jury what-ever view they might see of Mr. Williams through those convictions, speak for themselves, especially when the body armor issue that Mr. Sprouse is wanting to get into occurred sixteen months prior to this incident. It's not like it was six days or six months. It's sixteen months, which lessens the probative value what it is being offered for. I'm caught wearing body armor in 2004, therefore, somebody must be after me in 2006. I just don't see the relevancy of that, nor do I see the relevancy of asking Mr. Williams if he has ever been shot before, twelve years prior to this particular allegation being made.

Rule 404(a) of the Tennessee Rules of Evidence generally provides that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of providing action in conformity therewith." Nonetheless, evidence of a victim's character may be admissible under certain circumstances. For example, under Rule 404(a), the defendant in a criminal case may offer "evidence of a pertinent trait of character" of the victim. "Evidence is called 'pertinent' when

it is directed to the issues or matter in dispute, and legitimately tends to prove the allegations of the party offering it." Black's Law Dictionary 1145 (6th ed.1990). In other words, to qualify as "pertinent," the character evidence must be relevant." Id.

*12 In the present case, we conclude that the trial court did not err in excluding evidence of the victim being shot during a burglary twelve years prior to the shooting in this case nor did the court err in excluding evidence concerning the victim's wearing a bullet-proof vest sixteen months prior to the shooting. Although the trial court did not specifically state that the probative value of this evidence was outweighed by its prejudicial effect, such was implied in the court's ruling. Any connection between Defendants' claim that someone else shot the victim and the victim being shot twelve years earlier and his wearing of a bulletproof vest sixteen months earlier is too tenuous for the evidence to be considered critical to the defense. Defendants are not entitled to relief on this issue.

### III. Testimony Regarding Defendant Braxton's Prior Incarceration

Defendant Braxton argues that the trial court erred in allowing Wayne Miller of the Davidson County Sheriff's Office, Records Division, to testify in rebuttal that he was checked into the Davidson County Jail at 2:12 p.m. on February 6, 2006, and that he was released at 4:27 p.m. on February 13, 2006. He contends that the testimony "was unduly prejudicial and its probative value was outweighed by its prejudicial effect and violated Rule 403 of the Tennessee Rules of Evidence."

As previously discussed, Tennessee Rule of Evidence 401 provides that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn.Crim.App.2006) (citing State v. Dubose, 953 S.W.2d 649, 652 (Tenn.1997)). We also point out that rebuttal evidence "is that which tends to explain or controvert evidence produced by an adverse party." Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn.1979). It is also within the trial court's sound discretion to allow or reject rebuttal evidence. State v. Green, 613 S.W.2d 229, 234 (Tenn.Crim.App.1980).

During the trial Derrica Christman, an alibi witness for Defendant Braxton, testified during direct examination that she saw Defendant Braxton shooting dice on her back porch no later than 5:15 p.m. on February 15, 2006, the day that the victim was shot. During cross-examination by the State, the following testimony was elicited from Ms. Christman:

*13 Q. When was the last time you had seen [Defendant Braxton] prior to February 15th 2006?

A. February 14th.

Q. Okay. And, prior to February 14th?

A. February 13th.

Q. You had seen him on the thirteenth. Had you seen him on the twelfth?

A. No.

This was the extent of Ms. Christman's testimony during Defendant Braxton's proof which dealt with when she had observed Defendant Braxton on February 5, 6, or 13.

After both Defendants had submitted their proof, the State called Ms. Christman as a rebuttal witness to further testify as to when she had last seen Defendant Braxton prior to February 15, 2006. Her entire testimony in rebuttal is as follows:

[DIRECT EXAMINATION BY STATE]

Q. Ms. Christman, uh—the last time you testified was a little while ago, you mentioned that you saw Mr. Braxton on February 6th—uh—of 2006, is that correct?

A. Uh—huh.

Q. Do you remember if that was in the morning, the afternoon or the night time?

A. Had to be like in the evening, afternoon, evening.

Q. Okay. When you say the evening, what time would you put that to be the best of your memory?

A. Uh—five or so, after five.

Q. And, it would be—you base that time on the same thing, about when your children get home from school. So, on February 6th you would have seen him that evening after your children had been off the bus?

A. If—

Q. Is that a yes?

A. If that was a week day, then, yes.

Q. Okay. Well, do you remember what February 6th was?

A. No.

Q. But, to the best of your recollection it was around five o'clock, correct?

A. Yes.

Q. Okay. And, did you also say that you saw him on the thirteenth of February,—

A. Yes.

Q. —of 2006?

A. Uh-huh.

Q. And, about what time did you see him?

A. Uh—it was ... between five and five fifteen.

Q. And, what was he doing when you saw him on the thirteenth?

A. He was coming from the next building beside my building.

Q. Okay. And, what was he wearing at the time?

A. He was—uh—either brown or green jacket with patches on it.

Q. Now, we're talking not on the fifteenth. We're talking on the thirteenth.

A. Yeah.

Q. Okay. And, he was wearing that same outfit?

A. Uh-huh.

Q. Okay. And,—

A. Same jacket at least.

Q. —that would have been around five fifteen on—

A. Yes.

Q. —thirteenth of February, 2006?

A. Uh-huh.

Q. And, to your knowledge does he have any—he doesn't live where you are, does he?

A. No.

[CROSS EXAMINATION BY DEFENDANT BRAXTON'S COUNSEL]

Q. On cross-examination, your last cross-examination, uh—you were asked when the last time you saw Mr. Braxton was previously to the thirteenth?

A. Yes.

Q. Do you know when that was?

A. It was … it was more than a week. It was maybe …

Q. Do you know when it was?

A. Maybe eight days before the thirteenth.

Q. Okay. Let me … do you remember specifically? Is there anything special about that day that would make you remember it?

*14 A. Other than that was the last time I had seen him until I saw him a week or so later.

Q. Okay. So, you wouldn't swear by the fact that it was the sixth?

A. No. I'm not sure.

Q. Okay; thank you.

In response to Ms. Christman's testimony, the State called Wayne Miller of the Davidson County Sheriff's Office, Records Division. Counsel for Defendant Braxton objected on the ground that while possibly relevant, Mr. Miller's testimony that Defendant Braxton was taken into the custody of the Davidson County Jail at 2:12 p.m. on February 6, 2006, and he was released on February 13, 2006, at 4:27 p.m. should not have been admitted because it was more prejudicial than probative. Specifically, the following colloquy occurred between Defendant Braxton's counsel and the trial court:

THE COURT: The second time?

[DEFENSE COUNSEL]: Yes, Your Honor, the second time. Uh—but, keep in mind—

THE COURT: What did she say during her testimony when you called her?

[DEFENSE COUNSEL]: What did she say during the tes—when I called her the first time?

THE COURT: Uh—huh.

[DEFENSE COUNSEL]: During my direct?

THE COURT: No, her full testimony.

[DEFENSE COUNSEL]: During her cross-examination she said she had seen him on February 6th but, her testimony was not clear … it was not precise. From——uh—my recollection of it, she—uh—was not——it was February 4th or February 5th or February 6th she was not sure. And, that is not—

THE COURT: Is that what she said?

[DEFENSE COUNSEL]: I don't know—uh—that is what I remember it is. I'm not one hundred percent sure of that.

THE COURT: Okay. I've got it that she saw Mr. Braxton on two five and two six in the area around her house. When she was called back by the State, she said it was February—on February 6th had to be in the evening after five p.m.

Then, you got back up on recross and said, are you really wanting to swear that you saw—that you saw him on two six? And, she said, well, I don't know, I'm not sure.

The transcript reflects that Ms. Christman testified during Defendant Braxton's case-in-chief that she saw Defendant Braxton "maybe February 5th or the 6th." (emphasis added). This was the testimony the State was entitled to rebut in its rebuttal proof; the State was not entitled to rebut the more "definitive" testimony of seeing Defendant Braxton on February 6th during her testimony as a rebuttal witness for the State. This Court has explained:

The phrase "rebuttal evidence" may be defined as evidence "which tends to explain or controvert evidence produced by an adverse party." Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn.1979). This phrase encompasses "[a]ny competent evidence which explains or is a direct reply to, or a contradiction of, material evidence introduced" by an adverse party. Nease v. State, 592 S.W.2d 327, 331 (Tenn.Crim.App.1979). Rebuttal evidence is properly admitted for the purpose of impeaching a witness through the use of a prior inconsistent statement. Monts v. State, 218 Tenn. 31, 57–58, 400 S.W.2d 722, 733–734 (1966); Gray v. State, 194 Tenn. 234, 247–248, 250 S.W.2d 86, 92 (Tenn.1952); Beasley v. State, 539 S.W.2d 820, 824 (Tenn.Crim.App.1976). See Tenn. R. Evid. 613(b).

*15 State v. Braden, 867 S.W.2d 750, 760 (Tenn.Crim.App.1993).

We conclude that the trial court erred by overruling Defendant Braxton's objection to Mr. Miller's testimony. In a close case this error, which allowed an employee of the sheriff's office to testify as to the incarceration of a defendant on obviously unrelated charges prior to the commission of the offense for which the defendant is being tried, could result in the necessity for granting a new trial. However, we are confident in concluding in this case that the error was harmless. Defendant Braxton is not entitled to relief on this issue.

IV. Sentence Length

In this case, Defendants argue that their sentences are excessive as to their attempted second-degree murder convictions because the trial court erred in finding that they used a deadly weapon during the commission of the offense.

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40–35–210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." Carter, 254 S.W.3d, 335, 346 (Tenn.2008). Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections–102 and–103 of the Sentencing Act." Id.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40–35–113 and 40–35–114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the Defendant wishes to make in the Defendant's own behalf about sentencing. T.C.A. § 40–35–210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn.2002).

In Carter, the Tennessee Supreme Court clarified the 2005 changes in Tennessee sentencing law and stated:

[A] trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence.

*16 Carter, 254 S.W.3d at 345–46.

Thus, a trial court's "fail[ure] to appropriately adjust" a sentence in light of applicable, but merely advisory, mitigating or enhancement factors, is no longer an appropriate issue for appellate review. Id., 254 S.W.3d at 345 (citing State v. Banks, No. W2005–02213–CCA–R3–DD, 2007 WL 1966039, at *48 (Tenn.Crim.App., at Jackson, July 6, 2007) (noting that "[t]he 2005 amendment [to the Sentencing Act] deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts").

The record reflects that the trial court considered the evidence presented at the trial and the sentencing hearing. The court further considered the presentence report, the principles of sentencing and the arguments as to sentencing alternatives, the nature and characteristics of the offenses, the evidence offered by the parties on enhancement and mitigating factors, and the potential for rehabilitation or treatment.

As a range I offender convicted of a Class B felony, the applicable range of punishment for Defendant Harris was no less than eight nor more than twelve years. T.C.A. § 40–35–112(a)(2). As a Range II offender convicted of a Class B felony, the range of punishment for Defendant Braxton was no less than twelve nor more than twenty years. T.C.A. § 40–35–112(b)(2).

The trial court applied enhancement factor (1) that both Defendants had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. T.C.A. § 40–35–114(1). The trial court found that Defendant Harris had "three prior felonies, a felony cocaine case, a felony theft case and a felony evading arrest case, and ten misdemeanor convictions, including a prior carrying a weapon conviction." In addition to the convictions necessary to establish Defendant Braxton as a Range II offender, he has "the prior 'E' felony ..., and in addition six misdemeanor convictions, non-driving misdemeanor convictions." The trial court also applied enhancement factor (6) that extensive personal injury was inflicted upon the victim. T.C.A. § 40–35–114(6). At trial, the victim testified that after the shooting, he was transported by ambulance to Vanderbilt Medical Center where he was immediately taken into surgery. He said that one of the bullets struck him in the upper arm, which required a metal plate. A bullet also went through his hand and lodged in his wrist, and one struck his finger and his face. The victim testified that he had surgery on his finger because it was "hanging off," and the bullet that entered his face is still lodged under his nose, and he lost six teeth.

The trial court applied enhancement factor (8) that both defendants had a previous history of unwillingness to comply with release into the community. Defendant Harris had two prior probation violations, and Defendant Braxton had three. T.C.A. § 40–35–114(8). The trial court applied enhancement factor (9) that Defendants possessed and employed firearms in the commission of the offense. T .C.A. § 40–35–114(9). Concerning this factor, the court noted: "There is the enhancing factor as to both that a weapon was used, a firearm, multiple times, two different weapons according to the circumstantial proof ... fired thirteen or so plus times into Mr. William's car." The trial court applied enhancement factor (11) that the offense involved the threat of death or serious bodily injury to other persons, in Defendant Braxton's case, as he had been previously convicted of a felony that resulted in death. T.C.A. § 40–35–114(11). The trial court pointed out that "there was a high risk of injury to others there in the community when this shootout occurred, one sided shootout occurred there in broad daylight with high traffic, including the witness, Mr. Miller, who testified at the trial." The court further noted that Defendant Braxton had a prior manslaughter conviction. Finally, the trial court applied enhancement factor (13) to Defendant Braxton's sentence noting that he was on probation at the time of the offense. T.C.A. § 40–35–114(13). The trial court did not find any applicable mitigating factors as to either Defendant.

*17 Both Defendants argue that the trial court erred in finding that they employed firearms during the commission of the offenses because they contend that it is an element of the offense of attempted second degree murder. However, use of a deadly weapon is not an essential element of that offense. See T.C.A. §§ 40–35–114, 39–13–210, and 39–12–101; State v. Matthew Joseph Carter, No. E2009–00217–CCA–R3–CD, 2010 WL 4324386 (Tenn.Crim.App. Nov.2, 2010) no perm. app. filed.

The record clearly shows that the trial court followed the statutory sentencing procedure, made findings of facts that are adequately supported in the record, and gave due consideration to the principles that are relevant to sentencing. Based on our review, we conclude that the enhancement factors considered by the trial court adequately support the trial court's discretionary decision to impose a sentence of eleven years for Defendant Harris and nineteen years for Defendant Braxton. Defendants are not entitled to relief on this issue.

Defendant Harris also seems to argue that he should not have been ordered to serve his sentence in confinement. However, he does not support his argument with appropriate references to the record or reasons why he should be granted relief. Therefore this issue is waived. Tenn. R.App. P. 27(a)(7)(A).

**VI. Ineffective Assistance of Counsel**

Both Defendants argue that they received ineffective assistance of trial counsel in this case. More specifically, both Defendants argue that their respective trial counsel was ineffective for failing to request a jury instruction on the lesser-included offense of reckless endangerment. Defendant Braxton also argues that trial counsel was ineffective for (a) failing to object to the sentence or request a continuance when the State did not provide proper notice of intent to seek enhanced punishment or provide certified copies of his convictions; (b) failing to amend the original notice of alibi; (c) failing to investigate possible defenses or alibi witnesses; and (e) failing to adequately meet and prepare for trial. Defendant Harris contends that trial counsel was ineffective for asking the victim about a prior altercation with Defendant Harris that "opened the door" to the victim's testimony about an earlier attempt by Defendant Harris to harm or kill the victim.

Claims of ineffective assistance of counsel are generally more appropriately raised in a petition for post-conviction relief rather than on direct appeal. See State v. Carruthers, 35 S.W.3d 516, 551 (Tenn.2000). This Court has consistently "warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant amount of development and fact finding such an issue entails." Kendricks v. State, 13 S.W.3d 401, 405 (Tenn.Crim.App.1999). Raising the issue of ineffective assistance of counsel on direct appeal is "a practice fraught with peril." State v. Thompson, 958 S.W.2d 156, 161 (Tenn.Crim.App.1997). This peril is two-fold. First, ineffective assistance can rarely be established without an evidentiary hearing. See Strickland v. Washington, 466 U.S. 668, 689–90, 694, 104 S.Ct. 2052, 2065, 2067, 80 L.Ed.2d 674 (1984). Post-conviction procedures afford an evidentiary hearing to a Defendant with colorable claims. See T.C.A. §§ 40–30–109(a),–110 (2006). Second, raising the issue in the direct appeal could result not only in losing on appeal, but also in barring the claimant from raising the issue later in the post-conviction arena. T.C.A. §§ 40–30–106(f) & (h) (2006). A post-conviction claim for ineffective assistance of counsel will be dismissed where that claim has previously been determined by another court. T.C.A. § 40–30–106(f). "A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." T.C.A. § 40–30–106(h). However, because there is nothing barring a defendant from bringing an ineffectiveness claim in a direct appeal, we will proceed with our analysis of each Defendant's claims.

*18 Under Tennessee Code Annotated section 40–30–110(f) (2003), a defendant seeking post-conviction relief on the basis of ineffective assistance of counsel is required to prove his or her allegations "by clear and convincing evidence." This same standard applies even when the claim of ineffective assistance of counsel is raised on direct appeal. State v. Burns, 6 S.W.3d 453, 461 n. 5 (Tenn.1999) (citing State v. Anderson, 835 S.W.2d 600, 607 (Tenn.Crim.App.1992)). The factual findings entered by the trial court are conclusive unless the defendant establishes that the evidence preponderates against those findings. Fields v. State, 40 S.W.3d 450, 457 (Tenn.2001). For a defendant to successfully overturn a conviction based on ineffective assistance of counsel, the defendant must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn.1975). Second, the defendant must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). The defendant is not entitled to the benefit of hindsight; the defendant may not second-guess a reasonably based trial strategy; and the defendant may not criticize a sound, but unsuccessful, tactical decision made after adequate preparation for the case. Adkins v. State, 911 S.W.2d 334, 347 (Tenn.Crim.App.1994); Cooper v. State, 847 S.W.2d 521, 528 (Tenn.Crim.App.1992).

**A. Failure to Request a Jury Instruction on the Lesser–Included Offense of Reckless Endangerment.**

Defendant Braxton and Defendant Harris both contend that their respective trial counsel was ineffective for failing to request a jury instruction on the misdemeanor offense of reckless endangerment as a lesser-included offense of attempted premeditated first degree murder.

Initially, we note that each Defendant has the burden of proving that he or she was prejudiced by an alleged deficiency on the part of trial or appellate counsel. Strickland, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. In order to

establish prejudice, each Defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., 466 U.S. at 694. A defendant is required to request in writing that the trial court instruct the jury on any specifically identified lesser included offense. T.C.A. § 40–18–110(a). In the absence of such a request, the trial court may charge the identified lesser included offense, but the defendant is not entitled to the charge. Id. § 40–18–110(b). Reckless endangerment is a lesser included offense of attempted first degree murder. See State v. Rush, 50 S.W.3d 424, 431–32 (Tenn.2001). If it had been included in the jury charge, it would have been listed after aggravated assault.

*19 In this case, Defendants were indicted for the offense of attempted first degree murder. The trial court instructed the jury on the indicted offense and the lesser included offenses of facilitation of attempted first degree murder, attempted second degree murder, facilitation of attempted second degree murder, attempted voluntary manslaughter, facilitation of attempted voluntary manslaughter, aggravated assault with a deadly weapon, and aggravated assault with serious bodily injury. The jury convicted Defendants of attempted second degree murder to the exclusion of the immediate lesser included offense. Harmless error may be shown where the jury convicts on the higher offense to the exclusion of the immediately lesser offense, necessarily rejecting other lesser offenses. State v. Williams, 977 S.W.2d 101, 106 (Tenn.1998). Therefore, we conclude that Defendants were not prejudiced by trial counsels' failure to request jury instruction on the lesser included offense of reckless endangerment.

**B. Failure to Object to the Sentence or request a Continuance When the State Did Not Provide Proper Notice of Intent to Seek Enhanced Punishment or Provide Certified Copies of Defendant Braxton's Convictions.**

In his motion for new trial, Defendant Braxton raised the following issue concerning his sentence:

Defendant was denied effective assistance of counsel when counsel failed to object to the State's failure to file a Notice of enhanced punishment and allowing certain convictions to be used against the Defendant at sentencing, by not requiring certified copies of those convictions to be used, and by failing to make a motion for a continuance.

The trial court, in its order denying Defendant Braxton's motion for new trial held: "The Court accredits the testimony of trial counsel that he investigated all of the defendant's prior convictions and believed they were valid. The Court finds the State had filed timely a notice of enhanced punishment."

The record supports the trial court's finding. At the hearing on the motion for new trial, counsel for Defendant Braxton testified that the State had filed a notice of enhanced punishment but did not provide certified copies of his convictions at the sentencing hearing. Trial counsel admitted that he did not object to the hearing. He said:

I checked them out myself. I—I suppose I—I could have objected, there weren't any certified copies. And it is my understanding that, if that had been objected to, the—it just would've been continued for ten days, because, while we are entitled to notice, I don't necessarily know if it's like a gotcha (sic) thing, sort of, "You didn't give us notice, so I'm sorry."

Defendant Braxton has failed to show that he was prejudiced by trial counsel's failure to object to his enhanced sentence or by failing to request a continuance. He is not entitled to relief on this issue.

**C. Failure to Amend the Original Notice of Alibi**

Defendant Braxton next contends that trial counsel was ineffective for failing to amend the notice of alibi filed by his previous counsel to include an additional witness, Lateisha Martin. The trial court held that trial counsel made a tactical decision not to call Ms. Martin and did not render ineffective assistance of counsel.

*20 Again, the evidence presented at the hearing on Defendant's Braxton's motion for new trial supports the trial court's decision. At the hearing, trial counsel testified that it was his understanding that all of the alibi witnesses that Defendant Braxton intended to call at trial were listed on the notice filed by previous counsel. However, trial counsel admitted that he was mistaken, and Ms. Martin was not listed on the notice. The following exchange then took place:

Q. Did you have a bench conference regarding that particular witness?

A. I don't remember if we had a bench conference or not. I know the issue was discussed. The State stood up and said, "If this witness is going to be called for alibi witnesses, they are not listed, we've had no notice." I don't believe Judge

1-15

Dozier made a ruling on whether or not she would be allowed to testify. I think the issue was just kinda (sic) tabled. And I called Derrica Christman at that point; she was listed—

Q. Who was listed—

A. —on the notice. After her testimony the issue was re-raised and—as to whether or not she would be allowed to testify.

And at that point I made the decision, based upon how Mr. Harris' alibi witnesses had testified, that, quite frankly, even I decided to press the issue and the Judge were to allow me to call her as an alibi, I was worried.

And I thought Ms. Christman had done a good enough job that I just simply chose not to push the issue.

Q. Did you discuss that decision, not to call that particular witness, with Mr. Braxton?

A. I'm sure that we whispered at the table about it, that, you know, "This is why I'm not pushing the issue, and it's my fault that she wasn't listed on the notice. But, quite frankly, at this point I don't know if I'd call her anyway."

But, no, there was no—there was no recess, we didn't have an opportunity to, like, really get into it. We just whispered about it at the table.

Q. What was your understanding of Mr. Braxton's position on that?

A. I don't—I don't remember him voicing strong objection to my position on it. I—I—I don't remember that happening. I'm not saying it didn't, but I don't remember it happening.

Q. So, you don't recall if—whether or not he—that—that—in other words this was a tactical decision that you made, didn't—didn't necessarily have to wait on the Court to rule on that, it was—

A. Lemme (sic) be clear. It was not a tactical decision to leave her off the notice; and, if I had that to do over again, she would've been on the notice, without question.

But at the time, when it came to—to re-raise the issue, where I could've asked the Court, "Well, despite the fact that she's not on the notice, I wanna call her anyway," that's when I—yes, I decided at that point that, quite frankly, even it I would, I did not want to—

Q. Okay.

A. —recall her.

Q. But—and, so, it was a tactical decision to not push the issue.

On cross-examination, trial counsel further testified:

*21 Q. With regard to the second alibi witness, who was not called, you've indicated that you had decided during the trial, during watching Mr. Harris' alibi witnesses testify, that you did not want to call this second alibi witness anyway.

A. Yes, that's—I mean, it was a toss-up; but, counting the fact that I'd left her off the notice and the fact that I was worried about conflicting testimony from the two of them, I decided that I was not going to push the issue with the Court.

I don't know if I'm muddling the issue or not.

THE COURT: (To the Witness) Worried about conflicting testimony between anyone that may or may not could've been called versus—

THE WITNESS: Derrica Christman.

THE COURT:—the one that was called.

THE WITNESS: That's correct.

THE COURT: Okay. Well, I mean, did you have some information, as or after Ms. Christman was testifying, that—if I can find it here again (consulted file notes)—that Ms. Martin may have some inconsistent information?

THE WITNESS: Not on any material facts. I spoke with them both beforehand, and I was not about [to] put them on the stand, if I thought they were going to perjure themselves, no.

THE COURT: Right.

THE WITNESS: I mean, the material facts—I could not discern any inconsistencies between the two of them.

What I was speaking to more specifically is, when Mr. Harris' alibi witnesses testified, there were several questions about that they were wearing and that they had to eat and what time and what happened afterwards, quite frankly, things that were immaterial to the case, but nevertheless asked about, which they were dramatically different on.

And—and I did not—I thought Ms. Christman had done such an excellent job testifying, that I didn't wanna run the risk of messing up her testimony.

Trial counsel clearly made a tactical decision not to call Ms. Martin at trial, and Defendant Braxton has not presented any evidence to the contrary. Even if trial counsel had rendered deficient performance in failing to add Ms. Martin to the notice as an alibi witness, Defendant Braxton has not demonstrated any prejudice since he did not call Ms. Martin to testify at the hearing on his motion for new trial. See Pylant v. State, 263 S.W.3d 854, 869 (Tenn.2008); Black v. State, 794 S.W.2d 752, 757–58 (Tenn.Crim.App.1190).

**D. Failure to Investigate Possible Defenses or Alibi Witnesses .**

Defendant Braxton argues that trial court was ineffective for failing to investigate any possible defenses that he had to the offense or to investigate the alibi witnesses provided to him. As pointed out by the State, this issue was not raised in Defendant Braxton's motion for new trial or in his amended motion, and he may not raise the issue for the first time in this court. On direct appeal, our review is limited to the issues specifically raised in a motion for new trial. See Tenn. R.App. P. 3(e). "When an issue is raised for the first time on appeal, it is typically waived ." State v. Maddin, 192 S.W.3d 558, 561 (Tenn.Crim.App.2005); Tenn. R.App. P. 36(a) ("relief may not be granted in contravention of the province of the trier of fact."). Therefore, this issue is waived.

**E. Failure to Adequately Meet and Prepare for Trial.**

*22 Finally, Defendant Braxton argues that trial counsel was ineffective for failing to adequately meet with him and prepare for trial. Again, as pointed out by the State, Defendant Braxton failed to raise this issue in his motion for new trial or in his amended motion. Therefore, the issue is waived. See Tenn. R.App. P. 3(e); 36(a); and State v. Maddin, 192 S.W.3d 558, 561 (Tenn.Crim.App.2005).

**F. Opening the Door to the Victim's Testimony About an Earlier Attempt by Defendant Harris to Harm or Kill the Victim.**

Defendant Harris argues that his trial counsel rendered deficient performance by asking the victim about a prior altercation with Defendant Harris that "opened the door" to the victim's testimony about an earlier attempt by Defendant Harris to harm or kill the victim. At trial, the victim testified concerning the events surrounding the shooting on February 15, 2006. On cross-examination, trial counsel asked the victim about the shooting and questioned him about his prior testimony at the preliminary hearing where the victim indicated that he had no other altercations with Defendant Harris. After being cautioned by the court, trial counsel ultimately asked the victim, "Have you had any other altercations with Mr. Harris" to which the victim replied, "That's correct." Trial counsel then impeached the victim by pointing to the record of the preliminary hearing in which the victim indicated that had not had other altercations with Defendant Harris.

The State then sought to question the victim about a previous altercation during which Defendant Harris allegedly shot the victim in the foot. After a lengthy discussion out of the jury's presence, the trial court determined that the State would be allowed to question the victim about the prior altercation. On redirect examination, the victim testified that one night in October of 2005, someone had been following him. He said:

I was—uh—headed down Gallatin road going to McDonald's to get me something to eat. And, I rolled (phonetic) Mr. Harris, beauty shop, barber shop, whatever it was at the time, and—uh—I just noticed a car get behind me. I turned,

the car turned. And, I not gonna say it was a chase, but, the car stayed pretty much behind me where I had to speed up to lose the car. And, I finally side [sic] on a side street. And, I jumped out of the car and jumped in the bushes.

The victim testified that two cars "kept circling the block," and he called a couple of friends to pick him up. He stayed at their house for a few hours and then drove home around 12:45 a.m. The victim testified that he parked his car like he did every night. He then "checked the bushes", and as he walked up the breezeway, Defendant Harris and another individual opened fire on him. The victim said that although he had two handguns on him, he did not have a chance to return fire. He then realized that he had been shot in the foot. The victim testified that there was a third person "who ran on the side of the building and me and him exchanged gun-fire." He then hid under a neighbor's jeep until the three men left.

*23 The victim testified that one of the neighbors called police, and when they arrived, he did not tell them that he saw Defendant Harris or the other two individuals. He explained that he did not want to talk to police because he had two firearms on him, as well as several assault rifles in his home, and he did not want them to search his home.

Concerning this issue, the trial court held:

As to the defendant's allegations that trial counsel was ineffective in opening the door to a prior unproven altercation, the Court notes that trial counsel did ask this question. Before the witness could answer the question, "Have you had any other altercations with Mr. Harris," the Court asked counsel if he wanted to ask that question. Trial counsel said that he did wish to ask the question and the Court permitted him. Although the question opened the ability to question about other incidents in order to fill the conceptual void as to the bad blood between the defendant and the victim, much of this information was admissible if brought out by the State. This information also allowed information about the complaining witness and possible unfavorable demeanor seen by the jury. Even though potentially prejudicial, this was a tactical decision by trial counsel that may have had a valid defense motivation but certainly does not rise to the necessary level of effecting the outcome of the trial.

The record supports the trial court's findings. Trial counsel was able to successfully impeach the victim's testimony at the preliminary hearing where he testified that he had no prior alterations with Defendant Harris. Furthermore, as pointed out by the State, the victim's testimony had no corroboration from any other witness, and the victim admitted that he was in possession of two guns during the shooting, and there were additional assault rifles in the house. When police arrived on the scene, the victim did not tell them who shot at him because he did not want his own criminal activities discovered. Defendant Harris has not shown that he was prejudiced by trial counsel's performance in this area. The proof presented at trial was sufficient to support Defendant Harris's conviction for attempted second degree murder. This issue is without merit.

CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

August 1, 2004, be subject to the provisions of title 40, chapter 39, part 2, created by that act.

The sentencing commission terminated June 30, 1995. Sentencing Commission Comments have been retained, but do not reflect 1995 or subsequent legislation.

**Cross-References.**

Clerk, false statement in revenue report, § 9-2-111.

County board of equalization, false swearing before, § 67-5-1404.

Disfranchisement on conviction, § 40-20-112.

Expense account for state and county officers, false oath, § 8-26-111.

Gift tax, false return as perjury, § 67-8-110.

Heirship affidavits, false swearing, § 30-2-712.

Judge of general sessions court, false statement in revenue report, § 9-2-111.

Legislative committee, perjury before, § 3-3-120.

National guard, false oath to statement in enlistment contract, § 58-1-222.

Optometry board, false swearing before, § 63-8-112.

Penalty for Class A misdemeanor, § 40-35-111.

Penalty for Class E felony, § 40-35-111.

Penitentiary officer or employee violating oath, § 41-1-103.

Privilege tax on production of special nuclear material, perjured return, § 67-4-1107.

**Section to Section References.**

This section is referred to in §§ 3-17-104, 3-17-111, 8-8-102, 39-16-703, 39-17-1351, 40-28-122, 40-35-311, 40-39-203, 40-39-204, 50-6-904, 55-10-491, 62-5-381, 62-9-102, 67-1-1802.

**Rule Reference.**

This section is referred to in the text of and appendix to Rule 24 of the Rules of the Supreme Court of Tennessee.

**Textbooks.**

Tennessee Jurisprudence, 20 Tenn. Juris., Perjury, §§ 2, 3.

**Attorney General Opinions.**

T.C.A. § 39-16-704 does not apply to perjury, even though simple perjury has been held to be a lesser included offense of aggravated perjury, OAG 02-120 (10/28/02).

A jury may still convict a defendant of simple perjury, even if it is persuaded that the defendant has made an effective retraction, OAG 02-120 (10/28/02).

## NOTES TO DECISIONS

**1. Evidence.**

Because under T.C.A. § 39-16-707 the prosecutor was not required to prove which of the two statements made by defendant during his prior murder trial was false, the state was relieved of any election requirement, and no enhanced unanimity instruction was warranted; therefore, the appellate court erred by reversing defendant's perjury conviction. State v. Buford, 216 S.W.3d 323, 2007 Tenn. LEXIS 315 (Tenn. 2007).

---

**Collateral References.**

Acquittal as bar to a prosecution of accused for perjury committed at trial. 89 A.L.R.3d 1098.

Administrative requirement, oath taken in pursuance of, as predicate for criminal offense of perjury. 108 A.L.R. 1240.

Admissibility in criminal case, on issue of defendant's guilt, of evidence that third person has attempted to influence a witness not to testify or to testify falsely. 79 A.L.R.3d 1156.

Admissibility, in subornation of perjury prosecution, of evidence of alleged perjurer's plea of guilty to charge of perjury. 63 A.L.R.2d 825.

Conviction of perjury where one or more of elements is established solely by circumstantial evidence. 88 A.L.R.2d 852.

Determination of materiality of allegedly perjurious testimony in prosecution under 18 U.S.C.S. §§ 1621, 1622. 22 A.L.R. Fed. 379.

Materiality of testimony forming basis of perjury charge as question for court or jury in state trial. 37 A.L.R.4th 948.

Perjury conviction as affected by notary's nonobservance of formalities for administration of oath to affiant. 80 A.L.R.3d 278.

Perjury or false swearing as contempt. 89 A.L.R.2d 1258.

Recantation as defense in perjury prosecution. 64 A.L.R.2d 276.

Recantation by prosecuting witness in sex crime as ground for new trial. 51 A.L.R.3d 907.

Statement of belief or opinion as perjury. 66 A.L.R.2d 791.

## 39-16-703. Aggravated perjury.

(a) A person commits an offense who, with intent to deceive:

(1) Commits perjury as defined in § 39-16-702;

ATTACHMENT 2                    2-1

Case 3:20-cv-00251   Document 9-14   Filed 06/08/20   Page 69 of 102 PageID #: 937

(2) The false statement is made during or in connection with an official proceeding; and

(3) The false statement is material.

(b) It is no defense that the person mistakenly believed the statement to be immaterial.

(c) Aggravated perjury is a Class D felony.

**History.**
Acts 1989, ch. 591, § 1.

**Sentencing Commission Comments.** This section enhances the penalty for perjury where the false statement is made in an official proceeding.

**Compiler's Notes.**
The sentencing commission terminated June 30, 1995. Sentencing Commission Comments have been retained, but do not reflect 1995 or subsequent legislation.

**Cross-References.**
Penalty for Class D felony, § 40-35-111.

**Section to Section References.**
This section is referred to in §§ 3-17-104, 3-17-111, 40-1-105, 50-6-904, 55-10-491, 62-5-381.

### NOTES TO DECISIONS

#### Analysis

1. Materiality of Statement.
2. Evidence.

**1. Materiality of Statement.**
The state sufficiently established the materiality of the conflicting statements given by the defendant under oath before trial and at trial regarding the identity of the perpetrator of a burglary where the state had no other evidence regarding the identity of the perpetrator. State v. Cutshaw, 967 S.W.2d 332, 1997 Tenn. Crim. App. LEXIS 1237 (Tenn. Crim. App. 1997).

**2. Evidence.**
Proof that defendant told a "half-truth" was not legally sufficient to support a conviction for making a false representation of fact. State v. Forbes, 918 S.W.2d 431, 1995 Tenn. Crim. App. LEXIS 996 (Tenn. Crim. App. 1995).

Because under T.C.A. § 39-16-707 the prosecutor was not required to prove which of the two statements made by defendant during his prior murder trial was false, the state was relieved of any election requirement, and no enhanced unanimity instruction was warranted; therefore, the appellate court erred by reversing defendant's perjury conviction. State v. Buford, 216 S.W.3d 323, 2007 Tenn. LEXIS 315 (Tenn. 2007).

## 39-16-704. Retraction.

It is a defense to prosecution for aggravated perjury that the person retracted the false statement before completion of the testimony at the official proceeding during which the aggravated perjury was committed.

**History.**
Acts 1989, ch. 591, § 1.

**Sentencing Commission Comments.** The retraction defense extends only to aggravated perjury.

**Compiler's Notes.**
The sentencing commission terminated June 30, 1995. Sentencing Commission Comments have been retained, but do not reflect 1995 or subsequent legislation.

**Cross-References.**
Inconsistent statements, § 39-16-707.

**Section to Section References.**
This section is referred to in § 39-16-707.

**Attorney General Opinions.**
T.C.A. § 39-16-704 does not apply to perjury, even though simple perjury has been held to be a lesser included offense of aggravated perjury, OAG 02-120 (10/28/02).

A jury may still convict a defendant of simple perjury, even if it is persuaded that the defendant has made an effective retraction, OAG 02-120 (10/28/02).

(M) Conducting initial appearances for any defendant following arrest for a crime involving domestic abuse when conducted pursuant to the requirements imposed by § 36-3-602(c); and

(N) Any other judicial duty not prohibited by the constitution, statute, or applicable rules, when requested by a judge.

(7) If the domestic abuse magistrate is carrying out one (1) of the duties of the office under this subsection (h), the failure to appear before the magistrate constitutes failure to appear and shall subject the defendant or respondent to arrest and forfeiture of bond.

(8) If the appointed domestic abuse magistrate is absent or unavailable for any reason, the magistrate has the authority to appoint special, substitute, or temporary magistrates to carry out the duties of this section. A substitute magistrate shall be an attorney, licensed to practice law in the courts of this state, a resident of the county of the appointing domestic abuse magistrate, and not less than thirty (30) years of age. An order of appointment for a special, substitute, or temporary magistrate shall be for a fixed period of time and shall be reduced to writing and filed with the fourth circuit court clerk.

(9) The domestic abuse magistrate may also accept appointment by the judge of the fourth circuit court to serve as a special master to the fourth circuit court for any purpose established by the judge. The appointment may be made by the judge at the same time as the appointment to the position of domestic abuse magistrate, or at any time during the magistrate's term.

**History.**
Acts 1978, ch. 933, § 4; 1979, ch. 15, § 1; 1980, ch. 781, § 1; 1981, ch. 209, §§ 1, 2; T.C.A., § 40-120; Acts 1991, ch. 444, § 1; 1993, ch. 241, § 57; 1998, ch. 984, § 1; 2001, ch. 316, §§ 1, 2; 2004, ch. 685, § 1; 2009, ch. 503, § 1; 2010, ch. 989, §§ 1, 2; 2012, ch. 890, § 1; 2012, ch. 1052, §§ 1, 3; 2013, ch. 236, § 33; 2016, ch. 531, §§ 2, 3; 2017, ch. 222, § 1.

**Amendments.**
The 2013 amendment substituted "criminal justice committee of the house of representatives" for "judiciary committee of the house of representatives" in (a)(1)(D)(iii).

The 2016 amendment added the last sentence in (f)(6); and deleted (f)(7)(B), which read: "Subdivision (f)(7)(A) shall not apply in counties having a population of not less than sixty-six thousand two hundred (66,200) nor more than sixty-six thousand three hundred (66,300), according to the 2010 federal census or any subsequent federal census."

The 2017 amendment added (h).

**Effective Dates.**
Acts 2013, ch. 236, § 94. April 19, 2013.
Acts 2016, ch. 531, § 4. February, 1, 2016.
Acts 2017, ch. 222, § 3. April 28, 2017.

# CHAPTER 2

# LIMITATION OF PROSECUTIONS

Section
40-2-101. Felonies.
40-2-104. Commencement of prosecution.

**40-2-101. Felonies.**

(a) A person may be prosecuted, tried and punished for an offense punishable with death or by imprisonment in the penitentiary during life, at any time after the offense is committed.

(b) Prosecution for a felony offense shall begin within:

(1) Fifteen (15) years for a Class A felony;

(2) Eight (8) years for a Class B felony;

(3) Four (4) years for a Class C or Class D felony; and

(4) Two (2) years for a Class E felony.

(c) Notwithstanding subsections (a) and (b), offenses arising under the revenue laws of the state shall be commenced within the three (3) years following the commission of the offense, except that the period of limitation of prosecution shall be six (6) years in the following instances:

(1) Offenses involving the defrauding or attempting to defraud the state of Tennessee or any agency of the state, whether by conspiracy or not, and in any manner;

(2) The offense of willfully attempting in any manner to evade or defeat any tax or the payment of a tax;

(3) The offense of willfully aiding or abetting, or procuring, counseling or advising, the preparation or presentation under, or in connection with, any matter arising under the revenue laws of the state, or a false or fraudulent return, affidavit, claim or document, whether or not the falsity or fraud is with the knowledge or consent of the person authorized or required to present the return, affidavit, claim or document; and

(4) The offense of willfully failing to pay any tax, or make any return at the time or times required by law or regulation.

(d) Notwithstanding the provisions of subdivision (b)(3) to the contrary, prosecution for the offense of arson as prohibited by § 39-14-301 shall commence within eight (8) years from the date the offense occurs.

(e) Prosecutions for any offense committed against a child prior to July 1, 1997, that constitutes a criminal offense under § 39-2-601 [repealed], § 39-2-603 [repealed], § 39-2-604 [repealed], § 39-2-606 [repealed], § 39-2-607 [repealed], § 39-2-608 [repealed], § 39-2-612 [repealed], § 39-4-306 [repealed], § 39-4-307 [repealed], § 39-6-1137 [repealed], or § 39-6-1138 [repealed], or under §§ 39-13-502 — 39-13-505, § 39-15-302 or § 39-17-902 shall commence no later than the date the child attains the age of majority or within four (4) years after the commission of the offense, whichever occurs later; provided, that pursuant to subsection (a), an offense punishable by life imprisonment may be prosecuted at any time after the offense has been committed.

(f) For offenses committed prior to November 1, 1989, the limitation of prosecution in effect at that time shall govern.

(g)(1) Prosecutions for any offense committed against a child on or after July 1, 1997, that constitutes a criminal offense under § 39-17-902 shall commence no later than the date the child reaches twenty-one (21) years of age; provided, that if subsection (a) or (b) provides a longer period of time within which prosecution may be brought than this subsection (g), the applicable provision of subsection (a) or (b) shall prevail.

(2) Prosecutions for any offense committed against a child on or after July 1, 1997, but prior to June 20, 2006, that constitutes a criminal offense under §§ 39-13-502 — 39-13-505, § 39-13-522 or § 39-15-302 shall commence no later than the date the child reaches twenty-one (21) years of age; provided, that if subsection (a) or (b) provides a longer period of time within which prosecution may be brought than this subsection (g), the applicable provision of subsection (a) or (b) shall prevail.

3-2

(h)(1) A person may be prosecuted, tried and punished for any offense committed against a child on or after June 20, 2006, that constitutes a criminal offense under § 39-13-504, § 39-13-505, § 39-13-527 or § 39-15-302, no later than twenty-five (25) years from the date the child becomes eighteen (18) years of age.

(2) A person may be prosecuted, tried and punished for any offense committed against a child on or after June 20, 2006, but prior to July 1, 2014, that constitutes a criminal offense under § 39-13-502, § 39-13-503 or § 39-13-522 no later than twenty-five (25) years from the date the child becomes eighteen (18) years of age.

(i)(1) A person may be prosecuted, tried and punished for any offense committed against a child on or after July 1, 2007, that constitutes a criminal offense under § 39-13-532, no later than twenty-five (25) years from the date the child becomes eighteen (18) years of age.

(2) A person may be prosecuted, tried and punished for any offense committed against a child on or after July 1, 2007, but prior to July 1, 2014, that constitutes a criminal offense under § 39-13-531, no later than twenty-five (25) years from the date the child becomes eighteen (18) years of age.

(j) A person may be prosecuted, tried and punished for any offense committed against a child on or after July 1, 2012, that constitutes a criminal offense under § 39-17-902, § 39-17-1003, § 39-17-1004, or § 39-17-1005, no later than twenty-five (25) years from the date the child becomes eighteen (18) years of age.

(k)(1) A person may be prosecuted, tried and punished for any offense committed against a child on or after July 1, 2013, that constitutes a criminal offense under § 39-13-309 or § 39-13-529, no later than fifteen (15) years from the date the child becomes eighteen (18) years of age.

(2) A person may be prosecuted, tried and punished for any offense committed against a child on or after July 1, 2013, that constitutes a criminal offense under § 39-13-514 no later than ten (10) years from the date the child becomes eighteen (18) years of age.

(3)(A) A person may be prosecuted, tried, and punished for any offense committed against a child on or after July 1, 2013, but prior to July 1, 2015, that constitutes a criminal offense under § 39-13-515 no later than ten (10) years from the date the child becomes eighteen (18) years of age.

(B) A person may be prosecuted, tried, and punished for any offense committed against a child on or after July 1, 2015, that constitutes a criminal offense under § 39-13-515 no later than twenty-five (25) years from the date the child becomes eighteen (18) years of age.

(l)(1) Notwithstanding subsections (b), (g), (h) and (i) to the contrary, a person may be prosecuted, tried and punished for an act that constitutes the offense of aggravated rape, as prohibited by § 39-13-502, rape, as prohibited by § 39-13-503, rape of a child as prohibited by § 39-13-522 or aggravated rape of a child as prohibited by § 39-13-531 at any time after the commission of the offense if:

(A) The victim notifies law enforcement or the office of the district attorney general of the offense within three (3) years of the offense; and

(B) The offense is committed:

(i) On or after July 1, 2014; or

(ii) Prior to July 1, 2014, unless prosecution for the offense is barred because the applicable time limitation set out in this section for prosecution of the offense expired prior to July 1, 2014.

(2) If subdivision (l)(1) does not apply to the specified offenses, prosecution shall be commenced within the times otherwise provided by this section.

(m) A person may be prosecuted, tried, and punished for any offense committed against a child on or after July 1, 2016, that constitutes the offense of aggravated statutory rape under § 39-13-506(c), no later than fifteen (15) years from the date the child becomes eighteen (18) years of age.

(n) Notwithstanding subsection (b), prosecutions for any offense committed on or after July 1, 2016, that constitutes the offense of aggravated child abuse, or aggravated child neglect or endangerment, under § 39-15-402, shall commence by the later of:

(1) Ten (10) years after the child reaches eighteen (18) years of age; or

(2) The time within which prosecution must be commenced pursuant to subsection (b).

**History.**

Code 1932, §§ 11481-11483; Acts 1977, ch. 62, § 1; T.C.A. (orig. ed.), §§ 40-201 — 40-203; Acts 1985, ch. 478, § 21; 1990, ch. 980, § 17; 1997, ch. 214, §§ 1, 2; 1998, ch. 962, § 1; 2006, ch. 927, § 1; 2007, ch. 594, § 5; 2012, ch. 1027, § 1; 2013, ch. 416, § 1; 2014, ch. 836, §§ 1, 2; 2015, ch. 310, § 1; 2016, ch. 958, § 1; 2016, ch. 1032, § 1.

**Compiler's Notes.**

Pursuant to Article III, Section 18 of the Constitution of Tennessee, Acts 2014, ch. 836 took effect on April 28, 2014.

**Amendments.**

The 2013 amendment added (k).

The 2014 amendment, designated former (g) as present (g)(2) and added (g)(1); in (g)(2), inserted "but prior to June 20, 2006," and substituted "§§ 39-13-502 — 39-13-505, § 39-

13-522 or § 39-15-302" for "§§ 39-13-502 — 39-13-505, § 39-13-522, § 39-15-302 or § 39-17-902"; in (h), added (2) and substituted "criminal offense under § 39-13-504, § 39-13-505," for "criminal offense under §§ 39-13-502 — 39-13-505, § 39-13-522," in (1); in (i), added (2) and deleted "§ 39-13-531 or" preceding "§ 39-13-532"; and added (l).

The 2015 amendment, in (k), deleted "or § 39-13-515" following "§ 39-13-514" in (2) and added (3).

The 2016 amendment by ch. 958 added (m).

The 2016 amendment by ch. 1032 added (n).

**Effective Dates.**

Acts 2013, ch. 416, § 3. July 1, 2013.

Acts 2014, ch. 836, § 4. April 28, 2014. [See the Compiler's Notes.]

Acts 2015, ch. 310, § 2. July 1, 2015.

Acts 2016, ch. 958, § 2. July 1, 2016.

Acts 2016, ch. 1032, § 2. July 1, 2016.

## NOTES TO DECISIONS

### Analysis

3. Allegations of Indictment.
10. Statute of Limitations.

### 3. Allegations of Indictment.

It was no error to let the State amend an indictment to allege a new ground for tolling the statute of limitations applicable to second-degree murder because (1) defendant consented to the amendment, and (2) if defendant did not consent, jeopardy had not attached, no new crime was charged, and defendant's substantial right was not prejudiced, as the State could have obtained a superseding indictment. State v. Hollingsworth, — S.W.3d —, 2017 Tenn.

Crim. App. LEXIS 17 (Tenn. Crim. App. Jan. 11, 2017).

### 10. Statute of Limitations.

Prosecution for attempted aggravated rape was properly and timely commenced with in the eight-year statute of limitations for attempted aggravated rape, T.C.A. § 40-2-101(h)(1)-(2), by the filing of the "John Doe" arrest warrant because The "John Doe" designation in the warrant, coupled with the detailed DNA profile of the assailant, identified defendant with "reasonable certainty" as required by the Fourth Amendment, Tenn. Const. art. I, § 7, T.C.A. § 40-6-208, and Tenn. R. Crim. P. 4(c)(1)(B). State v. Burdick, 395 S.W.3d

120, 20
2012.
Issu
before the a
tions, Issu
DNA profil
limitations
State v. Da
Crim. App. L
5, 2012).

Because a
established i
son who wa
cause deter
sense under
clear unders
issuing an a
issued was v
tion for agg
ion. State v.
Crim. App. L
7, 2013), ap
Tenn. LEXIS

Defendant
commit first

**40-2-102.**

**Attorney Ge**
Retired mi
Tenn. AG LE

1. Indictm
9. Tolling
11. Case Ty
12. Case No

**1. Indictme**
Trial court
indictment cl
meanor vand
14-408 on the
statute of lim
cause the sa
amended the
limitation we
dictment, defe
to defend age
property belon
second indict
against the ch
longing to and
S.W.3d —, 20
Tenn. Crim. A

**9. Tolling St**
Driving und
dismissed agai
failed to comm

Case 3:20-cv-00251    Document 9-14    Filed 06/08/20    Page 74 of 102 PageID #: 942

# LOWERY v. STATE,

## 2013 WL 4767188 (Tenn. Crim. App. 9/4/2013)
### CCA No. E2012–01613–CCA–R3–PC.

**OPINION**

NORMA McGEE OGLE, J.

*1 The petitioner, John Lowery, appeals the Knox County Criminal Court's summary dismissal of his petition for a writ of error coram nobis. He asserts that newly discovered evidence, namely two witnesses' recantation of their identification of the petitioner as the shooter and a previously unknown witness who said the petitioner was not at the scene of the crime, warranted a new trial on his convictions of premeditated first degree murder and attempted first degree murder. Upon review, we reverse the judgment of the coram nobis court and remand for an evidentiary hearing.

*I. Factual Background*

The record reveals that on May 6, 1998, a Knox County Criminal Court Jury found the petitioner guilty of premeditated first degree murder and attempted first degree murder. The petitioner received consecutive sentences of life and twenty-five years, respectively. On direct appeal, this court summarized the proof adduced at trial as follows:

At approximately 6:40 a.m. on October 8, 1996, William Boatwright and his cousin, Vincent Hartsell, went to Kirk's Market in Knoxville to purchase food items. Boatwright went inside the market, while Hartsell remained in the car. After Boatwright made his purchase, he walked outside, and Jay Harris, who was standing outside, called him to the side of the building so that they could converse. After Boatwright spoke with Harris for a few seconds, he heard a gunshot. When he turned around, he saw the [petitioner] running towards him carrying a handgun. As Boatwright attempted to reenter the store, the [petitioner] shot him in the chest. Boatwright went inside the store and crawled behind the counter, and the [petitioner] went inside after him, firing his gun. However, because the store employee began screaming, the [petitioner] fled the scene. Boatwright remained in the store for several minutes and then went outside to check on Hartsell, who had been shot in the neck while waiting in the car.

Malik Hardin, a friend of Boatwright and Hartsell, witnessed the shooting while sitting in his car in the Kirk's Market parking lot. Boatwright got into Hardin's car and drove to a relative's home, while Hardin stayed with Hartsell until the police arrived. Boatwright was subsequently transported to the hospital, where he told the police that "J.B." shot Hartsell and him. The police compiled a photographic lineup, and Boatwright identified the [petitioner] as the shooter. Hardin also viewed the photographic lineup and identified the [petitioner] as the man who shot Boatwright and Hartsell.

The next day, Hartsell, who was sixteen (16) years of age, died as a result of a gunshot wound to the neck.

Investigating officers recovered a .45 caliber bullet behind the counter in the store as well as a .45 caliber shell casing in front of the store counter. The police also discovered a bullet hole in the counter. Another .45 caliber bullet casing was found in the car where Hartsell was shot, and officers found an "eight ball" of crack cocaine by the right passenger door. Don Carman, a TBI forensic firearms examiner, examined the bullet casings and determined that the casing found in the store and the casing found in the car were fired from the same weapon.

*2 James Bowman, a friend of [the petitioner's] family, gave a statement to police officers shortly after the incident. In his statement, Bowman told officers that, just prior to the shooting, he brought his stepdaughter to Kirk's Market so that she could purchase a drink before school. While his stepdaughter was inside the market, the [petitioner] got into Bowman's car and began telling Bowman that he had been robbed earlier that morning. Suddenly, a car pulled beside them, and the [petitioner] told Bowman that the men who robbed him were in the car. The [petitioner] then got out of the car and told his brother, Fred Lowery, and his cousin, Jay Harris, "[t]hat's it, boys, right here." When the [petitioner], Fred Lowery and Harris surrounded the building, Bowman left with his stepdaughter. Bowman dropped his stepdaughter off at school, and when he drove past Kirk's Market on his way home, Boatwright and Hartsell had been shot.

The state also presented the testimony of Mary Santos, who had previously been romantically involved with the [petitioner's] uncle, Walter Lowery. Santos testified that Walter hired the [petitioner] and the victim, Vincent Hartsell, to sell drugs for him. She stated that in late Spring or early Summer 1996, the [petitioner] and Walter were angry with Hartsell over a botched drug sale. Santos testified that, on several occasions, the [petitioner] stated that he would kill Hartsell in retaliation.

The [petitioner] presented an alibi defense at trial. Fred Lowery, Jay Harris and Greg Moore testified that they were at Kirk's Market during the shooting on October 8. None of these witnesses saw the person who shot Boatwright and Hartsell, but all testified that the [petitioner] was not present during the shooting. In addition, Tamera McMillan, the [petitioner's] neighbor, testified that the [petitioner] was at her home during the time of the shooting.

*State v. John Bradley Lowery*, No. E1998–00034–CCA–R3–CD, 2000 WL 748103, at *1–2 (Tenn.Crim.App. at Knoxville, June 12, 2000). This court affirmed the petitioner's convictions and sentences. *Id.* at *1. On August 23, 2000, the petitioner filed a Rule 11 application for permission to appeal to the supreme court, which was denied on February 20, 2001. More than a decade later, on September 14, 2011, the petitioner filed a petition for a writ of error coram nobis and an accompanying memorandum of law in support of the petition. He asserted that on September 16, 2010, Hardin signed a sworn affidavit in which he "admitted that he did not believe he was making a correct identification, and only made the identification at the time because he feared police action and the officer pointed to the Petitioner's photograph in the photo[graphic] array." The petitioner maintained that the photographic array used by police was unduly suggestive and that the identification was the result of coercive police action. The petitioner also asserted that the State had violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963), by failing to reveal an exculpatory statement by a witness, Loretta Turner. In support, the petitioner asserted that on August 17, 2011, Turner executed a sworn affidavit, saying that she

*3 was present at the time of the shooting. She was interviewed by police and was asked if the Petitioner was in the store at the time of the shooting. Turner indicated that the Petitioner was not present to the officer, but was not contacted further. Turner's statement was never provided to the defense despite representing exculpatory evidence which was requested [on] August 15, 1997. In addition, she was never contacted by defense counsel and was unaware that there had been a trial until well after the Petitioner was convicted.

The petitioner asserted that if his trial counsel "had conducted proper interviews of the witnesses, he would have discovered that Turner was present and that she would have testified that the Petitioner was not at the store at all that day."[1] The petitioner maintained that the foregoing two witnesses had provided newly discovered evidence establishing the petitioner's actual innocence and warranting the issuance of a writ of error coram nobis. The State did not file a response to the petition.

On May 22, 2012, the petitioner filed an amended petition for a writ of error coram nobis and an amended memorandum of law in support of the motion. He said that in addition to the affidavits sworn to by Hardin and Turner, he had "recently made contact" with Boatwright, who signed an affidavit on April 5, 2012, "stating that the incriminating testimony he provided at [the petitioner's] trial was false and that he was forced to provide that testimony by the investigating police officers, leading to the conviction of an innocent man." The petitioner attached Boatwright's affidavit to his amended petition. The petitioner said that Boatwright had "called the Petitioner by name in his identification despite having never known him and admitted that he had discussed the Petitioner's identity with someone before the identification before eventually recanting his testimony." The State filed no response to the amended petitions.

On June 27, 2012, the coram nobis court filed an order, dismissing the petition. The court noted that the petitioner had supplied two affidavits as newly discovered evidence. The court noted that Hardin's affidavit was dated twelve years after the trial. The court found that it was not newly discovered evidence because Hardin "does not completely recant his testimony, he was available for cross-examination, and the certainty and reliability of his identification testimony were certainly available for petitioner to attack." The trial court also stated that Turner's affidavit, which was dated thirteen years after the trial, did not contain newly discovered evidence. The court explained, "Neither her affidavit nor the petition establish why petitioner could not have known this person was at the scene of the crime and therefore a potential witness. A general *Brady* motion does not relieve a defendant of the duty to diligently investigate a case." The court stated:

Petitioner fails to show that the introduction of the contents of the affidavits into evidence would have produced a different result at trial. Witness Bowman testified that before the shooting the petitioner told him that he, the petitioner, had spotted the men who robbed him. Victim Boatwright identified petitioner as the perpetrator and the certainty and reliability of his identification were available for attack by the defense. Petitioner introduced other witnesses to present the defense of alibi. The jury did not believe his witnesses and did believe the state's witnesses.

*4 Petitioner seeks to bolster his argument by complaining of ineffective assistance of counsel. The effectiveness of trial counsel is not newly discovered evidence.

On appeal, the petitioner challenges the coram nobis court's summary dismissal of his petition.

*II. Analysis*

Tennessee Code Annotated section 40–26–105 provides:

There is hereby made available to convicted defendants in criminal cases a proceeding in the nature of a writ of error coram nobis, to be governed by the same rules and procedure applicable to the writ of error coram nobis in civil cases, except insofar as inconsistent herewith.... Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Generally, a decision whether to grant a writ of error coram nobis rests within the sound discretion of the trial court. *See State v.. Hart,* 911 S.W.2d 371, 375 (Tenn.Crim.App.1995).

Initially, we note that on appeal, the State asserts that the petitioner's claim was barred by the statute of limitations. The record reveals that the petitioner's petition for a writ of error coram nobis was filed well-outside the one-year statute of limitations. Tenn.Code Ann. § 27–7–103. However, the State did not file a response to the petition and therefore did not raise the untimeliness of the petition as an affirmative defense in the lower court. *See Harris v. State,* 102 S.W.3d 587, 593 (Tenn.2003) (stating that "the State bears the burden of raising the bar of the statute of limitations as an affirmative defense"). Additionally, the coram nobis court did not deny the petition on this basis. Therefore, we will not affirm the dismissal of the petition due to untimeliness.

The writ of error coram nobis, now codified in Tennessee Code Annotated section 40–26–105, is a post-conviction mechanism that has a long history in the common law and the State of Tennessee. *See, e.g., State v. Vasques,* 221 S.W.3d 514, 524–26 (Tenn.2007). The writ "is an *extraordinary* procedural remedy ... [that] fills only a slight gap into which few cases fall." *State v. Mixon,* 983 S.W.2d 661, 672 (Tenn.1999).

**Our supreme court has outlined the procedure that a court considering a petition for a writ of error coram nobis is to follow: [T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.**

**\*5 Vasques, 221 S.W.3d at 527. In determining whether the new information may have led to a different result, the question before the court is " 'whether a reasonable basis exists for concluding that had**

## *the evidence been presented at trial, the result of the proceeding might have been different.'*

" *Id.* (quoting *State v. Roberto Vasques,* No. M2004–00166–CCA–R3–CD, 2005 WL 2477530, at *13 (Tenn.Crim.App. at Nashville, Oct. 7, 2005)).

The petitioner's petition for coram nobis relief is based on claims of recanted testimony and a newly discovered witness. Recanted testimony may be considered newly discovered evidence under certain circumstances. *See Mixon,* 983 S.W.2d at 672. This court has concluded that a trial court should only grant a writ of error coram nobis upon the basis of newly discovered recanted testimony if:

(1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury *might have* reached a different conclusion had the truth been told.

*State v. Ratliff,* 71 S.W.3d 291, 298 (Tenn.Crim.App.2001) (emphasis added) (citing *Mixon,* 983 S.W.2d at 673 n. 17).

The coram nobis court found that "Petitioner fails to show that the introduction of the contents of the affidavits into evidence *would have* produced a different result at trial." As we have noted, the proper standard to be applied is whether the jury "may have" reached a different result. This court has previously stated, "While this appears at first glance to be a matter of mere semantics, the difference in the analysis of the situation under a 'would have' standard is definitively more burdensome for a coram nobis petitioner than would be the case under a 'may have' standard."

*Margo Freshwater v. State,* No. W2006–01758–CCA–OT–CO, 2008 WL 4560242, at *9 (Tenn.Crim.App. at Jackson, Oct. 8, 2008). Therefore, requiring a petitioner to show that the new evidence *would have* resulted in a different verdict is not the correct standard to use in denying coram nobis relief. *See Johnson v. State,* 370 S.W.3d 394, 698–99 (Tenn.2011); *Vasques,* 221 S.W.3d at 527–28. Accordingly, we must conclude that the trial court applied the wrong standard when dismissing the petition.

Moreover, the coram nobis court dismissed the petition without a hearing. Our supreme court has previously cautioned that "[c]oram nobis claims ... are singularly fact-intensive [allegations that] are not easily resolved on the face of the petition and often require a hearing." *Harris v. State,* 102 S.W.3d 587, 592–93 (Tenn.2003). "However, a petitioner is not automatically entitled to an evidentiary hearing by simply filing a petition for writ of error coram nobis. Instead, the petition must demonstrate that the petitioner is entitled to the extraordinary relief that the writ provides." *Phedrek Davis v. State,* No. M2011–01366–CCA–R3–CO, 2012 WL 3017806, at *3 (Tenn.Crim.App. at Nashville, July 23, 2012) (internal quotations and citations omitted). Leaving to the coram nobis court to decide whether the petitioner is entitled to the issuance of a writ of error coram nobis, we conclude that the petitioner nevertheless made a sufficient threshold showing of newly discovered evidence to warrant a hearing.

### III. Conclusion

*6 In sum, we conclude that the coram nobis court erred by summarily dismissing the petition and by applying the wrong standard. Accordingly, we reverse the judgment of the court and remand for an evidentiary hearing.

### Footnotes

1 A claim of ineffective assistance of counsel is not an appropriate ground for relief pursuant to a writ of error coram nobis. *See Daniel Lee Draper v. State,* No. E2009–00952–CCA–R3–PC, 2010 WL 5343193, at *5 (Tenn.Crim.App. at Knoxville, Dec. 21, 2010).

# HOLLIMAN v. STATE,

## 2012 WL 3793143 (Tenn. Crim. App. 8/31/2012)
### CCA No. W2011–01071–CCA–R3–CO.

**OPINION**
ROGER A. PAGE, J.

\*1 A Shelby County jury convicted petitioner, Brenda Holliman, of first degree murder and conspiracy to commit first degree murder. The trial court sentenced her to life imprisonment without the possibility of parole. Subsequently, she filed the instant petition for a writ of error coram nobis, claiming that a co-defendant recanted statements he made at his guilty plea hearing and that the recantation constitutes newly discovered evidence. The coram nobis court summarily dismissed the petition based on the statute of limitations. Following our review, we reverse the judgment of the coram nobis court and remand the matter for an evidentiary hearing.

**I. Procedural History**
Following an unsuccessful direct appeal to this court, *State v. Brenda Holliman*, No. W2003–01736–CCA–R3–CD, 2005 WL 819735 (Tenn.Crim.App. April 8, 2005), *perm. app. denied* (Tenn. Oct. 24, 2005), petitioner filed a timely petition for post-conviction relief .¹ While the post-conviction petition was pending, petitioner filed this petition for a writ of error coram nobis on March 26, 2010.

In her petition for a writ of error coram nobis, petitioner raises for the first time a claim of newly discovered evidence based on the recantation of her co-defendant James Rodney Mills. On August 24, 2009, a reporter from a Memphis television channel interviewed Mills. During the interview, Mills recanted statements he made at his guilty plea hearing implicating petitioner in the first degree murder and conspiracy to commit first degree murder. He stated that he exaggerated petitioner's involvement to avoid the death penalty. Petitioner amended her petition in June 2010 to include a sworn statement from Mills to that effect.

In the statement, Mills said that he and co-defendant Faglier met with petitioner and told her they were going to kill her husband, and they would kill her if she did not "go along" with their plan. He further stated that after he and Faglier killed petitioner's husband, they told her that if she made any mistakes when she spoke with police, one of them would kill her before police could arrest them both. He said that when he was indicted, members of the district attorney general's office and his attorney told him he would receive the death penalty for his crimes. For that reason, he said whatever "they" wanted him to say. He accused Faglier of lying about petitioner's involvement to save himself. Finally, he stated that petitioner is lucky to be alive because Faglier wanted to kill her when they did not receive the insurance money.

The State defended the petition by raising the one-year statute of limitations. The State argued that the judgment denying petitioner's motion for new trial was entered on March 28, 2003; therefore, the one-year statute began to run on April 28, 2003, and expired on April 28, 2004. Petitioner responded that the statute of limitations should be tolled in the interest of due process.

The coram nobis court held a hearing on the petition on August 10, 2010. The sole issue argued during the hearing was the timeliness of petitioner's filing, i.e., whether the court should toll the applicable one-year statute of limitations. The court took the matter under advisement, during which time petitioner filed a pleading entitled "Statement in Support of Tolling Statute of Limitations for Petition for Relief Under Writ of Error Coram Nobis" on November 15, 2010. The coram nobis court entered an order dismissing the petition on April 8, 2011. This appeal follows.

**II. Analysis**
**A. Standard of Review**
\*2 The decision to grant or deny a petition for writ of error coram nobis on its merits is left to the sound discretion of the trial court. *Harris v. State*, 301 S.W.3d 141, 144 (Tenn.2010) (citing *State v. Vasques*, 221 S.W.3d 514, 527–28 (Tenn.2007)). A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn.2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn.2006)). The writ of error coram nobis is an "extraordinary procedural remedy ... into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn.1999). Our legislature has limited the relief available through the writ:

The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Tenn.Code Ann. § 40–26–105(b) (Supp.2011). To demonstrate she is entitled to coram nobis relief, petitioner must clear several procedural hurdles.

First, the petition for writ of error coram nobis must relate: (1) the grounds and the nature of the newly discovered evidence; (2) why the admissibility of the newly discovered evidence may have resulted in a different judgment had the evidence been admitted at the previous trial; (3) the petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (4) the relief sought by the petitioner. *Freshwater v. State*, 160 S.W.3d 548, 553 (Tenn.Crim.App.1995) (citing *State v. Hart*, 911 S.W.2d 371, 374–75 (Tenn.Crim.App.1995)). The record reflects that petitioner complied with the initial requirements in her petition for relief. Next, a petition for writ of error coram nobis must generally be filed within one year after the judgment becomes final. Tenn.Code Ann. § 27–7–103 (2000). When a petition is filed outside of the statute of limitations, the coram nobis court must determine whether due process requires tolling. *State v. Harris*, 301 S.W.3d 141, 145 (Tenn.2010). In doing so, the "court must weigh the petitioner's interest in obtaining a hearing to present a later-arising ground for relief against the State's interest in preventing stale and groundless claims." *Id.* (citing *Workman v. State*, 41 S.W.3d 100, 103 (Tenn.2001)). A court should utilize the following three-step analysis to balance the competing interests:

\*3 (1) determine when the limitations period would normally have begun to run;
(2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and

(3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

*Id.* (citing *Sands v. State,* 903 S.W.2d 297, 301 (Tenn.1995)).

As previously noted, the coram nobis court held a hearing on the sole issue of whether the statute of limitations should be tolled in this case. The court held that there was an "unreasonable delay" in petitioner's filing of her petition for relief and that the period "exceed[ed] the reasonable opportunity afforded by due process," thus denying her the opportunity for a hearing on the merits. Our analysis of the coram nobis court's ruling involves application of the factors set forth in *Harris, supra.* It is undisputed that the one-year statute of limitations began on April 28, 2003, and expired on April 28, 2004. Petitioner filed her petition on March 26, 2010, and argued in the coram nobis court that the statute of limitations should be tolled in the interest of due process. We find, from our review of the record, that petitioner's asserted grounds for relief arose after the limitations period would have commenced. The news reporter did not interview co-defendant Mills until August 24, 2009. From the information available in the record, the August 24, 2009 interview was the first statement given by Mills in which he recanted the testimony he gave at his guilty plea hearing. Petitioner filed her petition for coram nobis relief on March 26, 2010. Thus, there was no unreasonable delay in filing the petition after the newly discovered evidence became known. Finally, we conclude that "a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim." *Id.* Accordingly, we reverse the coram nobis court's ruling that petitioner's later-arising claim is barred by the statute of limitations and remand for a hearing on the merits of her claim.

We recognize that co-defendant Mills did not testify at petitioner's trial and that any statement or testimony he offers at the coram nobis hearing would be largely impeaching in nature because it would refute much of the testimony of the State's primary material witness, Faglier. However, "whether the testimony qualifies as impeachment evidence may be relevant in the determination but is not controlling." *Vasques,* 221 S.W.3d at 527. Our supreme court has noted that "a complete restriction on the availability of coram nobis relief in the case of any newly discovered impeachment evidence would be inconsistent with the discretion afforded to our trial courts." *Id.* Thus, on remand, the ultimate question is the effect of the newly discovered evidence on the outcome of petitioner's case when viewed under the standards set forth by the court in *Mixon, Workman,* and *Vasques. Id.*

CONCLUSION

*4 Upon review of the record and the prevailing legal authorities, we reverse the judgment of the coram nobis court summarily dismissing the petition and remand for a merits hearing on the petition for a writ of error coram nobis.

**Footnotes**

*1 Petitioner's appeal from the denial of post-conviction relief was resolved unfavorably to petitioner on August 9, 2012. Brenda Holliman v. State, No. W2011–00201–CCA–R3–PC, 2012 WL 3249606 (Tenn.Crim.App. Aug. 9, 2012).*

# EBLEN v. STATE,

## 2013 WL 4677619 (Tenn. Crim. App. 8/28/2013)

### CCA No. E2012–01117–CCA–R3–CO.

**OPINION**

D. KELLY THOMAS, JR., J.

*1 The Petitioner, William Paul Eblen, appeals from the Knox County Criminal Court's denial of his petition for writ of error coram nobis. The Petitioner contends that the coram nobis court erred in concluding that testimony from two witnesses alleging that the victim later recanted her allegations against the Petitioner was not credible. Following our review, we affirm the judgment of the coram nobis court.

*FACTUAL BACKGROUND*

In 2001, the Petitioner was convicted of two counts of aggravated rape and one count of aggravated kidnapping, and he received an effective sentence of twenty-four years. *State v. William Paul Eblen*, No. E2002–01221–CCA–R3–CD, 2003 WL 22225636 (Tenn.Crim.App. Sept.26, 2003), *perm. app. denied*, (Tenn. Mar. 8, 2004). At trial, the victim testified that on the evening of August 31, 1998, the Petitioner entered her car, pulled out a gun, and had her drive to a secluded area. The Petitioner then forced the victim out of her car, sliced the front of her dress open with a knife, and raped her vaginally. During the rape, the victim tried to push away from the Petitioner, and he hit her in the face three times. *Id.* at * 1.

After the Petitioner ejaculated, he forced the victim back into the car and had her drive him to an alley. The victim testified that the Petitioner had her get out of the car and bend over the hood. The Petitioner then raped the victim anally. The victim testified that she could "feel it ripping" as the Petitioner raped her. When he was finished, the Petitioner shoved a ten-dollar bill in the victim's mouth, told her, "Thanks for a good time," and left. The victim testified that she drove home and told one of her friends about what happened. *Eblen*, 2003 WL 22225636, at *1–2.

The friend testified at trial that she heard the victim's "laying on" her car horn and eventually went outside to check on the victim. When she got outside, she found the victim in her car, crying and upset with a "black eye" and a torn dress. According to the friend, the victim then told her that she had just been raped. The friend flagged down a police officer, and the victim was taken to the hospital. Two police officers testified that they observed injuries to the victim's face and upper lip and that these injuries appeared to be "consistent with injuries that occurred immediately after an assault." Another officer testified that the victim's dress appeared to have been cut with a knife and torn. *Eblen*, 2003 WL 22225636, at *2–3.

The examining doctor testified that the victim had bruising and swelling on her right check, that the injury appeared to have occurred in the previous two hours, and that the injury was consistent with having been inflicted by a fist. There was also a cut on the victim's upper lip. The examining doctor testified that he observed irritation on the victim's labia and that the victim's rectal area "appeared to be traumatized." The doctor observed that the area was "diffusely swollen ... and there was a small tear" most likely caused by some type of penetrating trauma. A rape kit was performed and subsequent testing revealed the presence of sperm in samples taken from the victim's vagina and rectum. DNA testing of the samples determined that it was the Petitioner's sperm. *Eblen*, 2003 WL 22225636, at *2.

*2 At trial, the Petitioner testified that he had consensual sex with the victim and that the victim was lying, but that he did not "have a clue" why she was lying. However, the Petitioner claimed that he only had vaginal sex with the victim and that he did not know how the victim injured her rectal area. The Petitioner's counsel theorized at trial that the injuries to the victim's face had been caused the previous night by the victim's boyfriend. The Petitioner presented testimony at trial from the police officer who responded to "a domestic call" the night before the alleged rape. The officer testified that the victim told him that her boyfriend had hit her with his fist and that he observed the victim to have a split lower lip. However, the Petitioner claimed that he did not notice any injuries to the victim's face, that she did not complain about a hurt lip, and that her dress was not torn when he left her. *Eblen*, 2003 WL 22225636, at *3–4.

Prior to his direct appeal of his convictions, the Petitioner filed a writ of error coram nobis claiming that the victim had told three people that the victim had not raped her. The trial court held a hearing on the petition during which the Petitioner presented testimony from two of the victim's ex-boyfriends. Both men claimed that the victim told them that she lied about the Petitioner's raping her because she was afraid that her boyfriend would beat her if he learned that she had consensual sex with the Petitioner. Both men admitted that they did not tell anyone about the Petitioner's alleged statements until after the Petitioner's trial and after they had been incarcerated with the Petitioner. The Petitioner also presented the testimony of the mother of one of the men who claimed that the victim had made similar statements to her. The victim testified at the hearing that the witnesses were lying and reiterated that the Petitioner had raped her. *Eblen*, 2003 WL 22225636, at *9–10.

The trial court denied the petition for writ of error coram nobis, concluding that the witnesses were not credible. The trial court noted that both of the men were former boyfriends of the victim and did not come forward until after they had been incarcerated with the Petitioner. The trial court found that the testimony of the trial witnesses, along with the medical and physical evidence, corroborated the victim's claims and that it was not convinced that the victim had testified falsely at trial. On direct appeal, this court affirmed the Petitioner's convictions and concluded that the proof of the Petitioner's guilt was "overwhelming." This court also affirmed the trial court's denial of the Petitioner's petition for writ of error coram nobis, concluding that the trial court did not abuse its discretion in finding that the three witnesses were not credible. Our supreme court declined to review this court's opinions. *Eblen*, 2003 WL 22225636, at *4–10.

On May 5, 2011, the Petitioner filed a second petition for writ of error coram nobis, asserting that the victim's ex-boyfriend, Terry Norris, and her brother, B.P.,[1] had recently come forward to claim that the victim had told them that she had falsely accused the Petitioner of rape. The Petitioner also submitted affidavits from Mr. Norris and B.P.[2] The coram nobis court determined that the petition was not barred by the statute of limitations and held a hearing, at which both Mr. Norris and B.P. testified. The victim did not testify at this hearing, and B.P. claimed that the victim was "on the run from parole." Mr. Norris testified that he had not seen the victim in years and did not know where she was.

*3 At the hearing, B.P. claimed that sometime in the winter of 2001, he was at a party with the victim, and she was upset and intoxicated. B.P. testified that he asked the victim why she was upset, and she told him that the Petitioner "did not rape her." B.P.

claimed that the victim said that "she went along with the rape thing" because she was afraid of Mr. Norris. According to B.P., the victim told him that she and the Petitioner had gone out "riding around, smoking, drinking, and they had sex." B.P. claimed that the victim told him that Mr. Norris discovered that she had sex with the Petitioner, and when she got home, Mr. Norris pulled her out of the car and "beat the s—t out of [her]." B.P. testified that the victim told him that she said she was raped in order to get Mr. Norris to stop beating her. B.P. also testified that the victim did not tell him how Mr. Norris found out that she and the Petitioner had sex. B.P. admitted that he told no one about what the victim said to him until after he was incarcerated with the Petitioner. B.P. testified that he spoke with the Petitioner in the prison yard and that Mr. Norris was present during their conversation. B.P. claimed that he only talked to the Petitioner once[3] about what he knew and that the Petitioner asked him to have the prison's "legal clerk" type an affidavit for him to sign. B.P. testified that he wrote his statement himself and gave it to the clerk to type. However, B.P. later admitted that he only wrote out a brief outline of the facts, that the clerk "prettied [sic] them up," and that the affidavit actually contained the clerk's words and not his. B.P. also admitted that the affidavit stated that his alleged conversation with the victim occurred in 2009, that it stated that Mr. Norris only hit the victim in her face when he recalled the victim's saying that she Norris beat her "all over," and that it stated that the victim told him the Petitioner did not have a weapon when he actually did not recall the victim's making such a statement.

B.P. testified that he had prior convictions for possession of cocaine with intent to sell, "weapons charges," criminal impersonation, and violation of the terms of his probation. B.P. also testified that he was close to the victim and that she had always "confided" in him. However, B.P. later admitted that he had not spoken to the victim in years. B.P. further admitted that he knew very little about the details of the alleged rape because he did not live with the victim when it occurred, that he rarely spoke to her at that time, and that he did not attend the Petitioner's trial. B.P. also admitted that outside of two brief periods of time when he lived with his sister, he hardly ever spoke to her.

Mr. Norris testified that he did not hit the victim on the night she alleged the Petitioner had raped her and that he did not see any blood on her face. Mr. Norris instead claimed that the night before the victim had "fell in the floor" and had "busted her lips and bruised her face." Mr. Norris claimed that when the victim returned home, he "[ran] up on" her and pulled her out of the car by her dress. Mr. Norris testified that he did not know if he tore the victim's dress when he grabbed her but that it was possible. Mr. Norris claimed that the victim did not act like someone who had just been raped and that she did not start crying until after she told him the Petitioner had raped her. Mr. Norris also claimed that the victim did not want to call the police, but that "the neighbors" had crowded around while they were talking and one of them was "already on the phone" with the police.

[4] According to Mr. Norris, in 2009, he was at a party with the victim, and he described their relationship at the time as being "just friends." Mr. Norris claimed that the victim started crying and told him that she "had someone put in prison for something they didn't do." Mr. Norris testified that the victim told him that she "had always had [an] interest in" the Petitioner and that she had consensual sex with the Petitioner. Mr. Norris claimed that the victim told him that claiming the Petitioner raped her was "the first thing that [came] to her mind to say" when Mr. Norris "grabbed her and started wigging out on her." Mr. Norris also claimed that despite his relationship with the victim, that was the first time she had ever talked to him about the rape.

Mr. Norris testified that he told no one about the victim's alleged statements to him until after he had been incarcerated with the Petitioner. Mr. Norris admitted that the Petitioner's counsel had previously represented him in criminal court but that he did not say anything to counsel about the victim's alleged statements. Mr. Norris testified that he spoke to the Petitioner only once about the victim's alleged statements in the prison gym. Mr. Norris admitted that his affidavit contained factual inconsistencies with his testimony, such as incorrectly stating that he met with the Petitioner on the prison "ball field." Mr. Norris testified that he had no "ax to grind" with the victim. However, he admitted that in 2001, he was arrested and convicted of assault and aggravated burglary against the victim.

The coram nobis court, after reviewing the transcript of the Petitioner's trial, denied the petition. The coram nobis court concluded that the witnesses were not credible, noting that both men were convicted felons who did not come forward with this information until after they had been incarcerated with the Petitioner. The coram nobis court found the testimony of both witnesses to be inconsistent with the evidence at trial. The coram nobis court noted that the testimony at trial established that the victim told her friend about the alleged rape before she told Mr. Norris and that there was no evidence that Mr. Norris was present when she came home. The coram nobis court also noted the testimony at trial that the victim's injuries appeared to be very recent and that she had trauma to her anal region. The Petitioner now appeals the decision of the coram nobis court.

*ANALYSIS*

The Petitioner contends that the coram nobis court erred by denying his petition. The Petitioner argues that "the new evidence is trustworthy" given that several witnesses have alleged that the victim recanted her allegations against the Petitioner and that "had the jury heard [this new evidence], it might well have reached a different decision." The State responds that the Petitioner's claim should have been barred by the statute of limitations. The State further responds that the coram nobis court did not abuse its discretion in determining that the witnesses were not credible.

[5] A writ of error coram nobis is an extraordinary remedy available only under very narrow and limited circumstances. *State v. Mixon,* 983 S.W.2d 661, 666 (Tenn.1999). A writ of error coram nobis lies "for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." Tenn.Code Ann. § 40–26–105 (2006); *see State v. Hart,* 911 S.W.2d 371, 374 (Tenn.Crim.App.1995). The purpose of a writ of error coram nobis "is to bring to the court's attention a previously unknown fact that, had it been known, would have resulted in a different judgment." *Wilson v. State,* 367 S.W.3d 229, 234–35 (Tenn.2012). The decision to grant or deny the writ rests within the discretion of the trial court. *Teague v. State,* 772 S.W.2d 915, 921 (Tenn.Crim.App.1988). "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party." *Wilson,* 367 S.W.3d at 235.

**A petition for writ of error coram nobis must be filed within one year of the date the judgment of the trial court becomes final. See Tenn.Code Ann. §§ 27–7–103, 40–26–105; Mixon, 983 S.W.2d at 671. The one-year limitations period may be tolled only when required by**

*due process concerns. See Workman v. State, 41 S.W.3d 100, 103 (Tenn.2001). Courts must "balance the petitioner's interest in having a hearing with the interest of the State in preventing a claim that is stale and groundless" in determining whether due process tolls the statute of limitations. Wilson, 367 S.W.3d at 234. To do so, courts perform the following steps:*

*(1) determine when the limitations period would normally have begun to run;*

*(2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case a strict applications of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.*

Id. (quoting Sands v. State, 903 S.W.2d 297, 301 (Tenn.1995)).

Here, the limitations period would have begun upon the entry of the trial court's order denying the Petitioner's motion for new trial in 2002. B.P. and Mr. Norris both testified that they did not tell anyone about the victim's alleged statements until they spoke with the Petitioner in 2010. A strict application of the limitations period would "effectively deny [the] Petitioner a reasonable opportunity to present his claim." Wilson, 367 S.W.3d at 234. The State argues that the Petitioner's claim should be barred because he did not file his petition until a little over thirteen months after Mr. Norris spoke with him. However, our supreme court has previously held in a capital case that a petition filed thirteen months after the petitioner became aware of new evidence did not exceed the reasonable opportunity afforded by due process. Workman, 41 S.W.3d at 103; see also Sample v. State, 82 S.W.3d 267, 276 (Tenn.2002) (concluding that a petition filed sixteen months after the new evidence was discovered was not per se unreasonable). Accordingly, we conclude that the coram nobis court did not err by determining that due process principles tolled the statute of limitations in this case.

*6 Recanted testimony may qualify as newly discovered evidence and justify the granting of a writ of error coram nobis. Mixon, 983 S.W.2d at 672. However, newly discovered recanted testimony will only justify the granting of a writ of error coram nobis and a new trial if:

(1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after trial; and (3) the jury might have reached a different conclusion had the truth been told.

Id. at 673 n. 17. This court has previously held that this test applies when the newly discovered evidence is a material witness' statements that are inconsistent with her trial testimony. Eblen, 2003 WL 22225636, at *10 n. 3.

There is no evidence in the record that the trial court abused its discretion in determining that it was not reasonably well satisfied that the testimony given by the victim at trial was false and that the testimony of the witnesses was true. As both the trial and coram nobis courts found, the testimony of the other witnesses at trial, along with the medical and physical evidence, corroborated the victim's claims. The victim had injuries to her anal region consistent with a rape, the injuries to her face appeared to be recent and inconsistent with the description of the injuries she had sustained the night before, and the victim's dress appeared to have been cut with a knife. The testimony of B.P. and Mr. Norris was inconsistent with the testimony at trial regarding what occurred when the victim returned home. There was no evidence that Mr. Norris was present, and it was established at trial that the victim's friend flagged down a police officer, not that the police were called as Mr. Norris claimed. The testimony of both B.P. and Mr. Norris was inconsistent with statements made in their affidavits and with the other's testimony. Both men were inconsistent in their descriptions of where, when, and how they informed the Petitioner about the alleged newly discovered evidence. Furthermore, both men are convicted felons who told no one about the victim's alleged statements until after they had been incarcerated with the Petitioner. Accordingly, we conclude that the coram nobis court did not abuse its discretion in denying error coram nobis relief on the basis that the witnesses were not credible.

**CONCLUSION**

In consideration of the foregoing and the record as a whole, the judgment of the coram nobis court is affirmed.

**Footnotes**

1  It is the policy of this court to identify victims of rape by their initials. In order to protect the privacy of the victim we will refer to her brother by his initials as well.

2  These affidavits were not included in the appellate record. However, the State on cross-examination of both witnesses read extensive portions of the affidavits into the record.

3  B.P. admitted that he had separate conversations with Mr. Norris about the alleged conversation he had with the victim.

IN THE CRIMINAL COURT FOR DAVIDSON COUNTY, TENNESSEE
AT NASHVILLE
DIVISION I

Filed

NOV 3 0 2017

By: _____

FREDERICK BRAXTON )
Petitioner, )
 )
V. )
 )
STATE OF TENNESSEE, )
Respondent. )

CASE NO. 2007-A-732
(Error Coram Nobis)

## ORDER

This cause came to be heard on a petition for writ of error coram nobis. On October 15,

2008, the Petitioner was convicted by a jury of attempted second degree murder. The Petitioner

received a nineteen (19) year sentence to be served as a Range II offender. The Court denied the

Petitioner's motion for a new trial on August 4, 2009. Subsequently, the Tennessee Court of

Criminal Appeals affirmed the judgments of the Court. See State v. Braxton, 2011 WL 3809773

(Tenn. Crim. App. Aug. 26, 2011) perm. app. denied (Tenn. Jan. 10, 2012). No petition for post-

conviction relief was ever filed. The Petitioner, by and through counsel Gregory Smith, now

moves this Court to set aside his conviction and dismiss the case with prejudice on the basis that

the victim of the attempted murder, Mr. James Williams, has recanted his prior testimony

implicating the Petitioner and now states that neither individual who shot at him was the

Petitioner. The Petitioner submitted a sworn affidavit from Mr. Williams to that end.

After reviewing the allegations set forth in the instant petition, the Court does find that an

evidentiary hearing should be held for the Court to hear live testimony from the victim of the

case, Mr. James Williams, who allegedly has recanted his identification of the Petitioner.

Accordingly, the matter is set for hearing on January 5, 2018. Any written response by the State must be filed by the date of the hearing.

Entered this 30th day of November, 2017.

Steve R. Dozier, Judge
Criminal Court, Division I

cc:     Honorable Gregory Smith,
        Attorney for the Petitioner;
        Honorable J. Wesley King,
        Assistant District Attorney General.

IN THE CRIMINAL COURT FOR DAVIDSON COUNTY, TENNESSEE
DIVISION I

| | | |
|---|---|---|
| FREDERICK BRAXTON | ) | |
| Petitioner | ) | |
| | ) | |
| VS. | ) | NO: 2007-A-732 |
| | ) | |
| | ) | |
| STATE OF TENNESSEE | ) | |
| Respondent | ) | |

**MOTION TO DISMISS PETITION FOR WRIT OF ERROR CORAM NOBIS**

Comes the State of Tennessee, and moves the Court to dismiss the Petition of Writ of Error

Coram Nobis. In support thereof the State would show the following:

A writ of error coram nobis is an extraordinary remedy by which the court may provide

relief from a judgment under only narrow and limited circumstances. State v. Mixon, 983 S.W.2d

661, 666 (Tenn. 1999). Tennessee Code Annotated § 40-26-105 provides this remedy to criminal

defendants:

> Upon a showing by the defendant that the defendant was without fault in failing to present
> certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or
> newly discovered evidence relating to matters which were litigated at the trial if the judge
> determines that such evidence may have resulted in a different judgment, had it been
> presented at the trial. The issue shall be tried by the court without the intervention of a
> jury, and if the decision be in favor of the petitioner, the judgment complained of shall be
> set aside and the defendant shall be granted a new trial in that cause. Tenn. Code Ann.§
> 40-26-105(b), (c) (2012).

The statute of limitations for filing a petition for writ of error coram nobis is one year from the date the judgment becomes final in the trial court. See Tenn. Code Ann. § 27-7-103; Mixon, 983 S.W.2d at 667. A judgment becomes final, for purposes of coram nobis relief, thirty days after the entry of the judgment in the trial court if no post-trial motion is filed, or upon entry of an order disposing of a timely filed post-trial motion. Mixon, 983 S.W.2d at 670-71. The State bears the burden of raising the bar of the statute of limitations as an affirmative defense. Sands v. State, 903 S.W.2d 297, 299 (Tenn. 1995). However, due process considerations may toll the limitations period. Workman v. State, 41 S.W.3d 100, 103 (Tenn. 2001). To determine whether due process tolling applies, courts should examine: (1) when the limitations period would normally have begun to run; (2) whether the grounds for relief arose after the limitations period normally would have commenced; and (3) if the grounds are later-arising, would a strict application of the limitations period deny the petitioner a reasonable opportunity to present the claim. Sands, 903 S.W.2d at 301.

The petitioner in this case was convicted on October 15, 2008. His Motion for New Trial was denied on August 4, 2009. Therefore, the judgment became final in the trial court on or about September 5, 2009. The instant Petition for Writ of Error Coram Nobis was filed on November 13, 2017, over eight (8) years following the expiration of the statute of limitations.

The Petitioner requests the Court grant his Petition and dismiss the case based upon the argument that there is now recanted testimony. As a preliminary matter, the State submits the only possible remedy available to Petitioner should the Court grant his Petition is the granting of a new trial. A new trial should not be granted on the basis of "newly discovered recanted testimony" unless:

(1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true;

(2) the petitioner was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and

(3) the jury might have reached a different conclusion had the truth been told.

*Mixon, 983 S.W.2d at 673* n.17.

The State submits the proposed testimony of Mr. Williams lacks sufficient indicia of trustworthiness necessary for consideration by the Court. The State further submits that the Petitioner was not "reasonably diligent in discovering" what he contends to be new evidence and/or false testimony, as these allegations are surfacing over nine (9) years after Mr. Williams testified under oath in front of a jury.

The State would therefore submit that the Petition for Writ of Error Coram Nobis should be dismissed without further hearing. Should the Court allow the matter to proceed to hearing, the State denies the factual allegations contained in the petition and demands strict proof thereof.

Respectfully submitted,

Wesley King
Tenn.Sup.Ct.Reg.#24137
Deputy District Attorney General
Washington Square, Suite 500
222 Second Avenue North
Nashville, TN 37201-1649
(615) 862-5500

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been forwarded to Gregory

Smith, Counsel for Frederick Braxton, via facsimile to (931) 647-2850 and e-mail, on this the 4th

day of January, 2018.

IN THE CRIMINAL COURT OF DAVIDSON COUNTY, TENNESSEE, DIVISION I
MINUTES, JANUARY 8, 2018

STATE OF TENNESSEE

VS.                          CASE NO. 2007-A-732

FREDERICK EDWARD BRAXTON

2007-A-732
PETITION FOR
WRIT OF ERROR
CORAM NOBIS
TAKEN UNDER
ADVISEMENT

CAME THE ATTORNEY GENERAL WHO PROSECUTES FOR THE STATE AND THE
DEFENDANT IN PERSON, BEING REPRESENTED BY COUNSEL.

THEREUPON, THIS CAUSE CAME ON TO BE HEARD BY THE COURT UPON A PETITION
FOR WRIT OF ERROR CORAM NOBIS; AFTER A HEARING, DUE CONSIDERATION
AND ALL THE EVIDENCE INTRODUCED, SAID MOTION IS TAKEN UNDER
ADVISEMENT WITH AN ORDER TO BE ENTERED.

GREGORY SMITH , ATTORNEY FOR DEFENDANT

J. WESLEY KING , ASSISTANT DISTRICT ATTORNEY

ORDERED THAT COURT STAND ADJOURNED UNTIL IN THE MORNING AT NINE
O'CLOCK.

STEVE DOZIER , JUDGE

IN THE CRIMINAL COURT FOR DAVIDSON COUNTY, TENNESSEE
AT NASHVILLE
DIVISION I

Filed

FEB 0 6 2018

By: _____

FREDERICK BRAXTON )
Petitioner, )
)
V. )
) CASE NO. 2007-A-732
) (Error Coram Nobis)
STATE OF TENNESSEE, )
Respondent )

**ORDER**

This cause came before the Court on January 5, 2018, for a hearing on the Petitioner's

petition for writ of error coram nobis. On October 15, 2008, the Petitioner was convicted by a

jury of attempted second degree murder. The Petitioner received a nineteen (19) year sentence to

be served as a Range II offender. The Court denied the Petitioner's motion for a new trial on

August 4, 2009. Subsequently, the Tennessee Court of Criminal Appeals affirmed the judgments

of the Court. See State v. Braxton, 2011 WL 3809773 (Tenn. Crim. App. Aug. 26, 2011) perm.

app. denied (Tenn. Jan. 10, 2012). No petition for post-conviction relief was ever filed. On

November 13, 2017, the Petitioner, by and through counsel Gregory Smith, filed the instant

petition. The Petitioner requests the Court set aside his conviction and dismiss the case with

prejudice on the basis that the victim of the attempted murder, Mr. James Williams, has recanted

his prior testimony implicating the Petitioner. The Court conducted the instant evidentiary

hearing on January 5, 2018. At the conclusion of the hearing, the Court took the matter under

advisement, and now issues this Order regarding the requested relief.

### *Testimony*

At the instant hearing, the Court first heard testimony from Mr. James Williams, the victim in the instant case. Mr. Williams testified as to the following: He contacted the family of the Petitioner around the beginning of October, 2017, and subsequently met with the Petitioner's attorney, Mr. Gregory Smith. He testified in the trial in this case that the Petitioner was the man who shot at him. However, he now recants that testimony, and states that the Petitioner was neither present nor involved in the shooting. He deliberately lied and said the Petitioner was one of the shooters because he was upset with the Petitioner and wanted the Petitioner to get in trouble. In 2010, he was convicted of a crime that he believed he should not have been convicted for, and started feeling bad about what he did to the Petitioner. He met with Mr. Smith about his recantation. At his request, Mr. Smith provided him with copies of statutes related to aggravated perjury and the statute of limitations for that offense. He believed the statute of limitations for aggravated perjury had expired. Mr. Smith was clear when he provided the statutes that he was not advising him about whether the statute of limitations actually had expired. He has not hired an attorney to represent him, and declined to continue the hearing to have the opportunity to consult with an attorney. He wished to testify about his false testimony at trial because he has experienced bad karma since the original trial in this case. Before making contact with the family in October of 2017, he had not told anyone he had lied about his testimony.

On cross-examination by Assistant District Attorney Wesley King on behalf of the State, Mr. Williams testified as to the following: His conviction in 2010 was out of Davidson County Criminal Court, Division V, before Judge Monte Watkins. He served four years of that sentence in the custody of the Tennessee Department of Correction before his release. He never encountered the Petitioner while incarcerated. He did encounter Mr. Leonard Harris, the co-

2

defendant in this case, once when they were both at the courthouse for court dates while he himself was incarcerated. This incident has been "eating [him] up" since the day the Petitioner was convicted. Later in the hearing, he stated he realized what he did was wrong after his conviction in 2010. He was arrested in that case after selling drugs to a confidential informant. He was upset because he felt like someone "snitched" on him in that case. That arrest led him to realize that he should not have testified falsely against the Petitioner. He has known the Petitioner since the 1990s. He and the Petitioner began to have conflict with each other in 2005. The Petitioner was angry with him because the Petitioner thought that he shot the Petitioner's brother. He did not shoot the Petitioner's brother, but the Petitioner thought he did. In the instant case, he was shot multiple times and suffered extensive injuries. The shooting took place on Dickerson Pike at approximately 5:00 P.M. It was still daylight when the incident occurred, and he got a good look at the two men who shot at him. He was driving down the street when the vehicle the shooters were in pulled up beside him from behind him and the two shooters opened fire. He was struck by six shots, and there were nineteen shots into the car. Mr. Harris was one of the shooters, but the other shooter was not the Petitioner. He knew who the other shooter was, but was "not at liberty" to say who he was. He had previously shot the other shooter. Since this incident, he has made peace with that individual, so he does not wish to implicate him in the shooting at this time. Before he made contact with the Petitioner's family about recanting, a cookout had taken place. He was not at the cookout because he was in prison at the time. His uncle was at the cookout, as were several members of the Petitioner's family. Someone at the cookout gave his uncle the phone number of one of the Petitioner's brothers (not the one the Petitioner believed he had shot) and indicated that the Petitioner's family wanted to talk to Mr. Williams. He knew that brother as "Lil' Roe." His uncle gave him that message to him after he

3

was released from prison. He had not told anyone that he had testified falsely against the Petitioner, but everyone in his community knew that he did. He thought his uncle gave him the message so that he could make peace with the Petitioner and the Petitioner's family. Based on his uncle giving him "Lil' Roe's" phone number, he called "Lil' Roe," and that ultimately led to him meeting with the Petitioner's attorney and recanting. He has wanted to recant since he was convicted in 2010, but did not do so until recently because of pride and where he was in his life. After he was shot, he was transported to Vanderbilt University Medical Center, and that was where he first spoke with the police. At first, he did not want to identify the shooters, because he wanted to take revenge himself. He told his mother that was why he would not identify the shooters. His mother urged him to not take matters into his own hands. After that conversation, he told the police Mr. Harris and the Petitioner were the men who shot him. The Petitioner bound over his case without a preliminary hearing. However, a preliminary hearing was conducted in Mr. Harris's case, and he testified under oath in that hearing. Everything he testified to in that hearing was true except for his identification of the Petitioner as one of the shooters. He identified the Petitioner as a shooter because he was upset with the Petitioner. He was upset with the Petitioner because he believed the Petitioner was responsible for his sister and her children being shot at when they were driving on the interstate. This case remained pending for two years before it went to trial. He remained in contact with General King and Ms. Cathy Harrison, the victim witness coordinator in the case, while the trial was pending. Mr. Harris tried to contact him while the case was pending and threatened him, but he still wanted to go to trial. He did not want to let Mr. Harris bully him into not testifying. He met with the prosecutors handling the case of his own volition, and he was never coerced or bullied into testifying. The only thing the prosecutors ever asked him to do was tell the truth. He had a prior criminal history at the time of

the trial, and he was open and honest about that. He testified at trial while under oath that the Petitioner was one of the individuals who shot him. He also never gave any indication that the Petitioner was not the shooter in the sentencing hearing, and asked for the Petitioner to receive the maximum sentence the Court could give him. He never testified on the Petitioner's behalf before a parole board or anything like that. When he met with the Petitioner's attorney in relation to the instant proceeding, he was initially concerned about the possibility he could be charged with perjury. After he saw the statutes Mr. Smith provided to him, he believed he was beyond the statute of limitations. He has an extensive criminal history. In addition to his conviction in 2010 in Division V, he has prior convictions for one aggravated burglary, two aggravated assaults, felony tampering with evidence, alteration of a serial number, unlawful possession of a weapon, and a number of lesser offenses. He received a call shortly before the instant hearing from another of the Petitioner's brothers, who he knows as "Big Roe," who wanted to make sure he was coming.

On re-direct examination, he testified to the following: He has not received any payment or inducement from the Petitioner or the Petitioner's family to testify. He lied when he identified the Petitioner in this case originally, but is telling the truth at this time.

### *Analysis*

The statute that governs the writ of error coram nobis in Tennessee provides as follows:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it not been presented at the trial.

Tenn. Code Ann. § 40-26-105 (2010). The statute further provides that "[t]he relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or

could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding." Tenn. Code Ann. § 40-26-105 (2010). Tennessee courts have consistently recognized that the writ of error coram nobis "is an extraordinary procedural remedy... [that] fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (1999).

While recanted testimony can qualify as "newly discovered evidence" that can form the basis of coram nobis relief, the trial court is only to grant relief on the basis of recanted testimony where:

> (1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

State v. Vasques, 221 S.W.3d 514, 525 (Tenn. 2007) (quoting State v. Mixon, 983 S.W.2d 661, 673 n.17 (Tenn. 1999)).

Turning to the matter at hand, while Mr. Williams' testimony would clearly satisfy the second and third elements of the test set forth in Vasques, the Court finds that it is not "reasonably well satisfied" by the truthfulness of Mr. Williams' recantation, as the Court is of the opinion that Mr. Williams' recantation is not credible.

First, the Court notes that Mr. Williams only came forward with his purported recantation after being contacted by the Petitioner's family. Additionally, the Court is concerned by Mr. Williams' narrative about when he realized he was wrong to have testified falsely against the

Additionally, the Court also finds Mr. Williams' criminal record of crimes of dishonesty, weighs against his credibility.

Finally, and most critical to the Court's finding on Mr. Williams' credibility, is the fact that Mr. Williams refused to provide the name of the individual who actually shot him. The Court finds that Mr. Williams' explanation of why he could not identify the purported actual shooter—that he had made his peace with the purported actual shooter after Mr. Williams had shot the other individual, and the other individual shot Mr. Williams in this case—is simply not believable. Mr. Williams testified in several instances about his belief and desire, at least around the time of the shooting in this case, in retaliating on his own rather than involving law enforcement. He even admitted that he did not disclose the names of the shooters to the police at first because he planned to exact vengeance on his own. In light of this, the Court simply cannot accept that Mr. Williams went from planning to shoot the purported actual shooter to deciding to ignore that individual's actions and instead implicate the Petitioner in a situation in which the Petitioner was not even involved.

Accordingly, in light of the foregoing analysis, the Court is unable to find that it is "reasonably well satisfied" by the truthfulness of Mr. Williams recantation. Thus, the Court must hold that the Petitioner is not entitled to relief on his petition for a writ of error coram nobis, and the Petitioner's request is hereby denied.

Entered this _____ day of February, 2018.

_____
Steve R. Dozier, Judge
Criminal Court, Division I

cc:    Honorable Gregory Smith,
       Attorney for the Petitioner;
       Honorable J. Wesley King,
       Assistant District Attorney General.

Petitioner. At one point in the hearing, Mr. Williams testified that he was "eaten up" by his false testimony as soon as the Petitioner was convicted. Yet, he also admitted that at the sentencing hearing, he still asked the Court to impose the maximum sentence it could upon the Petitioner. However, at another point in the hearing, Mr. Williams testified that he only truly realized his false testimony had been wrong when he himself was convicted in 2010. While the Court is concerned by these inconsistencies, the Court is even more concerned by the fact that it took the passage of at least seven additional years and the Petitioner's family contacting Mr. Williams before he came forward and recanted. Not only did Mr. Williams not formally recant until after the Petitioner's family had reached out, but he had never even admitted to anyone that he lied in the instant case. The Court also notes with suspicion that Mr. Williams appeared concerned about the statute of limitations for aggravated perjury, and made sure to check the limitations period himself before he agreed to testify.

In addition to these concerns about the timing of Mr. Williams' recantation, the Court also notes that there is nothing surrounding the trial of the case that indicates Mr. Williams testified falsely at the time. Mr. Williams admitted that he was not pressured by the State to testify against the Petitioner and that the Petitioner had never threatened him (which could have steeled his resolve to testify against the Petitioner, as had occurred with the co-defendant, Mr. Harris). Further, Mr. Williams' testimony was corroborated by the testimony of another eyewitness as to the majority of the facts of the case except the identity of the shooters. While the Court recognizes that the fact Mr. Williams is the only witness who identified the Petitioner as one of the shooters is a key piece of the Petitioner's request, the Court is of the opinion that the fact that Mr. Williams' trial testimony was truthful in all other aspects weighs against his position now that he lied about the identity of the Petitioner.

Additionally, the Court also finds Mr. Williams' criminal record of crimes of dishonesty, weighs against his credibility.

Finally, and most critical to the Court's finding on Mr. Williams' credibility, is the fact that Mr. Williams refused to provide the name of the individual who actually shot him. The Court finds that Mr. Williams' explanation of why he could not identify the purported actual shooter—that he had made his peace with the purported actual shooter after Mr. Williams had shot the other individual, and the other individual shot Mr. Williams in this case—is simply not believable. Mr. Williams testified in several instances about his belief and desire, at least around the time of the shooting in this case, in retaliating on his own rather than involving law enforcement. He even admitted that he did not disclose the names of the shooters to the police at first because he planned to exact vengeance on his own. In light of this, the Court simply cannot accept that Mr. Williams went from planning to shoot the purported actual shooter to deciding to ignore that individual's actions and instead implicate the Petitioner in a situation in which the Petitioner was not even involved.

Accordingly, in light of the foregoing analysis, the Court is unable to find that it is "reasonably well satisfied" by the truthfulness of Mr. Williams recantation. Thus, the Court must hold that the Petitioner is not entitled to relief on his petition for a writ of error coram nobis, and the Petitioner's request is hereby denied.

Entered this 6th day of February, 2018.

Steve R. Dozier, Judge
Criminal Court, Division I

cc:     Honorable Gregory Smith,
        Attorney for the Petitioner;
        Honorable J. Wesley King,
        Assistant District Attorney General.

## NOTICE OF APPEAL

FILED

MAR 09 2018

Clerk of the Appellate Court
Rec'd By 2:15 pm

Cert mail
3·17·18

**Style**

Frederick E. Braxton

v. State of Tennessee

**Notice**

Notice is given that **Frederick E. Braxton**

[List name(s) of all appealing party(ies) on separate sheet if necessary]

appeals the final judgment(s) of the **Criminal** _____ Court of **Davidson**

[List the circuit, criminal, chancery or juvenile court]    [List the County]

County filed on **02/06/2018** to the **Court of Criminal Appeals**.

[List the date(s) the final judgment(s) was filed in the trial court clerk's office]

[Name the Court of Appeals (civil), Court of Criminal Appeals (criminal), or Supreme Court (Workers' Compensation)]

**Additional Information**

Type of Case [Check the most appropriate item]

| | | | |
|---|---|---|---|
| ☐ | Civil | ☐ | Habeas Corpus |
| ☐ | Criminal | ☐ | Juvenile |
| ☐ | Post Conviction | ☐ | Dependent and Neglect |
| ☐ | Workers's Compensation | ☑ | Other (Specifiy: Petition for Writ of Coram Nobis) |
| ☐ | Death Penalty | | |
| ☐ | Parental Termination | | |

**Trial Court Number**    2007-A-732

**Trial Court Judge**    Steve R. Dozier

Civil Appeal Cost Bond [Check the most appropriate item]

☐ Filed in trial court with copy attached
☐ Indigent with copy of indigency order or affidavit attached
☐ Cash bond filed in trial court with copy attached

**Criminal Appeal Appearance Bond** [Check the most appropriate item]

- [ ] Order appointing counsel with copy attached
- [ ] Appearance bond with copy attached
- [✓] Incarcerated pending appeal

**TDOC Number [Appellant is an inmate]**  332561

## List of Parties

**Appellant:** Frederick E. Braxton          At trial: ⦿ Plaintiff ◯ Defendant

**Party's Address:** Whiteville Correctional Facility, 1440 Union Springs Road, P.O. Box 679, Whiteville, TN 38075

**Party's Telephone:** (731) 254-9400

**Attorney's Name:** Gregory D. Smith          **BPR#:** 013420

**Attorney's Address:** 331 Franklin Street, Suite 1, Clarksville, TN 37040          **Phone:** (931) 847-1299

*\* Attach an additional sheet for each additional Appellant \**

### Appellee(s)

**Appellee:** State of Tennessee          At trial: ◯ Plaintiff ⦿ Defendant

**Appellee's Address:** Davidson County D.A., 222 Second Avenue, North, Suite 500, Nashville, TN 37201-1649

**Attorney's Name:** Glenn R. Funk          **BPR#:** 011492

**Attorney's Address:** Davidson County D.A., 222 Second Avenue, North, Suite 500, Nashville, TN 37201-1649          **Phone:** (615) 862-5500

*\* Attach an additional sheet for each additional Appellee \**

## CERTIFICATE OF SERVICE

I, Gregory D. Smith          , certify that I have forwarded a true and exact copy of

this Notice of Appeal by First Class, United States Mail, postage prepaid, to all parties and/or

their attorneys in this case in accordance with Rule 20 of the Tennessee Rules of Appellate

Procedure on this the 7th day of MARCH, 2018

[Signature of appellant or attorney
for appellant]

[Revised: 5-22-09]

IN THE CRIMINAL COURT FOR DAVIDSON COUNTY, TENNESSEE

FREDERICK E. BRAXTON

VS.                                                                    NO. 2007-A-732

STATE OF TENNESSEE

CERTIFICATE OF APPELLATE RECORD

Criminal Court Clerk of Davidson County, Tennessee, do hereby certify that the following

items herewith transmitted to the Court of Appeals are originals or true and correct copies of all of

the designated papers on file in my office in the captioned case.

1. Technical record attached to this record and consisting of (100) pages contained

   in (1) volume(s).

2. (1) volume(s) of transcript authenticated by the Trial Judge or automatically

   authenticated under T.R.A.P. Rule 24(f).

3. Exhibits filed in my office and authenticated by the Trial Judge or as provided

   by T.R.A.P. Rule 24(f) and described as follows:

   **Petition for Writ of Error Coram Nobis (1-5-18)**

   Exhibit 1: Copy of Petition for Writ of Error Coram Nobis

This /4th day of May , 2018.

_____
CRIMINAL COURT CLERK
DAVIDSON COUNTY, TENNESSEE